UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | CR. NO. 1:22-CR- 426 |
| | : | |
| v. | : | |
| | : | (Judge   WILSON   ) |
| **SCOTT E. BOONE**, | : | |
| **DANIEL E. MCGUIRE,** | : | |
| **THOMAS E. LAUER,** | : | |
| **REBECCA J. DAVIS,** | : | |
| | : | |
| Defendants. | : | |

# I N D I C T M E N T

THE GRAND JURY CHARGES:

At times material to this Indictment:

## COUNT 1
### 18 U.S.C. § 371
(Conspiracy to Commit Major Fraud Against the United States)

## BACKGROUND

1. Defendant, SCOTT E. BOONE, was a resident of Cumberland County, Pennsylvania, in the Middle District of Pennsylvania.

2. Defendant, DANIEL E. MCGUIRE, was a resident of Landisville, Pennsylvania.

3. Defendant, THOMAS E. LAUER, was a resident of Butler, Pennsylvania.

4. Defendant, REBECCA J. DAVIS, was a resident of Bethel Park, Pennsylvania.

5. GOVERNMENT OFFICIAL 1 worked at Letterkenny Army Depot, near Chambersburg, PA, in the Middle District of Pennsylvania, from on or about April 1978 until on or about May 2018.

6. Letterkenny Army Depot ("Letterkenny") was a U.S. Army facility under the command structure of the U.S. Army Aviation and Missile Command. It was founded in or around 1942. Following the terrorist attacks of September 11, 2001, Letterkenny played a significant role in the maintenance and modification of ground mobility vehicles and missile systems used in U.S. war efforts.

7. From about 1996 until about 2018, GOVERNMENT OFFICIAL 1 was the Chief of the Engineering and Planning Division in the Directorate of Public Works at Letterkenny. In this role, he was responsible for overseeing and managing the real property maintenance and construction work at Letterkenny. During this time period, a large

2

portion of this work was performed through contracts awarded to private companies, and GOVERNMENT OFFICIAL 1 was also responsible for managing these contracts.

8. SCOTT E. BOONE, DANIEL E. MCGUIRE, and THOMAS E. LAUER were business partners in the field of construction.

9. REBECCA J. DAVIS, a.k.a., Rebecca Elstner and Rebecca Numer, was the president of a construction company, Elstner Construction Company, Inc., with an address also in Bethel Park, Pennsylvania. REBECCA J. DAVIS, then Rebecca Elstner, founded Elstner Construction in or around 2000.

10. REBECCA J. DAVIS and her company, Elstner Construction, were participants in the U.S. Small Business Administration's 8(a) Business Development Program ("8(a) Program"). Elstner Construction was also a certified Women-Owned Small Business.

11. The 8(a) Program was designed to help socially and economically disadvantaged entrepreneurs gain access to and succeed in the marketplace for federal government contracts. One of the primary means through which it achieved this goal was by creating

reserved federal contracting opportunities for its participants, like the real property maintenance and construction contracts for which GOVERNMENT OFFICIAL 1 had management responsibility. These were known as "small business set-aside" contracts.

12.  An 8(a) Program participant was eligible to participate in the Program for a period of nine years from the date of SBA's approval letter certifying its admission to the program. The participant had to maintain its eligibility during its tenure in the Program and had to inform the SBA of any changes that would adversely affect its Program eligibility. A firm that completed its nine-year term of participation in the 8(a) Program was deemed to have graduated from the program.

13. Elstner Construction was certified as a participant in the 8(a) Program, with a nine-year program term that began on or about October 12, 2001.

14. Under 8(a) Program rules, in order to be awarded a small business set-aside contract or an 8(a) contract for general construction work, an 8(a) Program participant had to agree to perform at least 15% of the cost of the contract with its own employees.

15. In order to enter and remain in the 8(a) Program, a company had to be a small business that was unconditionally owned and controlled by one or more socially and economically disadvantaged individuals who were of good character and citizens of and residing in the United States.

16. Elstner Construction, through REBECCA J. DAVIS, submitted annual updates to the SBA. These updates included a certification that the company met certain requirements of the 8(a) Program, including the requirement for unconditional control.

17. Many of the construction contracts awarded by Letterkenny from the late 1990s until the time of GOVERNMENT OFFICIAL 1's retirement in 2018 were through the 8(a) Program. As a result, the only companies eligible to bid on and win these construction contracts were those that had qualified for entry into the 8(a) Program and continued to meet the eligibility requirements.

18. SCOTT E. BOONE, DANIEL E. MCGUIRE, and THOMAS E. LAUER were not eligible for entry into the 8(a) Program and,

consequently, could not bid on and enter 8(a) Program set-aside contracts on their own.

19. Letterkenny's contracting office generally issued construction contracts through a vehicle known as a job order contract ("JOC"). Sometimes these contracts were also referred to, alternatively, as indefinite delivery, indefinite quantity ("IDIQ") contracts or task order contracts.

20. With a JOC, a contract for a specified dollar amount was awarded to a prime contractor, and individual jobs or tasks could then be performed until the entire contract value was used up. A JOC could be either for one year with the possibility of renewal or for a period of several years.

21. GOVERNMENT OFFICIAL 1's office, the Directorate of Public Works ("DPW"), asked the Letterkenny contracting office to authorize JOCs for construction work. Hence, DPW was the "requiring activity" for the contract. These requests were generally made when GOVERNMENT OFFICIAL 1 indicated that another JOC was needed. GOVERNMENT OFFICIAL 1 also developed the scope of work for these

JOCs. When DPW, through GOVERNMENT OFFICIAL 1, requested that another JOC be issued, the contracting office generally followed these recommendations.

22. GOVERNMENT OFFICIAL 1 also provided the contracting office names of 8(a) Program participants that he believed the contracting office should consider for these contracts. After being recommended to the contracting office, these companies were then invited to submit technical proposals, which included a description of the company, its abilities, its past work experience, and key personnel summaries, which were like résumés.

23. A company interested in a contract also submitted a cost proposal in the form of a coefficient. With a JOC, a coefficient was generally supposed to account for a contractor's overhead and profits. It represented the markup or multiplier over specified direct cost items that a company proposed to charge for its services. The lower a company's coefficient, the cheaper the company's services were to the entity issuing the contract, in this case Letterkenny Army Depot.

24. Companies placing bids provided their coefficients directly to the contracting office, and these coefficients were generally not included in the information given to GOVERNMENT OFFICIAL 1.

25. GOVERNMENT OFFICIAL 1 was also the assigned contracting officer's representative or "COR" on the construction contracts that were initiated by DPW and issued to 8(a) Program participants. GOVERNMENT OFFICIAL 1's training as a COR instructed him to be "the eyes and ears" of the contracting officers at Letterkenny Army Depot.

26. Until in or around 2008, the construction contracts managed by GOVERNMENT OFFICIAL 1 were non-competitive, direct-award contracts. In other words, Letterkenny Army Depot could select prime contractors for these contracts without a competitive bidding process.

27. When making direct, non-competitive awards for construction contracts, the Letterkenny contracting office relied on GOVERNMENT OFFICIAL 1's recommendations. GOVERNMENT OFFICIAL 1, therefore, had significant input into when the Letterkenny contracting

8

office issued new construction contracts and the parties to whom those contracts were awarded.

28. GOVERNMENT OFFICIAL 1 also had significant input into the dollar amounts associated with the contracts that he managed. Until in or around 2008, the dollar limit on construction JOCs issued by Letterkenny was about $3.5 million. On several occasions between 2007 and 2009, the dollar limit on these contracts was increased following GOVERNMENT OFFICIAL 1's recommendations to the Letterkenny contracting office.

29. SCOTT E. BOONE, DANIEL E. MCGUIRE, and THOMAS E. LAUER became affiliated with several 8(a) Program participants that received 8(a) Program set-aside contracts at Letterkenny with the recommendation of GOVERNMENT OFFICIAL 1, prior to when they formed a relationship with REBECCA J. DAVIS. From about 2003 until about 2009, the cumulative value of the contracts awarded to these companies was over $40 million. Through these contracts, SCOTT E. BOONE, DANIEL E. MCGUIRE, and THOMAS E. LAUER developed a close working relationship with GOVERNMENT OFFICIAL 1.

9

30. From about 2007 until about 2014, REBECCA J. DAVIS was affiliated with SCOTT E. BOONE, DANIEL E. MCGUIRE, and THOMAS E. LAUER. REBECCA J. DAVIS's company, Elstner Construction, was awarded construction contracts at Letterkenny Army Depot in 2007, 2008, and 2009. The collective value of its construction contracts was over $70 million, including several non-competitive, direct award JOCs and also a competitive JOC awarded in 2009 that was worth about $60 million. In addition, Elstner Construction received a Letterkenny contract for painting and associated services worth approximately $15 million, also in 2009.

31. In or around 2006, SCOTT E. BOONE founded a company known as Bon Secour Management, LLC. Boone was president of Bon Secour Management, and the company was headquartered at his home in the Middle District of Pennsylvania.

32. SCOTT E. BOONE, DANIEL E. MCGUIRE, and THOMAS E. LAUER certified Bon Secour Management as a Service-Disabled Veteran Owned Small Business ("SDVOSB") on or about October 2011. This certification was made based on the representation that SCOTT E.

BOONE, president of Bon Secour Management, was a service-disabled veteran. As the president of Bon Secour Management, SCOTT E. BOONE had to exercise ownership and control over his company.

33. SDVOSBs were eligible to participate in the SBA's SDVOSB Program. The SDVOSB Program was similar to the 8(a) Program in that qualified entrants were eligible for certain reserved contracting opportunities, such as set-aside contracts. Its purpose was to help veteran-owned businesses in various ways.

34. Like the requirement for 8(a) Program participants, when awarded a prime contract or subcontract through the SDVOSB program, at least 15% of the labor costs associated with that contract had to be spent on the SDVOSB's own employees.

35. DANIEL E. MCGUIRE sought out SDVOSB contracting opportunities for Bon Secour Management and handled paperwork for Bon Secour Management, such as proposals and invoices. When promoting Bon Secour Management, DANIEL E. MCGUIRE encouraged others to contact GOVERNMENT OFFICIAL 1 for a review of the company's past performance.

11

36. THOMAS E. LAUER was the point of contact for Bon Secour Management in the U.S. Government's System for Award Management, a registry for companies doing business with the federal government, for several years following Bon Secour Management's certification as an SDVOSB. THOMAS E. LAUER also sought out and secured SDVOSB contracting opportunities for Bon Secour Management.

37. Bon Secour Management received several small-business set-aside contracts starting on or about November 2011, including a contract for work on the Letterkenny railroad system, which was signed on or about January 2013 and continued until on or about mid-2018. GOVERNMENT OFFICIAL 1 was the COR for this contract as well.

## THE 8(A) PROGRAM CONSPIRACY AND ITS OBJECTS

38. Paragraphs 1 through 37 are incorporated here.

39. From on or about 2003 until on or about 2014, in Franklin County, within the Middle District of Pennsylvania, and elsewhere, the defendants,

SCOTT E. BOONE,
DANIEL E. MCGUIRE,
THOMAS E. LAUER, and
REBECCA J. DAVIS,

12

did knowingly conspire, confederate, and agree, together and with other persons both known and unknown to the Grand Jury, to commit offenses against the United States and to defraud the United States, that is:

To knowingly and willfully execute a scheme and artifice with the intent to defraud the United States and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, in any procurement of property and services as a prime contractor with the United States and as a subcontractor and supplier on a contract in which there was a prime contract with the United States, and the value of such contract and subcontract, and any constituent part thereof, was $1,000,000 or more, in violation of Title 18, United States Code, Section 1031.

<u>MANNER AND MEANS OF THE CONSPIRACY</u>

40. SCOTT E. BOONE, DANIEL E. MCGUIRE, and THOMAS E. LAUER formed relationships with 8(a) Program participants, including REBECCA J. DAVIS and her company, Elstner Construction.

41. GOVERNMENT OFFICIAL 1 was introduced to REBECCA J.

13

DAVIS at a meeting that took place at Letterkenny in or around 2007. Around the time of this meeting, REBECCA J. DAVIS became aware of SCOTT E. BOONE, DANIEL E. MCGUIRE, and THOMAS E. LAUER's longstanding relationship with GOVERNMENT OFFICIAL 1 and their history of relationships with other 8(a) Program participants. Around the time of this meeting, REBECCA J. DAVIS's company, Elstner Construction, began receiving 8(a) Program set-aside contracts at Letterkenny.

42. From about 2007 until about 2009, SCOTT E. BOONE, DANIEL E. MCGUIRE, and THOMAS E. LAUER prepared and submitted proposals for 8(a) Program set-aside construction contracts at Letterkenny under the name of Elstner Construction.

43. GOVERNMENT OFFICIAL 1 was responsible for evaluating the technical components of the offers for construction contracts submitted under Elstner Construction's name. GOVERNMENT OFFICIAL 1 knew that Elstner Construction was affiliated with SCOTT E. BOONE, DANIEL E. MCGUIRE, and THOMAS E. LAUER. GOVERNMENT OFFICIAL 1 also became familiar with the style of

14

proposal written by DANIEL E. MCGUIRE, which he recognized and knew to be associated with SCOTT E. BOONE, DANIEL E. MCGUIRE, and THOMAS E. LAUER based on the other 8(a) Program participants they were affiliated with.

44. GOVERNMENT OFFICIAL 1 recommended Elstner Construction for selection by the Letterkenny contracting office on the basis of the company's affiliation with SCOTT E. BOONE, DANIEL E. MCGUIRE, and THOMAS E. LAUER.

45. Following GOVERNMENT OFFICIAL 1's recommendations, Elstner Construction was selected for a series of construction contracts managed by GOVERNMENT OFFICIAL 1, including three non-competitive, direct award contracts—each of which was worth approximately $3 million to $3.5 million—in 2007, 2008, and 2009.

46. Following their initial meeting in or around 2007, neither REBECCA J. DAVIS nor her company, Elstner Construction, had any meaningful presence at Letterkenny. REBECCA J. DAVIS and her existing employees played no meaningful role in the execution or oversight of contracts that Elstner Construction was awarded at

Letterkenny. Furthermore, no construction equipment bearing the name of Elstner Construction was present at Letterkenny.

47. SCOTT E. BOONE, DANIEL E. MCGUIRE, and THOMAS E. LAUER ran all of Elstner Construction's contracts on a day-to-day basis, including preparing individual job proposals for Elstner Construction, supervising subcontractors, and handling paperwork.

48. REBECCA J. DAVIS had no meaningful input in the amounts paid to vendors, suppliers, and subcontractors. Instead, a bookkeeper working for SCOTT E. BOONE and DANIEL E. MCGUIRE wrote out Elstner checks to these companies when directed to do so by SCOTT E. BOONE and DANIEL E. MCGUIRE. The bookkeeper then sent these already filled-out checks to REBECCA J. DAVIS, along with invoice copies and prefilled envelopes, so that REBECCA J. DAVIS could sign and mail payments to these companies.

49. GOVERNMENT OFFICIAL 1 held several hundred site visits on jobs associated with contracts awarded to Elstner Construction. SCOTT E. BOONE was a regular attendee at these meetings, as were a couple of his site superintendents. SCOTT E. BOONE and his

employees regularly signed into these meetings as employees of Elstner Construction. REBECCA J. DAVIS did not attend these site visits. GOVERNMENT OFFICIAL 1 then prepared a memorandum of the site visit, adopting the representations made by SCOTT E. BOONE and his employees. This memorandum became part of the relevant contract file.

50. For several years starting around 2007, SCOTT E. BOONE, DANIEL E. MCGUIRE, and THOMAS E. LAUER were simultaneously affiliated with both Elstner Construction and another 8(a) Program participant that received contracts managed by GOVERNMENT OFFICIAL 1. The representations made by SCOTT E. BOONE, DANIEL E. MCGUIRE, and THOMAS E. LAUER about which company they were affiliated with depended on which contract a job fell under, but the performance of the work itself was otherwise unaffected by whether it was a job done, on paper, by Elstner Construction or the other 8(a) Program participant.

51. As stated above, on several occasions between 2007 and 2009, the dollar limit on construction contracts managed by GOVERNMENT OFFICIAL 1 was increased. Each time an increase occurred,

17

GOVERNMENT OFFICIAL 1 made a recommendation to the Letterkenny contracting office to increase the dollar limit to a specific amount—first, from $3.5 million to $15 million in or around 2008, then from $15 million to $60 million in or around 2009. The contracting office accepted each of GOVERNMENT OFFICIAL 1's recommendations.

OVERT ACTS IN FURTHERANCE OF THE CONSPIRACY

52. At the meeting in or around 2007 attended by GOVERNMENT OFFICIAL 1, SCOTT E. BOONE, DANIEL E. MCGUIRE, THOMAS E. LAUER, and REBECCA J. DAVIS, it was discussed that REBECCA J. DAVIS would, if selected for 8(a) Program set-aside construction contracts, also utilize favored subcontractors previously utilized by SCOTT E. BOONE, DANIEL E. MCGUIRE, and THOMAS E. LAUER to perform work on the contracts awarded to her company, Elstner Construction.

53. On or about November 15, 2007, REBECCA J. DAVIS, then Rebecca Elstner, and THOMAS E. LAUER created a business account with account number ending in 2180 at a branch of Dollar Bank located in or around Pittsburgh, PA. On a business account signature card, they

listed REBECCA J. DAVIS as the president of Elstner Construction and THOMAS E. LAUER, falsely, as Elstner Construction's "bookkeeper." This account was set up so that both of their signatures were required for each and every check, withdrawal, or transfer. In other words, REBECCA J. DAVIS was unable to use funds in this account without the express written approval of THOMAS E. LAUER.

54. On or about December 2007, REBECCA J. DAVIS assigned authority over Contract No. W911N2-08-D-0013, a $3.5 million Letterkenny JOC awarded to her company and signed on or about November 30, 2007, to SCOTT E. BOONE, DANIEL E. MCGUIRE, and THOMAS E. LAUER. REBECCA J. DAVIS specifically assigned authority to SCOTT E. BOONE, DANIEL E. MCGUIRE, and THOMAS E. LAUER to prepare proposals and negotiate contracts, issue and manage subcontracts, supervise construction, negotiate change orders, control and track project costs, prepare invoices, prepare and issue payments, and execute all documents. REBECCA J. DAVIS also assigned to them any other authority required to manage projects.

55. Around the same time, REBECCA J. DAVIS represented that she had established a separate checking account for all projects managed by SCOTT E. BOONE, DANIEL E. MCGUIRE, and THOMAS E. LAUER, with a requirement for dual signatures by her and one of them. REBECCA J. DAVIS also agreed to transfer any funds for projects managed by SCOTT E. BOONE, DANIEL E. MCGUIRE, and THOMAS E. LAUER into the dual signature checking account and to send all checks to vendors, suppliers, and subcontractors within two days of receipt, after these checks were already written out and signed by either SCOTT E. BOONE, DANIEL E. MCGUIRE, or THOMAS E. LAUER.

56. When assigning authority to SCOTT E. BOONE, DANIEL E. MCGUIRE, and THOMAS E. LAUER on or about December 2007, REBECCA J. DAVIS also pledged that she would "not interfere with the day-to-day operations" of her own contracts.

57. SCOTT E. BOONE, DANIEL E. MCGUIRE, and THOMAS E. LAUER, and REBECCA J. DAVIS moved laborers, on paper, onto the payroll of Elstner Construction to make it appear, falsely, as if Elstner

20

Construction was complying with the 8(a) Program requirement that it perform 15% of the cost of a contract with its own employees.

58. SCOTT E. BOONE described this practice of moving employees from one payroll to another to GOVERNMENT OFFICIAL 1. GOVERNMENT OFFICIAL 1 understood this was a violation of the rules and purpose of the 8(a) Program, and yet GOVERNMENT OFFICIAL 1 continued to assist SCOTT E. BOONE, DANIEL E. MCGUIRE, THOMAS E. LAUER, and REBECCA J. DAVIS in securing construction contracts that he managed.

59. A number of the employees that they moved onto the Elstner Construction payroll came from the favored subcontractors long utilized by SCOTT E. BOONE, DANIEL E. MCGUIRE, and THOMAS E. LAUER to perform work at Letterkenny. Despite the movement of these employees to the Elstner Construction payroll, the employees' roles remained unchanged. They had no interaction with REBECCA J. DAVIS or her existing employees, and instead they continued to report to the subcontracting companies from which they came.

60. GOVERNMENT OFFICIAL 1 also recommended Elstner Construction for contracts outside of his area of management on the basis of the company's affiliation with SCOTT E. BOONE, DANIEL E. MCGUIRE, and THOMAS E. LAUER. For instance, in or around 2009, Elstner Construction was awarded a Letterkenny contract for painting and associated services worth approximately $15 million. This contract was managed by a division other than the engineering and planning division, but GOVERNMENT OFFICIAL 1 was asked to evaluate Elstner Construction's past performance. GOVERNMENT OFFICIAL 1 described Elstner Construction's performance to Letterkenny's contracting office as "excellent," but did not disclose REBECCA J. DAVIS or her company's lack of meaningful involvement in contract execution.

61. The 2009 construction JOC that ended up being worth around $60 million was awarded to Elstner Construction through a competitive bidding process. Prior to the interested parties' submission of best-and-final offers, GOVERNMENT OFFICIAL 1 evaluated the proposals submitted by each of the two offerors, including Elstner Construction.

GOVERNMENT OFFICIAL 1 found both proposals to be capable of being made technically acceptable.

62. GOVERNMENT OFFICIAL 1 was aware that the primary determinant of which party got the contract would be the cost coefficient. With this contract, the offerors' coefficient information was included in the package GOVERNMENT OFFICIAL 1 received, but the information was redacted. GOVERNMENT OFFICIAL 1 was, nevertheless, able to see these figures by turning the pages over and looking at them through the back of the sheets on which they were written. GOVERNMENT OFFICIAL 1 therefore gained access to bidding information that he was not supposed to have.

63. Around this same time, SCOTT E. BOONE stopped by GOVERNMENT OFFICIAL 1's office. SCOTT E. BOONE asked GOVERNMENT OFFICIAL 1 whether Elstner Construction's bid would be successful. GOVERNMENT OFFICIAL 1 told SCOTT E. BOONE that their coefficient would be fine, signaling that no further revision of that figure would be necessary to win the contract.

64. SCOTT E. BOONE thus solicited confidential information from GOVERNMENT OFFICIAL 1 that GOVERNMENT OFFICIAL 1 was not supposed to have and which SCOTT E. BOONE was not supposed to receive. GOVERNMENT OFFICIAL 1 shared this confidential information.

65. The 2009 JOC awarded to Elstner Construction, with total value of approximately $60 million, contained a contractual provision requiring Elstner Construction to "perform on the site, and with its own organization, work equivalent to at least 10 percent of the total amount of work to be performed under the contract." GOVERNMENT OFFICIAL 1 and SCOTT E. BOONE had a discussion that Elstner Construction would make it appear, falsely, that the company was satisfying this requirement by moving onsite laborers onto Elstner Construction's payroll, consistent with prior practice.

66. From on or about July 2009 until on or about May 2013, REBECCA J. DAVIS received in a Dollar Bank checking account over $70 million in payments from the federal government. REBECCA J. DAVIS then transferred a similar amount to the Dollar Bank checking

24

account ending in 2180 over which she and THOMAS E. LAUER had dual signature authority. From the account ending in 2180, nearly $9 million was paid to Bon Secour Management, and around $6 million was paid back into the Elstner Construction account from which the funds originally came. Tens of millions of dollars were also paid to subcontractors that had long been performing work for SCOTT E. BOONE, DANIEL E. MCGUIRE, and THOMAS E. LAUER at Letterkenny.

67. On numerous occasions, including on or about June 4, 2010, the bookkeeper working for SCOTT E. BOONE and DANIEL E. MCGUIRE sent by FedEx Express to REBECCA J. DAVIS a Priority Overnight envelope containing checks that were already made out to various parties, such as vendors, suppliers, and subcontractors, requiring only the signature of REBECCA J. DAVIS.

All in violation of Title 18, United States Code, Section 371.

## COUNTS 2 THROUGH 6
### 18 U.S.C. § 1031
### (Major Fraud Against the United States)

68. Paragraphs 1 through 37 and 40 through 67 are incorporated here.

69. From on or about 2007 until on or about 2014, in Franklin County, within the Middle District of Pennsylvania, and elsewhere, the defendants,

**SCOTT E. BOONE**,
**DANIEL E. MCGUIRE**,
**THOMAS E. LAUER,** and
**REBECCA J. DAVIS**,

aiding and abetting each other and other persons both known and unknown to the Grand Jury, knowingly and willfully executed and attempted to execute, and willfully participated in, a scheme and artifice with the intent to defraud the United States and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, in any procurement of property and services as a prime contractor with the United States and as a subcontractor and supplier on a contract in which there was a prime contract with the United States, and the value of such contract and

26

subcontract, and any constituent part thereof, was $1,000,000 or more, as described below:

| Count | Contract Signed On or About | Location and Contract Number | Approximate Total Contract Value |
|---|---|---|---|
| 2 | 11/30/2007 | Letterkenny, W911N2-08-D-0013 | $3.5 million |
| 3 | 5/22/2008 | Letterkenny, W911N2-08-D-0052 | $3.5 million |
| 4 | 3/14/2009 | Letterkenny, W911N2-09-D-0019 | $3.5 million |
| 5 | 4/30/2009 | Letterkenny, W911N2-09-D-0023 | $15 million |
| 6 | 7/27/2009 | Letterkenny, W911N2-09-D-0027 | $60 million |

All in violation of Title 18, United States Code, Sections 1031 and 2.

## COUNT 7
18 U.S.C. § 371
(Conspiracy to Commit Major Fraud Against the United States)

### BACKGROUND

70. Paragraphs 1 through 37 and 40 through 67 are incorporated here.

71. VA Medical Centers were facilities that provided healthcare services to U.S. military veterans, including many of the services

27

typically associated with hospitals such as surgery, critical care, physical therapy, oncology, and prosthetic care.

72. On or about March 26, 2013, Bon Secour Management, as an SDVOSB, was awarded contract VA246-13-C-0018 to replace the high voltage distribution system at the Salem Veterans Affairs Medical Center in Salem, Virginia.

73. The value of this contract was approximately $5.3 million. Bon Secour Management received its final payment for this contract on or about March 2019.

74. The work for this contract required laborers to be in or around Salem, Virginia, at the site of the VA Medical Center. In addition, the contract required specialized skill in performing electrical work.

75. ELECTRICAL SUBCONTRACTOR 1 was a company focusing on specialized electrical contracting. SCOTT E. BOONE knew the owner of the company.

THE SDVOSB PROGRAM CONSPIRACY AND ITS OBJECTS

76. Paragraphs 1 through 37, 40 through 67, and 71 through 75 are incorporated here.

77. From on or about 2013 until on or about 2019, in Cumberland County, within the Middle District of Pennsylvania, and elsewhere, the defendants,

**SCOTT E. BOONE,**
**DANIEL E. MCGUIRE**, and
**THOMAS E. LAUER,**

did knowingly conspire, confederate, and agree, together and with other persons both known and unknown to the Grand Jury, to commit offenses against the United States and to defraud the United States, that is:

To knowingly and willfully execute a scheme and artifice with the intent to defraud the United States and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, in any procurement of property and services as a prime contractor with the United States and as a subcontractor and supplier on a contract in which there was a prime contract with the United States, and the value of such contract and subcontract, and any constituent part thereof, was $1,000,000 or more, in violation of Title 18, United States Code, Section 1031.

## MANNER AND MEANS OF THE CONSPIRACY

78. On or about April 2013, Bon Secour Management, through SCOTT E. BOONE as managing member, hired ELECTRICAL SUBCONTRACTOR 1 to perform high voltage electrical work and supporting trade work on contract VA246-13-C-0018 at the Salem VA Medical Center.

79. Bon Secour Management moved individuals who worked for ELECTRICAL SUBCONTRACTOR 1 onto its payroll to make it appear, falsely, that Bon Secour Management was meeting the requirement for SDVOSBs to perform at least 15% of the labor on its contracts.

## OVERT ACTS IN FURTHERANCE OF THE CONSPIRACY

80. On or about March 12, 2013, Bon Secour Management, through SCOTT E. BOONE and one of SCOTT E. BOONE's employees, told the owner of ELECTRICAL SUBCONTRACTOR 1 that Bon Secour Management would receive 4% of the contract value as its "profit," plus an additional $150,000 in "profit from product and material," irrespective of the winning contract bid amount.

30

81. On or about April 2013, Bon Secour Management, through SCOTT E. BOONE, placed a longtime superintendent of ELECTRICAL SUBCONTRACTOR 1 on the Bon Secour Management payroll, knowing that the superintendent would already be supervising the work performed by ELECTRICAL SUBCONTRACTOR 1. The superintendent continued to report to the owner of ELECTRICAL SUBCONTRACTOR 1.

82. In addition, Bon Secour Management placed on its payroll one or more additional laborers, including a backhoe operator, who had been working for ELECTRICAL SUBCONTRACTOR 1. These laborers likewise continued to report to the same superintendent moved onto the Bon Secour Management payroll and, ultimately, to the owner of ELECTRICAL SUBCONTRACTOR 1

83. ELECTRICAL SUBCONTRACTOR 1's owner told SCOTT E. BOONE how much these employees of ELECTRICAL SUBCONTRACTOR 1 were paid.

84. On or about April 24, 2013, Bon Secour Management submitted to the Department of Veterans Affairs a "STATEMENT AND

31

ACKNOWLEDGEMENT" signed by both SCOTT E. BOONE and the owner of ELECTRICAL SUBCONTRACTOR 1 acknowledging the prime contractor/subcontractor relationship between the two companies.

85. On or about April 25, 2013, Bon Secour Management submitted to the Department of Veterans Affairs' acquisition office in Salem, Virginia a "Letter of Superintendent Designation," signed by both SCOTT E. BOONE and the superintendent he had just hired. SCOTT E. BOONE gave the superintendent "authority and responsibility to act on behalf of Bon Secour Management, LLC on all matters regarding VA246-13-C-0018, Replace High Voltage Distribution System." SCOTT E. BOONE wrote, "As the Project Superintendent, you will be responsible for all personnel on site and will be present at all times when work is being completed on the above referenced contract."

86. SCOTT E. BOONE also submitted to the Department of Veterans Affairs a list of personnel that Bon Secour Management intended to have work on the site. This list included the personnel moved onto the Bon Secour Management payroll from the payroll of

32

ELECTRICAL SUBCONTRACTOR 1. It did not include individuals who had previously worked for Bon Secour Management.

All in violation of Title 18, United States Code, Section 371.

## COUNT 8
18 U.S.C. § 1031
(Major Fraud Against the United States)

87. Paragraphs 1 through 37, 40 through 67, 71 through 75, and 78 through 86 are incorporated here.

88. From on or about 2013 until on or about 2019, in Cumberland County, within the Middle District of Pennsylvania, and elsewhere, the defendants,

**SCOTT E. BOONE**,
**DANIEL E. MCGUIRE**, and
**THOMAS E. LAUER**,

aiding and abetting each other and other persons both known and unknown to the Grand Jury, knowingly and willfully executed and attempted to execute, and willfully participated in, a scheme and artifice with the intent to defraud the United States and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, in any procurement of property and

services as a prime contractor with the United States and as a subcontractor and supplier on a contract in which there was a prime contract with the United States, and the value of such contract and subcontract, and any constituent part thereof, was $1,000,000 or more, as described below:

| Count | Contract Signed On or About | Location and Contract Number | Approximate Total Contract Value |
|---|---|---|---|
| 8 | 3/26/2013 | Salem VA Medical Center, VA246-13-C-0018 | $5.3 million |

All in violation of Title 18, United States Code, Sections 1031 and 2.

THE GRAND JURY FINDS PROBABLE CAUSE:

FORFEITURE ALLEGATIONS

1.    The allegations contained in Counts 1 through 8 of this Indictment are hereby re-alleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 982(a)(3) – (4).

2.    Upon conviction of an offense set forth in Counts 2 through 6 of this Indictment, the defendants,

SCOTT E. BOONE,
DANIEL E. MCGUIRE,
THOMAS E. LAUER, and
REBECCA J. DAVIS,

shall forfeit to the United States pursuant to Title 18, United States Code, Section 982(a), any property real or personal that constitutes, is derived from, or is traceable to the proceeds obtained directly or indirectly from the commission of the offense of which the person is convicted; or that is used to commit, facilitate, or promote, or is intended to be used to commit, facilitate, or promote, the commission of the offense of which the person is convicted. The property to be forfeited includes, but is not limited to, the following:

a.  Approximately $85,000,000;

3.    Furthermore, upon conviction of an offense set forth in Count 8 of this Indictment, the defendants,

SCOTT E. BOONE,
DANIEL E. MCGUIRE, and
THOMAS E. LAUER,

35

shall forfeit to the United States pursuant to Title 18, United States Code, Section 982(a), any property real or personal that constitutes, is derived from, or is traceable to the proceeds obtained directly or indirectly from the commission of the offense of which the person is convicted; or that is used to commit, facilitate, or promote, or is intended to be used to commit, facilitate, or promote, the commission of the offense of which the person is convicted. The property to be forfeited includes, but is not limited to, the following:

  b. Approximately $5,300,000;

4. If any of the property described above, as a result of any act or omission of the Defendant:

  a. cannot be located upon the exercise of due diligence;

  b. has been transferred or sold to, or deposited with, a third party;

  c. has been placed beyond the jurisdiction of the court;

  d. has been substantially diminished in value; or

e.     has been commingled with other property which

cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of

substitute property pursuant to Title 21, United States Code,

Section 853(p), as incorporated by Title 28, United States Code,

Section 2461(c).

All pursuant to 18 U.S.C. § 982(a)(1) – (8).


A TRUE BILL


GERARD M. KARAM
United States Attorney

FOREPERSON


RAVI ROMEL SHARMA
Assistant United States Attorney

12/14/22

Date