# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Crim. No. 1:22-CR-00426 |
| | : | |
| v. | : | |
| | : | |
| SCOTT E. BOONE, *et al.* | : | Judge Jennifer P. Wilson |

## MEMORANDUM

The dispute presently before the court explores temporal limits on the government's power to investigate criminal activity. The motion now submitted for the court's consideration is the government's "motion for an order applying the crime-fraud exception." (Doc. 74.) In sum, the government seeks to enforce certain administrative and grand jury subpoenas. In support of the motion, the government contends that certain materials withheld as privileged fall within the crime-fraud exception to the attorney-client privilege. Yet, the government seeks enforcement of these subpoenas for the first time several years after Defendants were indicted. The indictment was returned many months after the subpoenas were issued. The court has serious doubts about the propriety of the government's request at this time and in this procedural posture. Therefore, for the reasons that follow, the court will deny the government's motion.

1

## BACKGROUND

An exhaustive recitation of the facts is unnecessary for resolution of the instant motion. The court need only briefly recount the background pertinent to the motion. The court gleans these facts from the allegations in the indictment as well as the parties' briefing.

Boone and his business partners Daniel McGuire ("McGuire") and Thomas Lauer ("Lauer") (collectively "Defendants") are charged with six counts of major fraud against the United States, in violation of 18 U.S.C. § 1031, and two counts of conspiracy to commit major fraud against the United States, in violation of 18 U.S.C. § 371. (Doc. 1, pp. 1, 26, 27, 33.)[1] Defendants are accused of fraudulently obtaining contracts through two government contracting programs, the Small Business Administration's 8(a) Business Development Program ("8(a) Program") and the Service-Disabled Veteran Owned Small Business Program ("SDVOSB Program").

**A. Indicted Conduct – 8(a) Program**

The 8(a) Program is designed to help small businesses owned by historically disadvantaged groups "compete in the American economy through business development." 13 C.F.R. § 124.1. The 8(a) Program pursues this goal by "creating reserved federal contracting opportunities for its participants." (Doc. 1

---

[1] For ease of reference, the court uses the page numbers from the CM/ECF header.

¶ 11.) To be eligible, participants must satisfy several program requirements. Relevant to this matter are two requirements. First the indictment alleges that businesses can participate in the 8(a) Program only if they are a small business and "unconditionally owned and controlled by one or more socially and economically disadvantaged individuals." (*Id.* ¶ 15.)[2] Second, the indictment alleges that 8(a)-Program participants must "agree to perform at least 15% of the cost of the contract with its own employees." (*Id.* ¶ 14.)

Counts 1 through 6 of the indictment concern alleged fraud involving the 8(a) Program. From 2007 until 2014, Defendants allegedly conspired with Rebecca Davis ("Davis") to obtain federal contracts reserved for 8(a)-Program participants.[3] (*See id.* ¶ 30.) Davis and her business Elstner Construction, unlike her alleged co-conspirators, were participants in the 8(a) Program. (*Id.* ¶ 10.) Through an affiliation with Davis, Defendants allegedly "prepared and submitted proposals for 8(a) Program set-aside construction contracts at Letterkenny [Army Depot] under the name of Elstner Construction." (*Id.* ¶ 42.) These proposals resulted in the awarding of five contracts to Elstner Construction from Letterkenny

---

[2] *See generally* 13 C.F.R. § 124.105 (setting forth 8(a)-Program ownership requirements).

[3] Rebecca Davis is also a defendant in this matter. She is not implicated by the government's present motion. (*See* Doc. 74, p. 2.)

Army Depot between 2007 and 2009, collectively worth approximately $85.5 million. (*Id.* ¶ 69.)

Davis allegedly did not control Elstner Construction with respect to these contracts. Instead, Boone, McGuire, and Lauer allegedly "ran all of Elstner Construction's contracts on a day-to-day basis." (*Id.* ¶ 47.) Davis allegedly ceded financial control of the contracts by opening a checking account for project-related funds whose checks required the signature of Davis and either Boone, McGuire, or Lauer. (*See id.* ¶ 55.) Thus, any payments to "vendors, suppliers, or contractors" required the signature of Boone, McGuire, or Lauer. (*Id.*)

So, too, Davis and her employees at Elstner Construction allegedly "played no meaningful role in the execution or oversight of [the] contracts." (*Id.* ¶ 46.) Instead, Boone, McGuire, Lauer, and Davis allegedly moved "laborers, on paper, onto the payroll of Elstner Construction to make it appear" that Elstner Construction's employees were performing the percentage of work required under the 8(a) Program. (*Id.* ¶¶ 57, 65.) According to the government, these alleged actions, among others, rendered Davis and Elstner Construction ineligible for these 8(a)-Program contracts.

### B. Indicted Conduct – SDVOSB Program

The SDVOSB Program provides exclusive contracting opportunities to small businesses that are owned by service-disabled veterans. *See* 13 C.F.R. §

4

128.101.  The SDVOSB Program also has certain participation requirements.  One in particular is relevant here.  The government alleges that, like the 8(a) Program, the SDVOSB Program requires that an eligible SDVOSB must "perform at least 15% of the labor of its contracts."  (Doc. 1 ¶ 79.)

Counts 7 and 8 concern SDVOSB-Program fraud.  The government alleges that Boone, McGuire, and Lauer fraudulent benefited from the SDVOSB Program using Boone's company, Bon Secour Management LLC ("BSM").  (*See id.* ¶¶ 70–88.)  In 2013, BSM obtained a contract through the SDVOSB Program from a VA Medical Center to perform electrical work.  (*See id.* ¶ 78.)  BSM is a certified SDVOSB.  (*Id.* ¶ 32.).  However, BSM allegedly failed to perform 15% of the labor on this contract, as the SDVOSB Program requires.  (*See id.* ¶¶ 79–86.)  Instead, Boone allegedly relied on a subcontractor to perform the electrical work and fraudulently placed certain of the subcontractors' employees onto BSM's payroll to give the illusion that BSM was complying with SDVOSB-Program requirements.  (*Id.* ¶ 79.)  In doing so, BSM allegedly obtained the benefits of the contract through false pretenses.

### C. Alleged Conduct Giving Rise to Crime-Fraud Exception

The alleged criminal or fraudulent activity giving rise to the government's instant motion is only tangentially related to the indicted conduct.

5

In 2013, BSM obtained a contract through the SDVOSB Program from the Coatesville VA Medical Center.  (*See* Doc. 75-1, p. 3.)  The second lowest bidder on the project lodged a status protest with the U.S. Department of Veterans Affairs and the Small Business Administration  ("2013 Status Protest").  (*See id.*)  The protestor claimed that BSM was affiliated with and controlled by Alan Smallwood Excavating ("ASE") and, therefore, was ineligible for SDVOSB-Program contracts.  (*Id.* at 7.).  In turn, BSM enlisted the help of Attorney J.M. to draft a response to the 2013 Status Protest.[4]  (Doc. 75, p. 7.)  J.M. drafted responses relying on sworn affidavits from Boone and Lauer.  (Doc. 75-2.)

The government alleges that the affidavits and J.M.'s written responses contain false statements.  (Doc. 75, p. 7.)  Specifically, the government identifies four falsehoods: (1) that there was no "teaming agreement, joint venture, or similar association between BSM and ASE"; (2) that BSM and ASE do not have "common management" nor "provide financial assistance to each other"; (3) that "BSM and ASE do not share office space"; and (4) that "BSM and ASE do not share . . . employees."  (*Id.* at 20–33.)  The government agencies allegedly relied on these false statements to deny the protest and give BSM access to the contract for which the government claims BSM was ineligible.  (*Id.* at 7.)  The government seeks to

---

[4] The government refers to the attorney in an abbreviated fashion, because "[i]t remains unclear" whether J.M. was aware of the alleged fraudulent conduct at issue.  The court will similarly refer to the attorney as J.M.

6

obtain certain communications between J.M. and BSM's principals related to these four purported falsehoods.

### D. Subpoenas at Issue

The government's investigation of Defendants' alleged fraud involved, in relevant part, certain subpoenas. Two were issued to BSM and Boone, respectively, by the Small Business Administration's Office of Inspector General ("SBA-OIG"). (Doc. 90, p. 10.) The SBA-OIG subpoenas were issued in April 2020. (*Id.*) In response to the SBA-OIG subpoenas, both BSM and Boone produced responsive, non-privileged documents. (*Id.*) Both BSM and Boone also produced privilege logs of documents withheld. (*Id.*) The last of these privilege logs was produced in February 2021. (*Id.*)

Subsequently, a federal grand jury issued a subpoena to BSM in December 2021 and one to Boone in February 2022. (*Id.*) Boone asserted his right against self-incrimination and did not respond. (*Id.*) BSM notified the government that it provided all documents responsive to its grand jury subpoena in response to its SBA-OIG subpoena. (*Id.*)

### E. Procedural Background

The grand jury returned an indictment against Boone, McGuire, Lauer, and Davis on December 14, 2022. (Doc. 1.) Each has pleaded not guilty. (Docs. 16, 25, 27, 36.) The government filed the instant motion with a brief in support on

October 1, 2024. (Docs. 74 & 75.) BSM, as the privilege holder, then sought to intervene in this case for the limited purpose of opposing the government's motion. (Doc. 77.) The court allowed BSM's intervention. (Doc. 87.) BSM, Boone, McGuire, and Lauer ("Respondents") then filed a joint brief in opposition to the government's motion. (Doc. 90.) The government filed a reply brief, and the court permitted Respondents to file a surreply. (Docs. 100, 103, 104.) The government also filed a motion for a hearing on its motion. (Docs. 105.) The government's motions are ripe for review.

## DISCUSSION

The government's request for application of the crime-fraud exception takes an odd form. The government's motion neither explicitly asks the court to enforce a specific subpoena nor to compel production of specific documents identified on a privilege log. Instead, the government seeks to compel production of general categories of documents related to the 2013 Status Protest without identifying the legal basis for why it is entitled to the documents. (*See* Doc. 75, p. 4.) Indeed, the government failed to attach any subpoenas or privilege logs to its filings. BSM's briefing, however, assumes that the government is attempting to enforce the SBA-OIG and grand jury subpoenas. (*See* Doc. 90, pp. 9–11.) The government concedes that it requests, in part, enforcement of the subpoenas. (*See* Doc. 100, pp. 35–41.) Beyond the subpoenas, however, the government states it also seeks

8

an order applying the crime-fraud exception with respect to: (1) any potential voluntary interviews of J.M. the government may conduct; and (2) any possible testimony J.M. may give in this case. (*Id.* at 36.)

### A. Subpoenas

The court's analysis of this dispute is particularly hindered by the government's failure to identify and provide the subpoenas and specific requests it wants the court to enforce. The government's failure is arguably sufficient grounds for the court to refuse to enforce the subpoenas. *Cf. Hills v. PAC Hous. Grp., LLC*, Civil Action No. 23-5740, 2024 WL 5340075, at *1 (E.D. La. Sept. 26, 2024) (summarily denying motion to compel for failing to attach subpoena at issue); *Jenkins v. Winn-Dixie Stores, Inc.*, No. 3:14-CV-1104-J-34MCR, 2015 WL 12915699, at *1 (M.D. Fla. Oct. 5, 2015) (same). The court will nevertheless address other procedural issues that doom the government's request. In doing so, the court need not and does not make any finding as to whether the crime-fraud exception is applicable in this dispute.

### 1. Grand Jury Subpoenas

A grand jury has extensive investigative powers. Such powers are "necessarily broad if its public responsibility is to be adequately discharged." *Branzburg v. Hayes*, 408 U.S. 665, 700 (1972). "The investigatory powers of the grand jury are nevertheless not unlimited." *United States v. R. Enters., Inc.*, 498

9

U.S. 292, 299 (1991). The parties' arguments center around two specific limitations. The court addresses each in turn.

### i. The grand jury subpoenas have expired.

Respondents argue that the grand jury subpoenas at issue have expired. The government has not provided any authority refuting Respondents' argument. In any event, the court agrees with Respondents on this point.

One limitation to the grand jury's investigatory power is that a grand jury is not empaneled indefinitely. Fed. R. Crim. P. 6(g). Nor does a grand jury's investigation continue in perpetuity. Rather, "an investigation 'terminates with the grand jury that undertakes it.'" *In re Grand Jury Proceeding*, 971 F.3d 40, 50 (2d Cir. 2020) (hereinafter "Oberlander") (quoting *Loubriel v. United States*, 9 F.2d 807, 809 (2d Cir. 1926); *see also In re Grand Jury Proceedings*, 744 F.3d 211, 217 (1st Cir. 2014) (hereinafter "NITHPO").[5]

A corollary to this limitation is that "a subpoena, which is merely an investigative tool, also terminates with the investigating grand jury that issued it." *Oberlander*, 971 F.3d at 50. In other words, "the *duty* imposed by a subpoena to produce documents to, or to testify before, a specific grand jury ceases once that grand jury's term expires." *Oberlander*, 971 F.3d at 50 (original emphasis);

---

[5] This is not to say that a subsequent grand jury cannot continue an investigation begun by a previous grand jury. *NITHPO*, 744 F.3d at 217; *United States v. Gakoumis*, 624 F. Supp. 655, 657 (E.D. Pa. 1985). It is to say, however, that the subsequent grand jury is responsible for its own investigation. *See Oberlander*, 971 F.3d at 50; *NITHPO*, 744 F.3d at 217.

10

*accord In re Grand Jury Proceedings, Thursday Special Grand Jury Sept. Term 1991*, 33 F.3d 342, 347 (4th Cir. 1994) (explaining that the grand jury subpoenas at issue "clearly do not have force as a result of the expiration of that grand jury"). This is because the subpoenaed party's duty is "measured by the subpoena." *Loubriel*, 9 F.2d at 809. When the issuing grand jury no longer exists, it becomes impossible for the subpoenaed party to comply with the subpoena. *Oberlander*, 971 F.3d at 50 (holding that a grand jury subpoena was "a nullity, since it required [the subpoenaed party] to produce documents to and appear before a grand jury that was no longer empaneled, in connection with an [expired] investigation"); *NITHPO*, 744 F.3d at 218 ("It follows as a matter of logic that [the subpoenaed party] could only comply with the subpoena so long as the issuing grand jury was in existence."). For a court to enforce a subpoena from a non-existent grand jury would run "afoul of the maxim '*lex non cogit ad impossibilia*'—literally, 'the law does not compel to impossible ends.'" *NITHPO*, 744 F.3d at 218 (quoting Black's Law Dictionary 1844 (9th ed. 2009)); *see also Shillitani v. United States*, 384 U.S. 364, 371 (1966) ("Where the grand jury has been finally discharged, a contumacious witness can no longer be confined since he then has no further opportunity to purge himself of contempt.").[6]

---

[6] The court acknowledges, as the *NITHPO* and *Oberlander* courts did, that other circuits have enforced grand jury subpoenas after the expiration of the issuing grand jury. *In re Sealed Case*, 223 F.3d 775, 778 (D.C. Cir. 2000); *In re Grand Jury Proceeding*, 658 F.2d 782, 783–84 (10th

Relying on these principles, the court finds that the grand jury subpoenas at issue here have expired. It is undisputed that the grand jury subpoenas were issued in December 2021 and February 2022, respectively. A grand jury's maximum allowable term is twenty-four months. Fed. R. Crim. P. 6(g). There is no doubt the grand jury that issued the subpoenas to BSM and Boone no longer existed when the present motion was filed in October 2024. The government misses the mark by emphasizing that the grand jury subpoenas are enforceable because they were validly issued for a legitimate purpose. (Doc. 100, pp. 40–41.) It is irrelevant that the subpoenas were valid when issued. They became unenforceable when the issuing grand jury and its investigation ceased to exist. Therefore, the court will not compel Respondents to comply with subpoenas with which it is impossible to comply.

Lastly on this point, the government contends that Respondents waived their argument that the grand jury subpoenas are no longer enforceable when BSM's counsel produced documents responsive to the SBA-OIG and grand jury subpoenas. (Doc. 100, pp. 38–39.) On October 25, 2024, BSM counsel produced to the government an additional 4,966 documents that were previously unknown to

---

Cir. 1981) (hereinafter "Sutton"). Yet, *Sealed Case* and *Sutton* are materially different than the case at bar. They dealt with situations in which a subsequent grand jury carried on the investigation of the expired grand jury. *Oberlander*, on the other hand, dealt with a case in which the investigation at issue ceased with the expiration of the issuing grand jury. 971 F.3d at 50. As explained in this memorandum, the government has not made any showing that a grand jury investigation is ongoing. Thus, the court finds *Oberlander's* holding more applicable here.

counsel. (Doc. 97-2.) Counsel wrote that BSM was producing the documents "[a]s a courtesy", yet explicitly stated that the "subpoenas no longer have force or effect." (*Id.*) The government cites no authority in support of its assertion that BSM's voluntary production constitutes waiver. And, the court sees no reason why it should, especially given counsel's express statement concerning the subpoenas' unenforceability. Therefore, the government's waiver argument fails.

> ii. **The court has no basis to conclude the government seeks enforcement of the grand jury subpoenas for a proper purpose.**

Even if the expiration of the grand jury subpoenas was not dispositive—which it is—the government faces another procedural hurdle. Respondents contend that the subpoenas are unenforceable because the government's motion is motivated by an improper purpose, *i.e.*, a desire to collect evidence for trial. (*See* Doc. 90, pp. 13–15.) A "firmly entrenched" limitation on grand juries is that "once a defendant has been indicted, a prosecutor may not use a grand jury's investigative powers for the purpose of securing additional evidence against the defendant for use in the upcoming trial." *In re Grand Jury Proceedings*, 632 F.2d 1033, 1041 (3d Cir. 1980); *accord United States v. Bressi*, 4:19-CR-0207, 2024 WL 4311507, at *2 (M.D. Pa. Sept. 26, 2024). The government provides several rejoinders, none of which are persuasive.

13

First, the government claims it has a proper purpose because it might be able to investigate more subjects and additional charges depending on the information it receives. (Doc. 100, p. 40.) It is true that a grand jury is undoubtedly permitted to investigate "other charges within the scope of the grand jury's lawful authority . . . even if it uncovers further evidence against an indicted person." *In re Grand Jury Proceedings*, 632 F.2d at 1041. Yet, the court has no basis to conclude that the government is seeking the documents at issue for such an investigative purpose. Only the government knows whether there is an ongoing investigation. This is why the Third Circuit requires the government, when seeking to enforce a grand jury subpoena, "to make some preliminary showing by affidavit that each item [subpoenaed] is at least relevant to an investigation being conducted by the grand jury and properly within its jurisdiction, and is not sought primarily for another purpose."[7] *In re Grand Jury Proceedings*, 486 F.2d 85, 93 (3d Cir. 1973). Such a showing is necessary "[t]o prevent the abuse of [the grand jury] process," since the grand jury "deliberates in secret and acts 'independently of either prosecuting attorney or judge.'" *In re Grand Jury Subpoena*, 223 F.3d 213, 216 (3d Cir. 2000) (quoting *United States v. Dionisio*, 410 U.S. 1, 16 (1973)). The government did not submit an affidavit making any such showing in support of its motion.

---

[7] This is commonly referred to as a "*Schofield* affidavit."

Apart from this failure, the court has reason to doubt that the government seeks enforcement of the grand jury subpoenas for an investigative purpose.  The government has waited to enforce the subpoenas until years after receiving the privilege logs and makes its request with relatively little time before pre-trial filings are due in this case.[8]  These circumstances lead the court to believe that the purpose of the government's request is, in fact, to prepare for trial.

Second, the government insists that it is unaware of any authority that has held a grand jury subpoena validly issued pre-indictment to be unenforceable post-indictment.  The court—through its own independent research—has identified such authority.  *United States v. Jeter*, Crim. No. CCB-14-0121, 2015 WL 114118, at *3 (D. Md. Jan. 7, 2015).  In what it characterized as a "peculiar" case, the *Jeter* court held that it was improper for the government to accept property after the defendant had been indicted when the property was commanded by a pre-indictment subpoena issued to a defendant's detention center.  *Id.*  "[T]he post-indictment use of the pre-indictment grand jury subpoena was improper," because its purpose was to gather evidence against the defendant "for use in the criminal proceeding against him."  *Id.* at 1, 3.  This appears to be precisely what is occurring in this matter.

---

[8] The deadline to file pre-trial motions is set for May 9, 2025.  (Doc. 98, p. 1.)  Absent "unforeseen and extraordinary circumstances," this deadline will not change.  (*Id.* at 2.)

15

Thus, even if the pre-indictment grand jury subpoenas were not expired, the request to enforce them post-indictment and in preparation for trial would still fail.

### 2. SBA-OIG Subpoenas

Respondents argue that the statute authorizing SBA-OIG to issue subpoenas does not permit the use of such subpoenas in criminal prosecutions. (Doc. 90, pp. 11–12.) The Respondents further contend that no court has held an administrative subpoena to be "enforceable post-indictment." (*Id.* at 12.) The government simply provides one reason why the SBA-OIG subpoenas are enforceable: they still serve a legitimate purpose, *i.e.*, "ensuring the integrity of SBA programs." (Doc. 100, p. 39.) Specifically, the government insists that the information produced in response to the SBA-OIG subpoenas could be used to institute "suspension and disbarment proceedings" against wrongdoers. (*Id.*) The government's proffered basis for enforcement is insufficient.

Some administrative subpoenas are enforceable post-indictment, even if they are related to pending criminal charges. *See United States v. Phibbs*, 999 F.2d 1057, 1077 (6th Cir. 1993) (holding that 21 U.S.C. § 876 permits use of DEA subpoena "to discover evidence related to the charges in [an] indictment"); *United States v. Lazar*, No. 04-20017-DV, 2006 WL 3761803, at *8 (W.D. Tenn. Dec. 20, 2006) (collecting authority holding that administrative subpoenas issued pursuant to 21 U.S.C. § 876 and 18 U.S.C. § 3486, respectively, may be used to obtain

evidence related to pending charges). But not all administrative subpoenas are enforceable post-indictment. *See United States v. LaSalle Nat'l Bank*, 437 U.S. 298, 311–12 (1978) (holding the IRS could not exercise its summons authority under 26 U.S.C. § 7602 once a matter has been referred for criminal prosecution). Whether or not an administrative subpoena is enforceable post-indictment depends on the statute authorizing the issuance of the subpoena at issue. *See, e.g.*, *United States v. Westinghouse Elec. Corp.*, 788 F.2d 164, 167 (3d Cir. 1986) (explaining that courts will enforce administrative subpoenas only if, *inter alia*, "the subpoena is within the statutory authority of the agency").

The government has not made any argument why the statute authorizing the SBA-OIG subpoenas permits post-indictment enforcement. In fact, the government has not even identified the authorizing statute. "The court will not attempt to discern an argument the [government has] failed to make." *Casey v. Gayewski*, No. 1:23-CV-00168, 2023 WL 8935057, at *5 (M.D. Pa. Dec. 27, 2023).

Even assuming the statute authorizing the SBA-OIG subpoenas permits post-indictment enforcement, the government's argument suffers from another fatal flaw. The government has not proffered—nor has the court independently identified—any case in which a court enforced an administrative subpoena directed at an indicted defendant. Rather, the cases the court has reviewed addressing post-

indictment enforcement nearly all involved subpoenas issued to third parties. *Phibbs*, 999 F.3d at 1077; *United States v. Harrington*, 761 F.2d 1482, 1485 (11th Cir. 1985); *Lazar*, 2006 WL 3761803, at *3, 8 (citing *United States v. Wachter*, No. 4:05CR667SNL, 2006 WL 2460790 (E.D. Mo. Aug. 23, 2006) and *United States v. Daniels*, No. 99-40099-01-DES, 2000 WL 764951 (D. Kan. May 22, 2000)).

The court identified one case addressing administrative subpoenas directed at indicted defendants. In that case, the court held an administrative subpoena was unenforceable post-indictment precisely because it was directed at the criminal defendant. *United States v. Rakhit*, No. 1:18-CR-33, 2020 WL 5530056, at *23 (N.D. Ohio Sept. 15, 2020) ("[H]ealth care administrative subpoenas that seek information that may be relevant to pending charges may not be directed towards a criminal defendant."); *see also Harrington*, 761 F.2d at 1485 (holding that 18 U.S.C. § 876 permits DEA to issue subpoenas in an ongoing criminal investigation as long as the subpoenas are not issued to the indicted individual).[9]

---

[9] The *Rakhit* court persuasively notes that the government's own *Justice Manual* recognizes—at least in the context of administrative subpoenas authorized by 18 U.S.C. § 3486—that "[a]fter an indictment has been issued, authorized investigative demands may continue to be used in furtherance of an ongoing investigation, provided they are not directed to a defendant." *Rakhit*, 2020 WL 5530056, at *8 (quoting U.S. Dep't of Justice, *Justice Manual* 9-44.202(5)). The *Justice Manual* still contains this guidance.

The government has not argued that the SBA-OIG subpoenas–which were not attached to the motion–are not directed at Defendants.  And, the court has no basis to conclude they are not, given the dearth of information made available by the government.  Accordingly, the court will deny the government's request to enforce them.

**B. J.M.'s Potential Interview or Testimony**

Finally, the government also seeks an order stating that it may voluntarily interview J.M. and that J.M. may not invoke the attorney-client privilege or work-product doctrine in response to any interview questions or during testimony if called to testify.  (Doc. 75, p. 8.)  Respondents counter that the dispute over the applicability of the crime-fraud exception vis-à-vis the potential interview or testimony of J.M. is a hypothetical dispute that calls for an advisory opinion.  (Doc. 104, p. 9.)  The court agrees with Respondents that this issue is not ripe.[10]

A dispute "is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'"  *Texas v. United States*, 523 U.S. 296, 300 (1998) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580–81 (1985)).  Here, the government simply has represented that it might interview J.M. or call J.M. to testify, and that J.M. provisionally expressed interest in cooperating with the government.  (Doc. 75, p.

---

[10] The government does not need a court order to conduct a voluntary interview of J.M.

8.) Nowhere does the government state, for example, that it will interview J.M., that J.M. has agreed to a voluntary interview with the government, that an interview with J.M. is scheduled, that it will subpoena J.M. to testify at trial, or that J.M. has invoked the attorney-client privilege on behalf of his clients. The simple fact that the government might interview J.M. sometime in the future does not justify a judicial determination that the crime-fraud exception would apply in the context of questions that may be posed during that interview.

## Conclusion

For the reasons stated in this memorandum, the court will deny the government's motion to apply the crime fraud exception. (Doc. 74.) The court will further deny as moot the government's request for a hearing on its motion. (Doc. 105.) An appropriate order will issue.

s/Jennifer P. Wilson<br>
JENNIFER P. WILSON<br>
United States District Judge<br>
Middle District of Pennsylvania

Dated: March 3, 2025