**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Crim. No. 1:22-CR-00426 |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| SCOTT E. BOONE, *et al.* | : | Judge Jennifer P. Wilson |

## <u>MEMORANDUM</u>

Defendants are collectively charged with six counts of major fraud against the United States and two counts of conspiracy to commit the same. Defendants have filed two motions to dismiss the indictment. In one motion, they argue that the indictment fails to charge essential elements of the offenses. In the other, they argue that the indictment violates the Constitution's guarantees of due process and the equal protection of the laws. Alternatively, Defendants move for a bill of particulars. For the reasons that follow, the court will deny the motions to dismiss, but will grant in part and deny in part the motion for a bill of particulars.

### FACTUAL BACKGROUND

The indictment alleges two fraudulent schemes, each of which involved a different Small Business Administration ("SBA") contracting program. One scheme involved the 8(a) Business Development Program ("8(a) Program"), and the other involved the Service-Disabled Veteran Owned Small Business Program ("SDVOSB Program"). The 8(a) Program's purpose is "to help socially and economically disadvantaged entrepreneurs gain access to and succeed in the

marketplace for federal government contracts." (Doc. 1, ¶ 11.)  Likewise, the SDVOSB Program aims to provide similar assistance to service-disabled veterans. (*Id.* ¶ 33.)  Both programs attempt to achieve these purposes through, *inter alia*, reserved contracting opportunities for program participants.  (*Id.* ¶¶ 11, 33.)   In essence, the indictment alleges that Defendants were ineligible to obtain contracts through these programs, but fraudulently obtained some anyway.

### A. Alleged Fraud Involving the 8(a) Program

Defendants' alleged fraud involving the 8(a) Program arose out of the relationship between Defendant Rebecca Davis ("Davis") and Defendants Scott Boone ("Boone"), Daniel McGuire ("McGuire"), and Thomas Lauer ("Lauer"). The latter three were business partners in the construction industry, *id.* ¶ 8, and were ineligible to participate in the 8(a) Program.  (*Id.* ¶ 18.)  Unlike those three, Davis and her company Elstner Construction Company, Inc. ("Elstner") were 8(a) Program participants.  (*Id.* ¶ 10.)  Leveraging Davis's and Elstner's status, Boone, McGuire, and Lauer allegedly conspired with Davis to fraudulently obtain 8(a) Program set-aside contracts from Letterkenny Army Depot ("Letterkenny").

### 1. Letterkenny

Letterkenny was a United States Army facility in Chambersburg, Pennsylvania.  (*Id.* ¶ 6.)  Dating back to 2003, Boone, McGuire, and Lauer had contracted with Letterkenny and, through this work, developed "a close working

2

relationship" with an individual identified in the indictment as Government Official 1.  (*Id.* ¶ 29.)  Government Official 1 was the Chief of the Engineering and Planning Division in Letterkenny's Directorate of Public Works, which made him "responsible for overseeing and managing the real property maintenance and construction work at Letterkenny."  (*Id.* ¶ 7.)  In general, whenever the Directorate of Public Works needed work done, Government Official 1 would ask Letterkenny's contracting office to issue construction contracts.  (*Id.* ¶ 21.)  The contracting office generally obliged these requests.  (*Id.*)

During Government Official 1's tenure, Letterkenny issued many 8(a) Program contracts.  (*Id.* ¶ 17.)  These contracts were mostly "non-competitive, direct-award contracts."  (*See id.* ¶ 26.)  When such contracts were being awarded, Government Official 1 recommended 8(a) Program participants to Letterkenny's contracting office.  (*Id.* ¶ 22.)  Letterkenny's contracting office relied on these recommendations.  (*Id.* ¶ 27.)  In fact, Government Official 1 had "significant input into when the Letterkenny contracting office issued new construction contracts[,] the parties to whom those contracts were awarded," and "the dollar amounts associated with the contracts."  (*Id.* ¶¶ 27–28.)  Government Official 1's relationship with Boone, McGuire, and Lauer began developing as he recommended that 8(a) Program contracts go to several participants with whom

Boone, McGuire, and Lauer were affiliated. (*Id.* ¶ 29.) The value of these contacts totaled over $40 million. (*Id.*)

### 2. Defendants Obtain 8(a) Program Contracts

Boone, McGuire, and Lauer allegedly first began a business relationship with Davis and Elstner in about 2007. (*Id.* ¶ 30.) At the time, Davis was allegedly aware that Boone, McGuire, and Lauer had a history of working with 8(a) Program participants and Government Official 1. (*Id.* ¶ 41.) An introductory meeting between Defendants and Government Official 1 occurred in 2007. (*Id.*)

Between 2007 and 2009, Boone, McGuire, and Lauer allegedly prepared and submitted proposals under Elstner's name for 8(a) Program contracts from Letterkenny. (*Id.* ¶ 42.) Government Official 1 was responsible for reviewing technical aspects of these proposals and recommended Elstner for the contracts "on the basis of the company's affiliation with" Boone, McGuire, and Lauer. (*Id.* ¶¶ 43–44.)

In all, Elstner received five 8(a) Program contracts from Letterkenny for construction-related services between 2007 and 2009. (*Id.* ¶ 69.) Three were worth about $3.5 million each. (*Id.*) One was worth about $15 million. (*Id.*) And, one was worth about $60 million. (*Id.*) This progressive increase in the value of contracts awarded to Elstner was allegedly recommended by Government Official 1. (*Id.* ¶ 51.)

### 3. Defendants' Alleged Violations of 8(a) Program Requirements

What made this conduct fraudulent was that Defendants allegedly violated 8(a) Program rules and regulations in the course of obtaining and performing these contracts. Specifically, two requirements are at issue.

The first requirement concerns who could control the 8(a) Program company participant. To become an 8(a) Program participant, Elstner "had to be a small business that was unconditionally owned and controlled by one or more socially and economically disadvantaged individuals who were of good character and citizens of and residing in the United States." (*Id.* ¶ 15.) Elstner "had to maintain its eligibility during its tenure in the Program and had to inform the SBA of any changes that would adversely affect its Program eligibility." (*Id.* ¶ 12.) Accordingly, Davis submitted, on Elstner's behalf, annual updates to the SBA that certified Elstner "met certain requirements of the 8(a) Program, including the requirement for unconditional control." (*Id.* ¶ 16.)

The indictment lays out several ways in which Davis allegedly did not comply with the 8(a) Program's "control" requirement. For instance, Davis allegedly assigned substantial authority over one of the $3.5-million contracts to Boone, McGuire, and Lauer. (*Id.* ¶ 54.) This assignment allegedly included the authority "to prepare proposals and negotiate contracts, issue and manage subcontracts, supervise construction, negotiate change orders, control and track

project costs, prepare invoices, prepare and issue payments, and execute all documents." (*Id.*)  In connection with this assignment, Davis allegedly pledged "not [to] interfere with the day-to-day operations of her own contracts." (*Id.* ¶ 56 (internal quotation marks omitted).)  Another example is that Davis and Lauer allegedly created a business bank account for Elstner that required "both of their signatures . . . for each and every check, withdrawal, or transfer." (*Id.* ¶ 53.)  Thus, Davis could not use any funds in that account without Lauer's "express written approval." (*Id.*)  Davis allegedly also had another checking account for use on all projects managed by Boone, McGuire, and Lauer that had a similar dual-signature requirement.  (*Id.* ¶ 55.)

The second requirement concerned the amount of work on its contacts the 8(a) Program company had to do with its own employees.  To obtain an 8(a) Program contract for general construction work, the "participant had to agree to perform at least 15% of the cost of the contract with its own employees." (*Id.* ¶ 14.)  The $60-million contract Elstner obtained had a provision that seemingly related to a similar 8(a) Program requirement.  (*See id.* ¶ 65.)  That provision required Elstner to "perform on the site, and with its own organization, work equivalent to at least 10 percent of the total amount of work to be performed under the contract." (*Id.*)

Defendants allegedly violated these requirements by nominally moving employees from other companies— including from "favored subcontractors long utilized by" Boone, McGuire, and Lauer—onto Elstner's payroll. (*Id.* ¶ 59.) Despite this movement, these "employees' roles remained unchanged." (*Id.*) They did not interact with Davis or Elstner's existing employees, but rather "continued to report to the subcontracting companies from which they came." (*Id.*) Government Official 1 allegedly knew of this practice and "understood [it] was a violation of the rules and purposes of the 8(a) Program, yet . . . continued to assist [Defendants] in securing" the contracts. (*Id.* ¶ 58.)

## B. Alleged Frauds Involving SDVOSB Program

The alleged fraud involving the SDVOSB Program was executed by Boone, McGuire, and Lauer using Boone's company, Bon Secour Management, LLC ("BSM"). Boone founded BSM around 2006 and certified the company as an SDVOSB in 2011. (*Id.* ¶¶ 31–32.) McGuire and Lauer both had roles at BSM. McGuire "sought out SDVOSB contracting opportunities for" BSM and handled certain company paperwork. (*Id.* ¶ 35.) Lauer also sought out SDVOSB contracting opportunities for BSM and served as the company's "point of contact . . . in the U.S. Government's System for Award Management." (*Id.* ¶ 36.)

The alleged SDVOSB Program fraud involved a $5.3-million contract awarded to BSM in 2013 by the Veterans Affairs Medical Center in Salem,

Virigina.  (*See id.* ¶¶ 72–73.)  Under that contract, BSM agreed to replace the hospital's "high voltage distribution system."  (*Id.* ¶ 72.)  In accepting this contract, BSM had to agree to spend to "at least 15% of the labor costs associated with [the] contract  . . . on [its] own employees."  (*See id.* ¶ 34.)

BSM allegedly did not follow through.  To make it appear falsely that BSM was complying with its obligations, Boone allegedly hired an electrical subcontractor and moved employees who worked for that subcontractor onto BSM's payroll.  (*Id.* ¶¶ 78–79.)  Specifically, Boone placed onto BSM's payroll "a longtime superintendent" of the electrical subcontract as well as additional laborers.  (*Id.* ¶¶ 81–82.)  Despite being on BSM's payroll, these individuals continued reporting to the personnel at the electrical subcontractor.  (*Id.* ¶¶ 81–82.)  A document submitted by Boone to the U.S. Department of Veterans Affairs included a list of personnel that BSM intended to work on site.  (*Id.* ¶ 86.)  None of the individuals listed therein had previously worked for BSM.  (*Id.*)

## PROCEDURAL HISTORY

On December 14, 2022, a federal grand jury returned an eight-count indictment against Defendants.  The charges consist of six counts of major fraud against the United States, in violation of 18 U.S.C. § 1031, and two counts of conspiracy to commit the same, in violation of 18 U.S.C. § 371.  Each Defendant has pleaded not guilty.  (Docs. 16, 25, 27, 36.)  On May 14, 2025, Defendants filed

a motion to dismiss for legal insufficiency, a motion to dismiss under the Due

Process and Equal Protection Clauses, and a motion for a bill of particulars.[1]

(Docs. 116, 117, 121.)  Briefing occurred over the next several months according

to schedules set by the court.  (Docs. 129 & 167.)  All three motions became fully

briefed and ripe for resolution on October 29, 2025.  (*See* Docs. 118, 122, 123,

151, 152, 155, 157, 171, 180, 184.)[2]

### MOTION TO DISMISS FOR LEGAL INSUFFICIENCY

The court first considers Defendants' motion to dismiss for legal

insufficiency.  This motion requests dismissal of the indictment pursuant to Federal

Rule of Criminal Procedure 12(b)(3)(B) on the basis that it fails to state an offense.

### A. Standard of Review

Under Federal Rule of Criminal Procedure 12(b)(3)(B), a defendant may

move to dismiss an indictment for duplicity, multiplicity, lack of specificity,

improper joinder, or failure to state an offense.  Fed. R. Crim. P. 12(b)(3)(B).  To

state an offense, an indictment must provide "a plain, concise, and definite written

---

[1] Defendants also filed other pre-trial motions that either have been resolved or will be resolved in due course.

[2] On October 29, 2025, the Government filed a notice of supplemental authority, informing the court of a recent Third Circuit opinion.  (Doc. 187.)  This notice failed to comply with Local Rule 7.36 in two respects.  First, the notice far exceeds the 100-word limit.  Second, the notice contains arguments.  Due to this noncompliance, the court will not consider anything raised in the Government's notice other than the citation to the Third Circuit's opinion.  Similarly, the court will not consider Defendants' response, Doc. 189, since such responses are not contemplated by Local Rule 7.36.

statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). The indictment also must provide "the official or customary citation of the statute, rule, regulation, or other provision of law that the defendant is alleged to have violated." *Id.*

An indictment is sufficient to survive a motion to dismiss for failure to state an offense if it "(1) contains the elements of the offense intended to be charged, (2) sufficiently apprises the defendant of what he must be prepared to meet, and (3) allows the defendant to show with accuracy to what extent he may plead a former acquittal or conviction in the event of a subsequent prosecution." *United States v. Fattah*, 858 F.3d 801, 814 (3d Cir. 2017) (quoting *United States v. Stevenson*, 832 F.3d 412, 423 (3d Cir. 2016)). "'No greater specificity than the statutory language is required so long as there is sufficient factual orientation' to permit a defendant to prepare his defense and invoke double jeopardy." *United States v. Huet*, 665 F.3d 588, 595 (3d Cir. 2012) (quoting *United States v. Kemp*, 500 F.3d 257, 280 (3d Cir. 2007)). Thus, an indictment is generally sufficient where it "informs the defendant of the statute he is charged with violating, lists the elements of a violation under the statute, and specifies the time period during which the violations occurred." *Id.* (quoting *United States v. Urban*, 404 F.3d 754, 771 (3d Cir. 2005)). "In contrast, if an indictment fails to charge an essential element of the crime, it fails to state an offense." *Id.* (citing *United States v. Wander*, 601 F.2d 1251, 1259 (3d Cir. 1979)).

The court reviews the indictment "as a whole," *United States v. Schramm*, 75 F.3d 156, 162 (3d Cir. 1996), providing it "a common sense construction." *United States v. Mattia*, 157 F.4th 305, 310 (3d Cir. 2025). Even still, the court must consider only the facts alleged in the indictment. *United States v. Vitillo*, 490 F.3d 314, 321 (3d Cir. 2007). A pretrial motion to dismiss is "not a permissible vehicle for addressing the sufficiency of the government's evidence." *United States v. Gillette*, 738 F.3d 63, 74 (3d Cir. 2013) (quoting *Huet*, 665 F.3d at 595). The court's review is therefore limited to determining whether, assuming the facts alleged in the indictment are true, "a jury could find that the defendant committed the offense for which he was charged." *Huet*, 665 F.3d at 596. A district court should generally uphold an indictment "unless it is so defective that it does not, by any reasonable construction, charge an offense." *United States v. Willis*, 844 F.3d 155, 162 (3d Cir. 2016) (quoting *Vitillo*, 490 F.3d at 324).

## B. Conspiracy Counts

Defendants seek dismissal of the entire indictment, yet make no specific argument why the conspiracy counts should be dismissed. At best, the court can infer that Defendants believe the conspiracy counts fail because the Government failed to properly allege the substantive offense. This argument, if Defendants actually are making it, is unavailing.

It has been long settled that "an indictment charging a conspiracy under 18 U.S.C. § 371 need not specifically plead all of the elements of the underlying substantive offense." *United States v. Williams*, 591 F. App'x 78, 87 (3d Cir. 2014); *accord United States v. Werme*, 939 F.2d 108, 112 (3d Cir. 1991); *Wander*, 601 F.2d at 1259.  Instead, "an indictment need only set forth 'the agreement and specific intent to commit an unlawful act, and when required by statute, an overt act.'"  *Werme*, 939 F.2d at 112 (quoting *Wander*, 601 F.2d at 1259).  Defendants make no attempt to explain why the indictment fails to satisfy this standard. Accordingly, the court will not dismiss the conspiracy counts of the indictment.

## C. Major-Fraud Counts

Defendants argue that the indictment fails to allege essential elements of major fraud against the United States.  (Doc. 123, p. 18.)[3]  Those elements are: "(1) the defendant knowingly and with the intent to defraud the Government or to obtain money or property by means of materially false or fraudulent pretenses, representations, or promises; (2) executed or attempted to execute a scheme with the intent to defraud the Government; (3) the scheme took place as a part of acquiring [a contract] with the Government; and (4) the value of the contract was $1,000,000 or more."  *United States v. Whyte*, 918 F.3d 339, 350 n.13 (4th Cir. 2019).  Defendants' arguments focus on the first element.  Specifically, Defendants

---

[3] For ease of reference, the court uses the page numbers from the CM/ECF header

contend that the indictment fails to adequately allege that they intended to defraud

the Government by means of material misrepresentations.[4]

### 1. The Indictment Sufficiently Pleads the First Element of Major Fraud.

As a general matter, the court does not share Defendants' view.  The

indictment explicitly alleges that Defendants executed "a scheme and artifice with

the intent to defraud the United States and to obtain money and property by means

of false and fraudulent pretenses, representations, and promises."  (Doc. 1, ¶¶ 69,

88.)  It then goes further and details the factual basis supporting this allegation.

When "taken as a whole, read reasonably and given fair construction," *Schramm*,

75 F.3d at 162, the indictment makes clear that Defendants are accused of

concocting schemes to obtain contracts through the 8(a) and SDVOSB Programs

with no intention of complying with those programs' requirements.  The

indictment as a whole notifies Defendants what these allegedly flaunted

requirements were, *i.e.*, the 8(a) Program's "control" requirement and both

programs' employee-use requirements.  The indictment also describes certain

conduct that allegedly violated these requirements and when that conduct generally

occurred.  For instance, the indictment alleges ways in which Davis ceded control

---

[4] In their initial brief, Defendants also argued that the indictment fails to allege a scheme to harm the property rights of the United States.  (Doc. 123, p. 39.)  Defendants' position relied on the assertion that the federal fraud statutes only covered frauds that cause the victim an economic loss.  The Supreme Court rejected that assertion in *Kousisis v. United States*, 605 U.S. 114, 129 (2025).

of Elstner to Boone, McGuire, and Lauer, *see, e.g.*, Doc. 1, ¶¶ 54, 56. So, too, the indictment describes Defendants' alleged practice of nominally moving laborers onto Elstner's and BSM's payrolls, respectively, without any sort of change in those employees' roles or duties. (*See, e.g., id.* ¶¶ 57, 59, 81, 82.) The indictment also strongly suggests the ways Defendants presumably misrepresented that they were in compliance with these requirements. For example, Davis submitted annual updates certifying Elstner's compliance with 8(a) Program rules during the time Defendants' were allegedly breaking those rules. (*See id.* ¶ 16.) So, too, Boone, Lauer, and McGuire allegedly prepared contract proposals for Elstner, which presumably contained misrepresentations about the company's compliance with Program 8(a) requirements. (*See id.* ¶ 42.) Given all of this information, the court cannot conclude the indictment fails to sufficiently plead that Defendants intended to defraud the Government by means of material misrepresentations.

## 2. Defendants Have Not Identified a Fatal Flaw with the Indictment.

Defendants identify what they believe are three fatal defects with the Indictment's attempt to plead that they made material misrepresentations. The court addresses each in turn.

14

### i. Failure to Explicitly Allege that Elstner's Annual Certifications were False

Defendants first fault the indictment for not explicitly alleging that Elstner's annual certifications were false. (Doc. 123, pp. 37–39.) They believe that by failing to do so, the indictment is wrongfully attempting to plead an essential element of the offense by implication. (*Id.*) But, the indictment does no such thing. As noted above, the indictment explicitly charges that Defendants made false representations. (Doc. 1, ¶¶ 69, 88.) These allegations substantially track the statutory language. *Compare id.*, *with* 18 U.S.C. § 1031. Defendants make no argument why this court should ignore the ordinary rule that "[a]n indictment that tracks the language of the underlying statute generally suffices." *Stevenson*, 832 F.3d at 424 (quoting *United States v. Troy*, 618 F.3d 27, 34 (1st Cir. 2010)).

Defendants' argument in reality does not go to whether the indictment alleges an essential element of the offense, but to whether the indictment contains a sufficient quantity of supporting factual allegations. This is laid bare by their insistence that the indictment should contain the contents of Elstner's certifications. (*See* Doc. 123, p. 38.) Yet, our legal system has long moved past criminal pleading rules that require detailed allegations. *United States v. Resendiz-Ponce*, 549 U.S. 102, 110 (2007). As noted above, the indictment explicitly alleges that Defendants made false representations and provides enough factual context to enable Defendants to infer what those misrepresentations were.

15

Therefore, the indictment's failure to explicitly allege that Elstner's certifications were false is, at most, a technical deficiency, which is not a reason to dismiss the major-fraud counts. *See Schramm*, 75 F.3d at 163 (cautioning that "courts must ignore minor and technical deficiencies in an indictment").

### ii. Failure to Define The Regulatory Concept of "Control"

Next, Defendants believe that the indictment's failure to define SBA's regulatory concept of "control" requires its dismissal. (Doc. 123, p. 38.) Defendants' argument relies primarily on two cases, *United States v. Harra*, 985 F.3d 196 (3d Cir. 2021), and *Russell v. United States*, 369 U.S. 749 (1962). In *Harra*, the Third Circuit held that when guilt depends on the falsity of statements made in response to an objectively ambiguous reporting requirement, the Government must prove at trial that the Defendants' statements were false under every objectively reasonable interpretation of the requirement. 985 F.3d at 215. In *Russell*, the Supreme Court held that an indictment charging the defendants with refusing to testify before Congress had to identify what the grand jury found was the subject under congressional inquiry. 369 U.S. at 771. The *Russell* Court reasoned that the subject under inquiry was "a specific identification of fact" upon which "guilt depend[ed] so crucially." *Id.* at 764.

Under Defendants' theory, the SBA's "control" requirement is an ambiguous regulatory requirement pursuant to *Harra* and, therefore, the definition

16

of "control" relied upon by the grand jury is a "specific identification of fact" upon which guilt depends pursuant to *Russell*.  (Doc. 123, pp. 38–39.)  The indictment's failure to supply the definition, Defendants' theory continues, leaves them susceptible to being convicted under a definition of "control" that is different than the one presented to the grand jury, thus undermining their Sixth Amendment rights.  (*See* Doc. 123, pp. 24–25.)

Defendants' theory is unpersuasive, because *Harra* and *Russell* are readily distinguishable.  *Harra*'s ruling came in a post-trial context and considered what the Government must prove at trial, not what the indictment must plead.  Contrary to what Defendants seemingly contend, *see* Doc. 157, p. 11, different standards govern what the Government must plead versus what it must prove at trial.  After all, an indictment need not lay out the evidentiary details of the Government's case.  *United States v. Clark*, No. 2:24-cr-246, 2025 WL 2826004, at *1 (W.D. Pa. Oct. 3, 2025); *see also United States v. Rafoi*, 60 F.4th 982, 994 (5th Cir. 2023) (quoting *United States v. Gordon*, 780 F.2d 1165, 1172 (5th Cir. 1986)) ("[A] defendant's constitutional *right* to know the offense with which he is charged must be distinguished from a defendant's *need* to know the evidentiary details establishing the facts of such offense, which can be provided through a motion for bill of particulars.").

Defendants are correct that a motion for acquittal considers whether the Government has proven beyond a reasonable doubt the essential elements of the crime. *United States v. Tyler*, 956 F.3d 116, 122 (3d Cir. 2020). So, a ruling on a motion for acquittal could shed light on what the essential elements of a crime are. But, whether the indictment has sufficiently pleaded an essential element is a distinct question from whether the trial evidence has proven that essential element. While *Harra* may require the Government at trial to prove Defendants' alleged misrepresentations were false under every reasonable interpretation of SBA regulations, it does not require the Government to explain how it plans to do so in the indictment. To hold otherwise would require the Government to meet a pleading standard that simply is not contemplated by Rule 7(c)(1). *See Resendiz-Ponce*, 549 U.S. at 110 (explaining that "[w]hile detailed allegations might well have been required under common-law pleading rules . . . they surely are not contemplated by Rule 7(c)(1)").

*Russell* is similarly inapposite. There, the indictment's failure to define the subject under congressional inquiry left "the chief issue" of the entire prosecution "undefined" and, thus, failed to inform defendants of the offenses against them. *Russell*, 369 U.S. at 766. This failure to inform was especially evident in one of the consolidated cases, where the defendant had never been informed of "what subject the subcommittee was investigating" and "at every stage in the ensuing

18

criminal proceeding . . . was met with a different theory, or by no theory at all, as to what the topic had been." *Id.* at 767–68.  In fact, the Government's articulation of the subject under inquiry at trial was different than the one it presented to the Supreme Court.[5]  *Id.* at 767.  This variation highlighted that the indictment's flaw could lead the defendant to "be convicted on the basis of facts not found by, and perhaps not even presented to, the grand jury which indicted him." *Id.* at 770.

The flaw in the *Russell* indictments is different from the flaw Defendants see in the present indictment.  *Russell* dealt with the omission of a fact; this case involves the omission of a legal definition.  The Supreme Court addressed the difference between the two in *Hamling v. United States*, 418 U.S. 87, 117–19 (1974).  There, the Court found that an indictment's failure to plead the definitional components of "obscenity" did not render it constitutionally deficient.  *Id.* at 118–19.  The Court recognized that *Russell* did not compel a different outcome.  *See id.* at 118.

Thus, *Hamling* made clear that *Russell* does not disturb two general rules.  First, an indictment may use a legal term of art so long as "it is a term sufficiently definite in legal meaning to give a defendant notice of the charge against him." *Id.*

---

[5]At trial, the Government stated that the subject was "Communist activities generally." *Russell*, 369 U.S. at 767.  At the Supreme Court, the Government stated that the subject was "Communist activity in news media." *Id.*

at 118; *accord United States v. Aliperti*, 867 F. Supp. 142, 145 (E.D.N.Y. 1994).[6]

Second, "an indictment that charges a legal term of art 'sufficiently charges the

component parts of the term.'" *United States v. Cefaratti*, 221 F.3d 502, 507 (3d

Cir. 2000) (quoting *United States v. Wicks*, 187 F.3d 426, 429 (4th Cir. 1999));

*accord Hamling*, 418 U.S. at 119.

Defendants attempt to save their theory by arguing that the regulatory

concept of "control" does not have a sufficiently definite meaning.  Indeed,

Defendants go so far as to state, without citing any supporting authority, that

"'control' has no fixed meaning."  (Doc. 157, p. 23.)  Defendants' position is

belied by their prior acknowledgements.  In a previous filing, they recognized that

13 C.F.R. § 124.106 governs what constitutes "control" for the purposes of

eligibility for the 8(a) Program and appreciated that this "regulation[] provide[s]

guidance on evaluating . . . control."  (Doc. 90, p. 30.)

A closer look at 13 C.F.R. § 124.106 reveals that the meaning of "control" is

not nearly as imperceptible as Defendants make it seem.  The court's own analysis

reveals that § 124.106's core requirements have remained constant since at least

2004.  An 8(a) Program participant has to "be managed on a full-time basis by one

---

[6] More generally, an indictment may use words with special or technical meanings so long as
those meanings are well known.  *United States v. Quong*, 303 F.2d 499, 503 (6th Cir. 1962); 1
Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 126 (5th ed. Sept.
2025 Update); *see Mattia*, 157 F.4th at 312 (finding that indictment may use a term whose
meaning could change depending on context when term "apprise[d]" the defendant "of what he
needs to meet at trial").

or more disadvantaged individuals who possess requisite management capabilities." 13 C.F.R. § 124.106(a)(1). This includes the corollary requirements that "a disadvantaged full-time manager must hold the [participant's] highest officer position" and that "[o]ne or more disadvantaged individuals who manage the . . . Participant generally must devote full-time to the business." 13 C.F.R. § 124.106(a)(2), (3). So, too, "[o]ne or more disadvantaged individuals must control the Board of Directors of a corporate . . . Participant." 13 C.F.R. § 124.106(d). The regulation also spells out exactly when the "SBA will deem disadvantaged individuals to control the Board of Directors." 13 C.F.R. § 124.106(d)(1). Defendants fail to reconcile how "control" can have no fixed meaning, yet be governed by such a detailed regulation. Accordingly, the court determines that "control" has sufficiently definite legal meaning such that the indictment did not need to define it to pass constitutional muster.

### iii. Reliance on Purported Misrepresentations Implicit in Conduct

Finally, Defendants fault the indictment for not explicitly alleging that they made false representations about their compliance with SBA's employee-use requirements. In Defendants' mind, the indictment merely alleges that they created the false impression of compliance with those requirements. (Doc. 123, pp. 34–36.) Defendants claim such allegations are insufficient under *United States v. Frankel*, 721 F.2d 917 (3d Cir. 1983).

21

In *Frankel*, the defendant was charged with mail fraud and wire fraud "for operating a check kiting scheme." *Id.* at 917.   The defendant wrote checks from two accounts to another, knowing that the paying accounts did not have sufficient funds.  *Id.* at 917–18.  The defendant then would use the artificial balance created to pay off his creditors.  *Id.* at 918.  The *Frankel* indictment alleged that the defendant made false representations in executing the alleged fraud.  *Id.* at 917. The only misrepresentation the charges relied upon was that adequate funds existed in the defendant's account, which was "implicit in the presentation of the checks." *Id.* at 919.  Applying Supreme Court precedent, the Third Circuit held that this purported misrepresentation could not be the basis for the charged crimes, because presenting a check for deposit "is not a factual assertion at all, and therefore cannot be characterized as 'true or false.'"  *Id.* (quoting *Williams v. United States*, 458 U.S. 279, 284 (1982)).  According to Defendants here, the instant indictment runs afoul of *Frankel's* holding because it does nothing more than allege a misrepresentation that is implicit in conduct.  (Doc. 123, p. 35.)  The Government offers no retort.

Nevertheless*, Frankel* is distinguishable from the present case.  A common-sense reading of the indictment suggests that the Government's case relies on actual misrepresentations, not purported misrepresentations implicit in conduct. With respect to the 8(a) Program scheme, the indictment suggests Davis provided

false annual updates that Elstner was complying with 8(a) Program rules and requirements.  (*See* Doc. 1, ¶ 16.)  It also suggests that Boone, McGuire, and Davis allegedly prepared bids for 8(a) Program contracts on Elstner's behalf, *id.* ¶ 42, which presumably involved some sort of false representation that Elstner was eligible for 8(a) Program contracts.  With respect to the SDVOSB Program, the indictment suggests Boone, McGuire and/or Lauer promised that BSM would abide by the SDVOSB employee-use requirement in securing the contract in Viriginia.  (*See id.* ¶¶ 32–36, 79.)  These are all actual misrepresentations.  Given this, Defendants reliance on *Frankel* is unpersuasive.

### D. Conclusion

The indictment satisfies its constitutional function of "fairly inform[ing]" Defendants of the crimes "against which [they] must defend" as well as "enabl[ing] [them] to plead an acquittal or conviction in bar of future prosecutions for the same offense."  *Resendiz-Ponce*, 549 U.S. at 108 (quoting *Hamling*, 418 U.S. at 117).  Accordingly, the court will deny Defendants' motion to dismiss for legal insufficiency.

MOTION TO DISMISS UNDER DUE PROCESS AND EQUAL PROTECTION CLAUSES

The court next considers Defendants' other motion to dismiss. (Doc. 121.) This motion asks the court to dismiss the counts related to the 8(a) Program on the ground that it violates Defendants' rights under the Due Process and Equal Protection Clauses.[7] Defendants' argument proceeds in three parts. First, they argue that the 8(a) Program's eligibility rules during the relevant time were unconstitutional, because the program used race-based presumptions to award contracts. (Doc. 171, pp. 5–7.) They then contend this unconstitutionality has two consequences. One, the Government cannot as a matter of law establish the materiality element of major fraud. (*Id.* at 9–14.) Two, the Government's theory of the case is so "intertwined" with the unconstitutionality of the 8(a) Program that the present prosecution is nothing more than an attempt to enforce unconstitutional racial set-asides against Defendants, which violates their rights under the Due Process and Equal Protection Clauses. (*Id.* at 14–16.)

A. Unconstitutionality of 8(a) Program

The court need not consider or detail the minutiae of Defendants' arguments as to why the 8(a) Program's eligibility rules were unconstitutional. In short, Defendants argue that the case *Ultima Services Corp. v. U.S. Department of*

---

[7] Although styled as a "motion to dismiss the indictment," the motion makes no argument why the court should dismiss the counts related to the SDVOSB Program.

*Agriculture*, 683 F. Supp. 3d 745 (E.D. Tenn. 2023) definitively settled the question.  (*See* Doc. 122, pp. 2–5.)  This was evident, according to Defendants, by the fact that the Government never challenged *Ultima* and changed the eligibility rules to conform with the decision.  (*See id.* at 2.)  The Government offers no defense of the prior eligibility rules.  Accordingly, the court will assume, without deciding, that the 8(a) Program's then-effective eligibility rules were unconstitutional.

### B. Materiality

Before contemplating the interplay between this assumed unconstitutionality and materiality, the court first looks at whether the indictment has sufficiently pleaded materiality in general.  A federal fraud conviction requires proof of a material falsehood.  *Cf. Neder v. United States*, 527 U.S. 1, 25 (1999) ("[M]ateriality of falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes").  An indictment sufficiently alleges this element "so long as the facts alleged in the indictment warrant an inference" of materiality.  *United States v. Saybolt*, 577 F.3d 195, 205 (3d Cir. 2009) (quoting *United States v. Creech*, 408 F.3d 264, 269 (5th Cir. 2005)).

"The materiality standard is demanding," *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 194 (2016), and "substantially narrows the universe of actionable misrepresentations." *Kousisis*, 605 U.S. at 135.

Similar to "a but-for standard, materiality asks whether the misrepresentation 'constitut[ed] an inducement or motive' to enter into a transaction." *Id.* at 131 (quoting *Smith v. Richards*, 38 U.S. (13 Pet.) 26, 39 (1839)); *accord Neder*, 527 U.S. at 22–23 (quoting 1 J. Story, *Commentaries on Equity Jurisprudence* § 195 (10th ed. 1870)) ("In the first place, the misrepresentation must be of something material, constituting an inducement or motive to the act or omission of the other party."). The analysis "look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Universal Health*, 579 U.S. at 193 (quoting 26 R. Lord, Williston on Contracts § 69:12, p. 549 (4th ed. 2003)); *accord Kousisis*, 605 U.S. at 131.

Defendants argue that materiality also requires that a misrepresentation go to the "essence of the bargain." (Doc.171, p. 9.) To Defendants, a misrepresentation is material only if it relates to the very fundamental basis of the bargain. (Doc. 123, pp. 19–20.) Defendants contend that the Third Circuit adopted this "heightened standard" in its opinion in *United States v. Kousisis*, 82 F.4th 230 (3d Cir. 2023), *aff'd*, 605 U.S. 114 (2025). (Doc. 123, p. 19–20.) The Government offers no position on this issue.

Even assuming *arguendo* that the Third Circuit in *Kousisis* adopted an essence-of-the-bargain standard, that case supports the conclusion that the present

indictment meets the standard.[8]  In *Kousisis*, the defendants were indicted for defrauding the U.S. Department of Transportation's disadvantaged business enterprise program.  82 F.4th at 234–35.  They had submitted contract proposals in which they committed, pursuant to the program's regulations, to contracting with a disadvantaged business enterprise for a specific percentage of the contract amount. *Id.* at 234.  The contracts at issue provided that failure to comply with these obligations would be a material breach of the contracts.  *Id.*  Nevertheless, the defendants disregarded these obligations and submitted false documentation stating they were in compliance.  *Id.* at 235.  The Third Circuit determined that the evidence on these facts presented at trial supported a federal fraud conviction.  *Id.* at 241.  When referencing materiality, the Third Circuit found that participation of disadvantaged business enterprises was "an essential component of the contract" and had there been none, "the nature of the [p]arties' bargain would have been different."  *Id.*

Defendants latch onto this language to argue that the Third Circuit adopted an essence-of-the-bargain test, but make no attempt to distinguish the underlying facts.  Ultimately, the misrepresentations in both *Kousisis* and the present case concern compliance with eligibility requirements for set-aside contracts.  The

---

[8] To be clear, the court reserves ruling on whether the essence-of-the-bargain standard governs. Nothing in this opinion should preclude the parties from making further arguments on this issue.

defendants in *Kousisis* falsely promised to follow such requirements to induce a transaction.  *See id.* at 234.  Defendants allegedly did the same here.  If the misrepresentations in *Kousisis* went to the nature of the bargain, the court sees no reasons why Defendants' misrepresentations do not.  Accordingly, the court finds that the indictment alleges sufficient facts to warrant an inference that Defendants' misrepresentations concerning their eligibility for the set-aside contracts were material to the transactions involving the contracts.[9]

That conclusion, of course, does not end the court's inquiry.  Defendants contend that the unconstitutionality of the 8(a) Program's prior eligibility requirements forecloses any finding of materiality as a matter of law.  Those requirements were not, however, determined to be unconstitutional at the time Defendants' alleged fraud was occurring.  The *Ultima* court found the requirements unconstitutional in 2023.  Therefore, the issue the court must address is whether Defendants' alleged misrepresentations ceased to be material after *Ultima's* ruling.  Fortunately, the Supreme Court settled that question long ago.

In *United States v. Kapp*, defendants were charged with "conspiracy to defraud the United States by furnishing false information and making false

---

[9] Defendants rely heavily on Justice Thomas's concurring opinion in *Kousisis*, 605 U.S. at 135–46 (Thomas, J. concurring), which expressed doubt that provisions requiring petitioners to comply with regulations governing the disadvantaged business enterprise program were material under the essence-of-the-bargain test.  Without commenting on its merits, Justice Thomas's concurring opinion is not binding on this court, whereas the Third Circuit's opinion is.

statements to the Secretary of Agriculture."  302 U.S. 214, 215 (1937).  The object of the fraud was "to secure benefit payments under the Agricultural Adjustment Act of May 12, 1933."  *Id.*  The defendants secured such payments by allegedly lying about who were the producers of hogs that the defendants sold to the Government.  *Id.*  The defendants argued that the indictment was invalid due to the fact that the Supreme Court had previously invalidated the relevant provisions of the Agricultural Adjustment Act.  *Id.*  The district court agreed.  *Id.* at 216.  It ruled that the defendants' misrepresentations "cease[d] to be a material fact," since relevant provisions of the statute were void.  *Id.*

The Supreme Court, however, reversed.  *Id.* at 218.  The Court explained, "Congress was entitled to protect the government against those who would swindle it regardless of questions of constitutional authority as to the operations that the government is conducting."  *Id.*  Otherwise, "[i]t might as well be said that one could embezzle moneys in the United States Treasury with impunity if it turns out that they were collected in the course of invalid transactions."  *Id.* at 217.  The Supreme Court was as clear as can be: A material misrepresentation made pursuant to a statute or regulation does not cease to be material when that statute or

regulation is later found to be unconstitutional.  *Id.* at 218.  That principle applies

with equal force here.[10]

## C. Due Process and Equal Protection Considerations

What is left of Defendants' argument is the contention that this prosecution

effectively enforces unconstitutional race-based eligibility rules against Defendants

in violation of the Due Process and Equal Protection.  As Defendants see it, there is

no constitutional difference between criminally punishing them for accessing the

8(a) Program contracts and preferentially allocating the contracts on the basis of

race.  (Doc. 184, p. 7.)  Throughout their briefing, Defendants use the language of

"intertwinement."  They argue, "a prosecution theory that is 'intertwined' with a

constitutional violation requires dismissal."  (Doc. 184, p. 6.)  Defendants do not,

however, adequately explain how this intertwinement theory applies in a

prosecution for fraud.

Defendants cite *Texas v. Johnson*, 491 U.S. 397 (1989), as a paradigmatic

example of when the intertwinement of a prosecution and unconstitutionality

requires dismissal.  (Doc. 184, p. 6.)  But, *Johnson* deals with a wholly distinct

situation.  That case involved a prosecution for desecrating the American flag,

which the Supreme Court determined was constitutionally protected activity.  491

---

[10] Defendants contend that *Kapp* cannot speak to what the essence-of-the-bargain standard requires because that case involved no bargained-for exchange.  Defendants are wrong.  The defendants in *Kapp* sold "hogs to the government at premium prices through misrepresentations." 302 U.S. at 215.

U.S. at 399.  The activity giving rise to the charges was protected; thus, the

initiation of the prosecution itself was a violation of the defendant's constitutional

rights.  *Johnson* simply supports the obvious proposition that an individual may not

be prosecuted for engaging in protected activity.  It does not speak to the propriety

of prosecuting individuals for engaging in fraud—an indisputably unprotected

activity, *United States v. Alvarez*, 567 U.S. 709, 723 (2012) (plurality opinion)—

when doing so might incidentally implicate constitutional protections.

     Cases that do speak to this issue, however, are *Bryson v. United States*, 396

U.S. 64 (1969) and *Dennis v. United States*, 384 U.S. 855 (1966).  Both cases

involved a then-present provision in the National Labor Relations Act—referred to

as Section 9(h)—which stipulated that labor unions could not secure certain NLRB

services unless each officer of the union and its parent organization submitted

affidavits affirming that they were not a member of the Communist Party.  *Dennis*,

384 U.S. at 857.  In both cases, the defendants were charged with falsely denying

their Communist affiliation in affidavits submitted to the NLRB.  *Bryson*, 396 U.S.

at 65; *Dennis*, 384 U.S. at 857.  Both sets of defendants sought to have the

indictments dismissed on the grounds that Section 9(h) violated their constitutional

rights.[11]   *Bryson*, 396 U.S. at 67–68; *Dennis*, 384 U.S. at 864–65.  The *Dennis*

court articulated the following "governing principle":

> [A] claim of unconstitutionality will not be heard to excuse a voluntary,
> deliberate and calculated course of fraud and deceit.  One who elects
> such a course as a means of self-help may not escape the consequences
> by urging that his conduct be excused because the statute which he
> sought to evade is unconstitutional.

*Id.* at 867.  The *Bryson* court found this principle equally applicable to the facts

presented therein.  396 U.S. at 68.  The plain lesson of these cases is that the

constitution offers no respite to those who fraudulently circumvent the law.

Defendants claim *Bryson* and *Dennis* are distinguishable.  They contend that

"the prosecution theories" in those cases "were independent of the underlying

constitutional violation."  (Doc. 184, p. 7.)  As opposed to here, according to

Defendants, where the prosecution theory is "intertwined" with the constitutional

violation.  (*Id.*)  Far from distinguishing the present case, Defendants' arguments

echo those made in *Dennis*.  Those petitioners argued that their case was distinct

from cases like *Kapp* because their constitutional challenge went "to the propriety

---

[11] Prior to *Dennis*, the Supreme Court upheld the constitutionality of Section 9(h) in *American Communications Ass'n v. Douds*, 339 U.S. 382 (1950).  *Dennis*, 384 U.S. at 864–65.  Congress then replaced Section 9(h) with a provision that "made it a crime for a member of the Communist Party to hold office or any other substantial employment in a labor union."  *Id.* at 864.  The Supreme Court struck the new provision down as a bill of attainder in *United States v. Brown*, 381 U.S. 437 (1965).  *Dennis*, 384 U.S. at 864.  Both the *Dennis* and *Bryson* petitioners argued that *Brown* had effectively overruled *Doud*.  *Id.* at 846–65; *see Bryson*, 396 U.S. at 66.

of the very question—Communist Party membership and affiliation— which

petitioners are accused of answering falsely." *Dennis*, 384 U.S. at 867.  The Court

found "this distinction as without force" and recognized that prosecuting fraud is

not the same as enforcing a "statute claimed to be unconstitutional."  *Id.*

This fundamental principle is ultimately what reveals the defect in

Defendants' conception of this case.  By prosecting Defendants' alleged fraud, the

Government is not attempting to enforce the 8(a) Program's prior eligibility rules.

To hold otherwise, the court would have to turn a blind eye to *Dennis* and *Bryson*.

If Defendants believed that those rules violated their constitutional rights, they

could have challenged them many years ago.  They cannot avoid prosecution for

fraudulently violating these rules by belatedly challenging their constitutionality.

### D. Conclusion

Defendants have failed to show that the unconstitutionality of the 8(a)

Program's prior eligibility rules require the dismissal of this case.  Accordingly,

the court will deny their motion to dismiss the indictment under the Due Process

and Equal Protection Clauses.

## MOTION FOR BILL OF PARTICULARS

In the alternative, Defendants move for a bill of particulars.  (Doc. 117.)

While the indictment satisfies Rule 7(c)(1) and fulfills its constitutional function,

the necessity of a bill of particulars is a separate question.  *See United States v.*

*Tranquillo*, 606 F. Supp. 2d 370, 382 (S.D.N.Y. 2009) (recognizing that "[a]n

indictment may fulfill the requirements of [Rule] 7(c)(1) but nonetheless may

provide insufficient information to permit the preparation of an adequate defense").

Upon consideration of the question, the court determines that a bill of particulars is

necessary in this case.  Thus, the court will grant in part and deny in part

Defendants' motion.

### A. Standard of Review

Federal Rule of Criminal Procedure 7(f) gives courts the power to "direct the

government to file a bill of particulars."  Fed. R. Crim. P. 7(f).  "A bill of

particulars is a 'formal, detailed statement of the claims or charges brought by . . .

a prosecutor."  *Urban*, 404 F.3d at 771 (quoting Black's Law Dictionary 177 (8th

ed. 2004)).  Its purpose is "to inform the defendant of the nature of the charges

brought against him, to adequately prepare his defense, to avoid surprise during the

trial and to protect him against a second prosecution for an inadequately described

offense."  *Id.* (quoting *United States v. Addonizio*, 451 F.2d 49, 63–64 (3d Cir.

1971)).

The decision whether to require a bill of particulars has long been committed to the trial court's discretion. *Will v. United States*, 389 U.S. 90, 98–99 (1967); *Addonizio*, 451 F.2d at 64. In general, courts should grant a motion for a bill of particulars "whenever an indictment's failure to provide factual or legal information significantly impairs the defendant's ability to prepare his defense or is likely to lead to prejudicial surprise at trial." *United States v. Rosa*, 891 F.2d 1063, 1066 (3d Cir. 1989); *accord Urban*, 404 F.3d at 771–72. This standard calls for courts to consider "matter[s] of degree" and cannot be reduced to "definite rules." *Addonizio*, 451 F.2d at 64 (quoting *United States v. Russo*, 260 F.2d 849, 850 (2d Cir. 1958)).

Nevertheless, a bill of particulars is not a discovery tool intended to "provide the defendant with the fruits of the government's investigation." *United States v. Smith*, 776 F.2d 1104, 1111 (3d Cir. 1985); *accord Addonizio*, 451 F.2d at 64; *United States v. Tedesco*, 441 F. Supp. 1336, 1343 (M.D. Pa. 1977) (noting that a bill of particulars is not "a means of compelling disclosure of every detail of the preparation and theory of the Government's case."). Instead, "it is intended to give the defendant only that minimum amount of information necessary to permit the defendant to conduct his *own* investigation." *Smith*, 776 F.2d at 1111.

### B. Defendants' Requests

Defendants seek a bill of particulars in order to compel the Government to identify the following: (1) the specific misrepresentations by which they executed the alleged fraudulent schemes and the factual basis for the materiality of those misrepresentations; (2) the rules and regulations of the 8(a) and SDVOSB Programs that they violated; (3) the identities of unnamed conspirators and/or aiders and abettors; and (4) the factual basis for the alleged attempt charge. (Doc. 118, p. 5.) The court considers each in turn.

### 1. Specific Misrepresentations and Their Materiality

Defendants contend that the Government should identify the specific material misrepresentations that are the basis for the charges here. (Doc. 118, pp. 6–10.) Otherwise, Defendants argue that they suspectable to prejudicial surprise at trial. (*Id.* at 6.) The Government counters that the indictment itself and the discovery given to Defendants provide them sufficient information to discern the material misrepresentations the Government intends to prove. (Doc. 151, p. 27–31.)

The court starts by noting that the indictment, far from being a paragon of clarity, relies heavily on implication. For instance, as noted above, the indictment does not specifically allege that any of Elstner's annual updates contained false statements, let alone identify what those misstatements were. (*See* Doc. 1, ¶ 16.)

The reader is left to infer as much from the rest of the indictment.  More generally, the indictment does not explicitly identify any specific material misrepresentation that any Defendant made to a government official.  The indictment leaves Defendants—and the court, for that matter—guessing as to what specific misrepresentations the Government will seek to prove at trial.  To be clear, the indictment provides enough information to put Defendants on notice that they are charged with making misrepresentations about their eligibility for contracts through the 8(a) and SDVOSB Programs.  But, it does not provide enough information to protect Defendants from surprise at trial.

The alleged criminal conduct in this case spanned sixteen years, Doc. 1, ¶¶ 39, 77, and involved multi-year-long contractual relationships likely involving, as Defendants note, thousands of representations.  (Doc. 155, p. 3.)  It is unreasonable to expect Defendants to guess which of these they will need to defend against at trial, especially since "the government knows precisely the statements on which it intends to rely and can easily provide the information." *United States v. Trie*, 21 F. Supp. 2d 7, 21 (D.D.C. 1998).  Without further clarity, "the burden of proof impermissibly may shift," in effect, to Defendants to prove all of their representations were not fraudulent.  *United States v. Rinsch*, No. 25-cr-85, 2025 WL 2972226, at *9 (S.D.N.Y. Oct. 22, 2025) (quoting *United States v. Vaid*, No. 16-cr-763, 2017 WL 3891695, at *11 (S.D.N.Y. Sept. 5, 2017)).

The Government's production of discovery does not obviate the issue. In many cases, "access to discovery . . . weakens the case for a bill of particulars." *Urban*, 404 F.3d at 772. But, that does not mean "disclosure . . . of 'mountains of documents' is . . . an adequate substitute for a bill of particulars when the disclosure does not provide guidance regarding what the government would prove at trial." *United States v. Kemp*, No. 04-cr-370, 2004 WL 2757867, at *8 (E.D. Pa. Dec. 2, 2004); *accord United States v. Bortnovsky*, 820 F.2d 572, 575 (2d Cir. 1987) (finding district court erred in not granting motion for bill of particulars when the Government provided "mountains of documents to defense counsel who were left unguided as to which documents would be proven falsified"); *United States v. Holmes*, No. 5:18-cr-00258, 2020 WL 666563, at *9 (N.D. Cal. Feb. 11, 2020) (finding a bill of particulars warranted since the "universe of potential misrepresentations [was] vast" and the discovery in th[e] case [was] immense").

Here, Defendants report that discovery provided by the Government consists of over 250,000 documents that cover a 20-year period. (Doc. 118, p. 8.) Most of the documents contain multiple pages and some even contain over 1,000 pages. (*Id.*) Providing such "a needle in a haystack is akin to not providing . . . a needle at all." *United States v. Khalil*, No. 22-cr-20200, 2024 WL 3160668, at *4 (E.D. Mich. June 25, 2024). Accordingly, a bill of particulars is necessary to apprise

Defendants of the affirmative misrepresentations and/or material omissions that the Government intends to prove at trial.[12]

Defendants also want the Government to explain why their misrepresentations are material.  (Doc. 118, pp. 6–7.)  But, they fail to explain why such explanation is necessary for them to prepare for trial.   As noted above, the indictment provides sufficient facts to warrant an inference that Defendants made misrepresentations about their compliance with SBA's control requirement and employee-use requirements, which in turn allegedly induced the Government into awarding them the set-aside contracts.  Defendants have failed to explain why more information concerning materiality is needed.  Thus, the Government need not provide that information in a bill of particulars.

## 2.  The Regulations and Rules Defendants Allegedly Violated

Defendants also argue the bill of particulars must identify the specific regulations that the Defendants allegedly violated.  They believe the indictment's failure to do so "significantly impairs" their ability to prepare for trial.  (Doc. 118, p. 11.)  For instance, Defendants claim that the indictment's use of the phrase "unconditional control" creates ambiguity as to which 8(a) Program rule they violated, because 8(a) program regulations do not require "unconditional control."

---

[12] The indictment does not clearly indicate that the Government intends to prove material omissions.  But, the Government's briefing suggests otherwise.  (Doc. 180, p. 14 n.5.)

(Doc. 155, pp. 5–6.)  Moreover, Defendants claim they are unsure as to which of multiple regulations regarding the employee-use requirements the Government will rely upon in this case.  (*Id.* at 6–9.)  The Government responds that the indictment's allegations plus the discovery provided to Defendants puts them on notice of the laws and regulations at issue.

The Government's response is unconvincing.  The indictment does not identify any SBA rule or regulation underpinning the Government's case.  Instead, the indictment merely uses generalities, such as "the rules and purpose of the 8(a) Program."  (Doc. 1, ¶ 58.)  The Government is right that Defendants are aware of the rules and regulations that seemingly are at issue in this case.  Indeed, they identify several regulations in their briefing on the instant motion, Doc. 155, pp. 5–9, and in previous filings, Doc. 90, pp. 30–32.  Nevertheless, Defendants' general awareness of SBA rules and regulations does not excuse the Government from clearly informing them of those that will be central to this case.  The general allusion to regulations and rules in the indictment is not sufficient when so many rules and regulations govern the 8(a) and SDVOSB Programs.

*Khalil* is instructive.  In that matter, the defendants were charged with healthcare-related frauds.  *Khalil*, 2024 WL 3160668, at *1.  The indictment alleged, in one count, that defendants fraudulently "impede[d] Medicare administration and oversight," yet did "not identify any specific violation of a rule

or regulation." *Id.* at *3.  In another count, it alleged that Defendants had failed to comply with obligations they had pursuant to Medicare regulations, yet did not identify the source of those obligations.  *Id.*  The most the indictment did was generally cite to "Medicare guidance," which "encompass[es] nearly forty chapters and thousands of pages."  *Id.* at *4.  The indictment's shortcomings led the *Khalil* court to order the Government to provide a bill of particulars that identified "what law, rule, regulation, or other authority it will claim establishes or bears upon Defendants' culpability under [the two counts]."  *Id.*

The indictment here similarly alludes to violations of regulations, yet fails to identify them.  Given the complexity of this fraud case and the regulatory regime involved, Defendants are entitled to know what rules and regulations are relied upon by the Government.[13]

### 3.  Unindicted Coconspirators and Aiders and Abettors

The indictment alleges in the conspiracy counts that Defendants "conspire[d] . . . together and with other persons both known and unknown to the Grand Jury." (Doc. 1, ¶¶ 39, 76.)  Similarly, the indictment alleges in the substantive counts that

---

[13] In passing, Defendants suggest that the Government should not only identify the rules and regulations Defendants allegedly violated, but also the Government's interpretation of them. That request seeks "the legal theories upon which [the Government] intends to rely at trial." *United States v. Delle Donna*, 552 F. Supp. 2d 475, 498 (D.N.J. 2008) (quoting *United States v. Burgin*, 621 F.2d 1352, 1359 (5th Cir. 1980)).  Such a request is outside the proper purview of a bill of particulars.  *Id.*

Defendants "aided and abetted each other and other persons both known and unknown to the Grand Jury." (*Id.* 69, 88.) Defendants argue they are entitled to learn the identities of these unnamed individuals.

Courts are "highly reluctant to require a bill of particulars when defendants have asked for specific identities of coconspirators or others allegedly involved." *United States v. Sampson*, No. 4:11-cr-155, 2012 WL 214707, at *2 (M.D. Pa. Jan. 24, 2012) (quoting *United States v. Coffey*, 361 F. Supp. 2d 102, 122 (E.D.N.Y. 2005)); *accord United States v. Smukler*, 330 F. Supp. 3d 1050, 1066 (E.D. Pa. 2018); *United States v. Knight*, No. 12-cr-0367, 2013 WL 3367259, at *4 (E.D. Pa. July 3, 2013). Defendants simply argue, in a conclusory fashion, that their ability to prepare for trial will be "unfairly hampered" unless the Government reveals the identities of unindicted co-conspirators. (Doc. 118, pp. 12–13.) This argument is belied by the fact that the Government provided Defendants, among other discovery, several dozen witness-interview memoranda, some of which involved cooperating witnesses. (Doc. 151, p. 29, 36 n.5.) In light of the discovery provided and without a more particularized argument as to why their defense is being hindered, Defendants have failed to show they are entitled to a bill of particulars on this issue.

### 4. Attempt Charge

Finally, the indictment's substantive counts include allegations that Defendants "willfully executed and attempted to execute . . . a scheme and artifice with intent to defraud the United States." (Doc. 1, ¶¶ 69, 88.) Defendants contend that the Government should identify the factual basis for this attempt charge. (Doc. 118, p. 13.) The Government retorts that this is an improper effort to obtain the Government's evidence and theories of criminal liability. (Doc. 151, pp. 37–38.)

The court finds Defendants' argument persuasive. Read as a whole, the indictment describes executed fraud schemes. Nowhere in the indictment can one gleam any attempted, uncompleted schemes. Given the indictment's lack of clarity as to any attempted schemes, Defendants' request cannot be characterized as improper. If the Government is charging Defendants with an attempt crime, they are entitled to know the factual basis for such a charge. *See Rosa*, 891 F.2d at 1066 (recognizing that defendants have a "legitimate interest in securing information concerning the [G]overment's case.") Otherwise, Defendants would be left guessing about what they would have to be prepared to meet at trial.

### C. Conclusion

While the present indictment provides sufficient notice to Defendants to survive the motions to dismiss, certain of its shortcomings substantially hinder

43

Defendants' ability to prepare for trial.  Accordingly, the court will grant in part and deny in part the motion for bill of particulars in order to address these shortcomings.

SUMMARY OF RULINGS

For the reasons explained above, the court will deny Defendants' motion to dismiss for legal insufficiency and their motion to dismiss under the Due Process and Equal Protection Clauses.  The court will, however, grant in part and deny in part Defendants' motion for a bill of particulars.  An appropriate order will issue.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Judge
Middle District of Pennsylvania

Dated: December 9, 2025