**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Crim. No. 1:22-CR-00426 |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| SCOTT E. BOONE, *et al.* | : | Judge Jennifer P. Wilson |

**<u>MEMORANDUM</u>**

Defendants Scott Boone ("Boone"), Daniel McGuire ("McGuire"), Thomas Lauer ("Lauer"), and Rebecca Davis ("Davis") (collectively, "Defendants") stand accused of major fraud against the United States, 18 U.S.C. § 1031, and conspiracy to commit the same, 18 U.S.C. § 371.  Among other pretrial motions, Defendants filed a motion to dismiss the indictment for prejudicial pre-indictment delay.  A multi-day hearing on that motion is scheduled to take place next month.  In connection with the hearing, the Government issued a subpoena *ad testificandum*. Currently pending before the court is a motion to quash that subpoena.  For the reasons that follow, the court will grant the motion.

**BACKGROUND**

The Government alleges that Defendants fraudulently obtained construction-related contracts through the Small Business Administration's 8(a) Business Development Program ("8(a) Program") and the Service-Disabled Veteran Owned

1

Small Business Program ("SDVOSB Program").[1]  A full recounting of how they allegedly did so is unnecessary to resolve the instant motion.[2]  Suffice it to say that the Government alleges Defendants obtained these contracts by, *inter alia*, impermissibly affiliating with other entities.  One of these entities allegedly was Davis's company, Elstner Construction.  (Doc. 1, ¶ 40.)  Another allegedly was—although not referenced in the indictment—Alan Smallwood Excavating ("ASE").  (Doc. 75, p. 15.)[3]  In total, Defendants allegedly obtained five 8(a) Program contracts from the Letterkenny Army Depot between 2007 and 2009, collectively worth $85.5 million.  (Doc. 1, ¶ 69.)  Boone, McGuire, and Lauer allegedly obtained one SDVOSB Program contract from the Salem VA Medical Center in 2013, worth $5.3 million.  (*Id.* ¶ 88.).

Defendants filed a motion to dismiss the indictment on the basis that the Government wrongly and prejudicially delayed initiating this case.  (Doc. 119.)  Defendants contend that the Government's investigation of their conduct began in 2011.  (Doc. 120, p. 6.)  Around that time, the Small Business Administration's Office of Inspector General started a two-year investigation into Defendants'

---

[1] To be clear, Davis is not alleged to have had any involvement in obtaining SDVOSB Program contracts.

[2] The court has previously recounted the alleged scheme.  *E.g.*, *United States v. Boone*, No. 22-cr-00426, 2025 WL 3530078, at *1–3 (M.D. Pa. Dec. 9, 2025).

[3] For ease of reference, the court uses the page numbers from the CM/ECF header.

alleged 8(a) Program dealings.  (*Id.* at 6–7.)  Subsequent investigations ensued between 2013 and 2022, conducted by the United States Attorney's Offices in the Western District of Pennsylvania and Middle District of Pennsylvania, respectively.  (*Id.* at 7–9.)  Nevertheless, the Government did not bring the indictment until 2022.  (Doc. 1.)  This delay, according to Defendants, resulted in the loss of exculpatory evidence.  (*Id.* at 28–31.)

An evidentiary hearing on Defendants' motion is currently scheduled for May 26–28, 2026.  (Doc. 209.)  In connection therewith, the Government issued a subpoena *ad testificandum* to attorney J.M., commanding him to appear at the evidentiary hearing.[4]  (Doc. 210-1.)  J.M. represented Boone's company Bon Secour Management ("BSM") when it faced a challenge to its SDVOSB Program eligibility in 2013 ("2013 Status Protest").  The 2013 Status Protest arose after BSM obtained an SDVOSB Program contract from the Coatesville VA Medical Center.  (*See* Doc. 75-1, p. 6.)  There are no allegations in the indictment about this contract or this Status Protest.  A competing bidder on that project lodged a protest with the U.S. Department of Veterans Affairs and the Small Business Administration.  (*See id.*)  In short, the protestor claimed that BSM was ineligible

---

[4] The parties have previously referred to J.M. by his initials since "[i]t remain[ed] unclear" whether he engaged in misconduct.  (Doc. 75, p. 5 n.2.)  The court will continue this practice here.

3

to participate in the SDVOSB Program due to an impermissible affiliation with ASE. (*Id.* at 6.) J.M. drafted BSM's response to the 2013 Status Protest ("2013 Response"), which denied that BSM and ASE had any disqualifying affiliation. (*See* Doc. 75-2.)

The Government has proffered that it intends to ask J.M. about the 2013 Response at the May evidentiary hearing. (*See* Doc. 210-2, pp. 2–5.) Specifically, the Government identified eight topics in a January 6, 2026, email to opposing counsel. (*See id.*) The first five topics concern the state of mind or knowledge J.M. had when he drafted the 2013 Response. The first topic is whether J.M. knowingly made false statements or representations in the 2013 Response. (*See id.* at 2.) The second topic is whether J.M. had seen a 2007 letter from ASE that granted Boone, McGuire, and Lauer an "assignment of authority" over a contract from Letterkenny Army Depot and "pledged not 'to interfere with any facet of their operations.'" (*See id.*) The third topic is whether J.M. had seen a similar "assignment of authority" letter from Elstner Construction involving a contract that entity received from Letterkenny Army Depot. (*See id.* at 3.) The fourth topic is whether J.M. had seen an indemnity agreement between ASE and Boone, McGuire, and Lauer. (*See id.*) The fifth topic is whether J.M. had seen a similar indemnity agreement between Elstner Construction and Boone, McGuire, and Lauer. (*See id.* at 4.) The remaining topics concern whether—after having the

4

chance to review some of the aforementioned documents—J.M. stands by three representations he made in the 2013 Response. (*See id.* at 4–5.) Those representations are that (1) ASE and BSM never entered a teaming agreement; (2) BSM does not influence or control ASE's business decisions; and (3) ASE and BSM do not provide financial support to each other. (*See id.*)

Defendants, BSM, and J.M. (collectively, "Movants") move to quash the Government's subpoena.[5] (Docs. 199.) On January 27, 2026, Defendants and BSM submitted a brief in support of their motion. (Doc. 210.) The Government timely submitted a brief in opposition to Defendants' and BSM's brief on February 11, 2026. (Doc. 215.) Defendants and BSM responded with a reply brief on March 20, 2026.[6] (Doc. 239.) On March 13, 2026, J.M. timely filed a brief in support of the motion to quash. (Doc. 227.) Rather than respond to J.M.'s brief, the Government filed a motion for oral argument or, in the alternative, leave to file a consolidated response to J.M.'s brief in support and the other Movants' reply

---

[5] The court previously granted BSM leave to intervene so that it could protect its asserted attorney-client and work-product privileges. (Doc. 87.) The court granted J.M. leave to intervene to respond to the subpoena. (Doc. 217.)

[6] The Government seemingly faults Defendants and BSM for incorporating by reference arguments made in previous briefing. (*See* Doc. 215, p. 26.) Under Local Rule 7.8, "[n]o brief may incorporate all or any portion of any other brief." L.R. 7.8(a). Nevertheless, incorporation by reference can be useful and efficient in this case given the voluminous record. The court, therefore, will henceforth permit briefs in this case to incorporate by reference previously made arguments with specific citation by reference to CM/ECF document number and pagination.

brief. (Doc. 244.) Defendants and BSM filed a response to the Government's

motion on March 30, 2026. (Doc. 247.) Both motions are ripe for adjudication.

## STANDARD OF REVIEW

Federal Rule of Criminal Procedure 17 authorizes the issuance of both

subpoenas *ad testificandum*, Fed. R. Crim. P. 17(a), and subpoenas *duces tecum*,

Fed. R Crim. P. 17(c). It does not, however, explicitly contemplate a court's

power to quash both types of subpoenas. Only Rule 17(c)—which governs

subpoenas *duces tecum*—has an explicit provision permitting a court to quash a

subpoena. Fed. R. Crim. P. 17(c)(2). The rule is silent as to the court's power to

quash subpoenas *ad testificandum*. Nevertheless, "courts routinely have

entertained motions" to quash such subpoenas. *Stern v. U.S. Dist. Court for the

Dist. of Mass.*, 214 F.3d 4, 17 (1st Cir. 2000); *see United States v. Bebris*, 4 F.4th

551, 559 (7th Cir. 2021); *United States v. Robinson*, No. 3:21-cr-0027-001, 2023

WL 7019109, at *3 (D.V.I. Oct. 25, 2023); *United States v. Riego*, 627 F. Supp. 3d

1254, 1258 (D.N.M. 2022); *United States v. Kumar*, No. 4:17-cr-5-FL-1, 2019 WL

1486365, at *4 (E.D.N.C. Apr. 3, 2019).[7] In doing so, they apply "roughly the

---

[7] The court recognizes that certain courts have held that the more prudent course "in ordinary cases," rather than entertain a motion to quash, "is to require the witness to appear and claim any privilege or immunity he may have." 2 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 274 (4th ed. Apr. 2026 update); *accord United States v. Alexander*, No. 24-cr-676, 2026 WL 292913, at *1 (S.D.N.Y. Feb. 4, 2026); *United States v. Vaughan*, No. 4:22-cr-00162, 2025 WL 77382, at *6 (E.D. Tex. Jan. 10, 2025). Similarly, at least one court in this circuit has questioned a district court's power to quash subpoenas *ad testificandum*. *Baylson v. Disciplinary Bd. of the Supreme Court of Pa.*, 764 F. Supp. 328, 347 (E.D. Pa. 1991). In this

same standard" that governs motions to quash subpoenas *duces tecum*. *Stern*, 214 F.3d at 17.

This means that quashal is warranted if a subpoena *ad testificandum* is "unreasonable or oppressive." Fed. R. Crim. P. 17(c)(2). Such a standard is met when the subpoena seeks irrelevant testimony. *See Bebris*, 4 F.4th at 559 ("Where the sought testimony is cumulative or immaterial, a court does not abuse its discretion by quashing a Rule 17(a) subpoena."); *Stern*, 214 F.3d at 17 (explaining that "a subpoena ad testificandum survives scrutiny if the party serving it can show that the testimony sought is both relevant and material"). It is also met if the subpoena seeks testimony implicating privileged information. *Cf. In re Grand Jury, John Doe No. G.J.2005-2*, 478 F.3d 581, 585 (4th Cir. 2007) ("Rule 17(c) offers a vehicle for a subpoenaed party to assert a constitutional, statutory, or common-law privilege."); *In re Impounded*, 241 F.3d 308, 316 (3d Cir. 2001) (suggesting that Rule 17(c) gives a court authority "to rule on whether the lawyer's testimony was protected under the attorney-client privilege.").

---

matter, the court has no concern entertaining Movants' motion. For one, the Government has made no argument that this court lacks the authority to quash a Rule 17(a) subpoena. Moreover, the parties have extensively briefed the legal issues surrounding J.M.'s testimony. Deferring ruling would simply be a waste of spent resources. In future cases, of course, different circumstances might counsel different outcomes.

## DISCUSSION

Movants argue that the Government's subpoena should be quashed because it seeks testimony that is irrelevant and protected by the attorney-client and work-product privileges. The Government contests both points. Much of the Government's brief argues why the attorney-client privilege does not apply. (Doc. 215, pp. 7–40.) While the Government raises interesting privilege issues, the court need not grapple with them here. Instead, the court can begin and end its analysis with relevance, because the Government has not shown that J.M.'s anticipated testimony is relevant to Defendants' motion to dismiss based on prejudicial delay.

### A. Relevance

Evidence is relevant when "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. The Government proffers two theories as to why J.M.'s testimony satisfies this framework: the good-faith theory and the obstruction theory. Both theories rely on the Government's expectation that J.M.'s testimony will show that Defendants (1) lied to the Government during the 2013 Status Protest; and (2) "used [J.M.'s] services to effect those lies, including by concealing material information from [J.M.]." (Doc. 215, p. 43.)

8

### 1. Good-Faith Theory

The Government's good-faith theory posits that J.M.'s anticipated testimony will reveal Defendants did not act in good faith during their pre-indictment dealings with the Government.  (*See* Doc. 215, pp. 41–44.)  In the Government's view, Defendants made their own good faith "the centerpiece of their . . . motion to dismiss."  (*Id.* at 42.)  As such, the Government contends the motion must fail if the Government can show that Defendants did not act in good faith.  This position fails to appreciate what is actually at issue in Defendant's motion to dismiss.  A brief summary is in order.

Our criminal justice system protects defendants against impermissible delays.  The Sixth Amendment's Speedy Trial Clause is the primary protection for those formally charged or actually restrained.  *United States v. Marion*, 404 U.S. 307, 320 (1971).  For those not yet charged, statutes of limitations are "the primary guarantee" against "prosecutorial delay" and the initiation of "overly stale criminal charges."  *United States v. Lovasco*, 431 U.S. 783, 789 (1977) (quoting *Marion*, 404 U.S. at 322).  Yet still, the Fifth Amendment's Due Process Clause "has a limited role to play in protecting against oppressive [pre-indictment] delay."  *Id.*

To prevail on such a due process claim, a defendant must show: "(1) that the government intentionally delayed bringing the indictment in order to gain some advantage over him, and that (2) this intentional delay caused the defendant actual

prejudice." *United States v. Ismaili*, 828 F.2d 153, 167 (3d Cir. 1987); *accord United States v. Staton*, 605 F. App'x 110, 113 (3d Cir. 2015); *United States v. Roland*, 545 F. App'x 108, 115 (3d Cir. 2013); *United States v. Beckett*, 208 F.3d 140, 150– 51 (3d Cir. 2000).[8]

Under this framework, it makes little sense for the Government to claim that Defendants' own good faith is the "centerpiece" of their motion to dismiss. Defendants need not prove good faith. Yes, Defendants and BSM used the phrase "good faith" in their briefing. Each mention, however, is in reference to exculpatory evidence they claim is lost due to the Government's delay. (*See* Doc. 120, pp. 11, 17, 19, 23, 29.) Their point is that certain lost evidence showed Defendants acted in good faith and, therefore, did not have the intent to commit the crimes charged. (*See id.* at 28–31.)

It is not clear how J.M.'s anticipated testimony is related to this argument, let alone sufficient to defeat it. J.M. may shed light on whether he saw certain documents in preparing the 2013 Response. (*See* Doc. 210-2, pp. 2–5.) One may be able to infer from his answers that Boone, McGuire, and/or Lauer lied to J.M. or

---

[8] Defendants argue that they need not necessarily show intentional delay. They claim *Lovasco* recognizes that a due process violation can arise from "reckless disregard of circumstances, known to the prosecution, suggesting there existed an appreciable risk that delay would impair the ability to mount an effective defense." (Doc. 120, pp. 25–26 (quoting *Lovasco*, 431 U.S. at 795 n.17).) Whether Defendants are correct is immaterial to the present motion. Thus, the court does not address that argument here and nothing in this opinion should be construed as a determination of this issue.

concealed documents from him.  One may even draw the conclusion that Defendants acted in bad faith.  (*See* Doc. 215, p. 43.)  The Government offers no explanation why that ultimate conclusion is consequential in deciding whether exculpatory evidence was lost.  The court does not see how it can be.  The fact the Government may have some other incriminating evidence—about a contract and Status Protest that are not referenced in the indictment, it should be noted—is entirely unresponsive to whether prejudice resulted from lost exculpatory information.  For this reason, the Government's "good faith" theory of relevance falls short.

### 2.  Obstruction Theory

The Government's obstruction theory posits—as the name suggests—that Boone, McGuire, and Lauer committed obstruction in submitting their allegedly false 2013 Response to the Status Protest.  (Doc. 215, p. 45 (citing 18 U.S.C. § 1505).)  To support this theory, the Government hopes to elicit testimony from J.M. that shows two things.  The first is that Boone, McGuire, and Lauer hid information from J.M.  (*See* Doc. 210-2, pp. 2–4.)  The second is that J.M. is no longer "comfortable" with statements in the 2013 Response after seeing certain documents that he might not have seen in 2013.  (*See id.* at 4–5.)  This latter point is presumably intended to support the Government's position that J.M.'s 2013

statements were false, which Defendants dispute.  (*See* Doc. 215, pp. 44.)  How is any of this relevant to the Defendants' motion to dismiss?

The Government offers two answers.  It first states that "it is entirely conceivable" that a truthful response from J.M. in 2013 "could have informed the ongoing criminal investigation [of ASE]."  (Doc. 215, p. 46.)  This reasoning runs into several issues.  One is that the Government seemingly does not know whether the alleged obstruction had any effect on the investigation of ASE.  It is only "conceivable" that it "could have."  (*Id.*)  Another is that the Government makes no effort to explain how the investigation of ASE had any bearing on the investigation of Defendants or the decision to charge them.  Finally, the Government acknowledges that whether or not J.M.'s response had an effect on the ASE investigation really is beside the point.  As it notes, "[t]he point is not that it necessarily would have informed the investigation."  (*Id.*)

"The point," the Government claims in its second answer, is that the court should consider "[D]efendants' own obstruction and its potential effects."  (*Id.*) Again, the Government equivocates, failing to take a firm position that the alleged obstruction had any actual effects relevant to Defendants' motion to dismiss.  (*See id.*)  This equivocation leaves the impression that the Government is unsure whether the 2013 Response had any effect on its investigation of Defendants. Putting this aside, the Government also fails to explain how these potential effects

are relevant.  The Government seems to believe that the alleged obstruction "had the effect of obstructing and undermining the [G]overnment's knowledge of, and investigation into, their underlying conduct." (Doc. 210-2, p. 5.)  Other than this conclusory statement, the Government has not articulated how the alleged obstruction of the 2013 Status Protest—which involved an entity and contract mentioned nowhere in the indictment—had any effect on its investigation of Defendants—which the Government does not contest began in 2011.  (Doc. 120, pp. 6–7.)  Without such explanation, the court cannot conclude that J.M.'s anticipated testimony is relevant.[9]

### CONCLUSION

For the reasons stated herein, the court will grant Movants' motion to quash. The court will also deny the government's motion for oral argument as moot.  An appropriate order will issue.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Judge
Middle District of Pennsylvania

Dated: April 14, 2026

---

[9] The Government argues J.M.'s testimony will be relevant at trial.  (Doc. 215, pp. 47–48.)  The court need not address that argument now.  The motion to quash only seeks quashal of a subpoena directing J.M. to testify at the May evidentiary hearing.  (*See* Doc. 199.)