FILED
HARRISBURG, PA
AUG 12 2026
PER ______
DEPUTY CLERK

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | CR. NO. 1:22-CR-426 |
| v. | : | |
| | : | (Judge Wilson) |
| **SCOTT E. BOONE,** | : | |
| **DANIEL E. MCGUIRE,** | : | |
| **THOMAS E. LAUER,** | : | (electronically filed) |
| | : | |
| Defendants. | : | |

# SUPERSEDING INDICTMENT

**THE GRAND JURY CHARGES:**

At times material to this Superseding Indictment:

## COUNT 1
18 U.S.C. § 371
(Conspiracy to Commit Major Fraud Against the United States)

### BACKGROUND

1. Defendant, SCOTT E. BOONE, was a resident of Cumberland County, Pennsylvania, in the Middle District of Pennsylvania.

2. Defendant, DANIEL E. MCGUIRE, was a resident of Landisville, Pennsylvania.

3. Defendant, THOMAS E. LAUER, was a resident of Butler, Pennsylvania.

4. 8(A) PROGRAM PARTICIPANT 1 was a resident of Bethel Park, Pennsylvania.

5. GOVERNMENT OFFICIAL 1 worked at Letterkenny Army Depot, near Chambersburg, PA, in the Middle District of Pennsylvania, from on or about April 1978 until on or about May 2018.

6. Letterkenny Army Depot ("Letterkenny") was a U.S. Army facility under the command structure of the U.S. Army Aviation and Missile Command. It was founded in or around 1942. Following the terrorist attacks of September 11, 2001, Letterkenny played a significant role in the maintenance and modification of ground mobility vehicles and missile systems used in U.S. war efforts.

7. From about 1996 until about 2018, GOVERNMENT OFFICIAL 1 was the Chief of the Engineering and Planning Division in the Directorate of Public Works at Letterkenny. In this role, he was responsible for overseeing and managing the real property maintenance and construction work at Letterkenny. During this time period, a large

portion of this work was performed through contracts awarded to private companies, and GOVERNMENT OFFICIAL 1 was also responsible for managing these contracts.

8. SCOTT E. BOONE, DANIEL E. MCGUIRE, and THOMAS E. LAUER were business partners in the field of construction.

9. 8(A) PROGRAM PARTICIPANT 1 was the president of a construction company, 8(A) COMPANY 1, with an address also in Bethel Park, Pennsylvania. 8(A) PROGRAM PARTICIPANT 1 founded 8(A) COMPANY 1 in or around 2000.

10. 8(A) PROGRAM PARTICIPANT 1 and her company, 8(A) COMPANY 1, were participants in the U.S. Small Business Administration's 8(a) Business Development Program ("8(a) Program"). 8(A) COMPANY 1 was also a certified Women-Owned Small Business.

11. The 8(a) Program was designed to help socially and economically disadvantaged entrepreneurs gain access to and succeed in the marketplace for federal government contracts. The 8(a) Program rules stated that the purpose of the 8(a) Business Development Program was to assist eligible small disadvantaged business concerns

compete in the American economy through business development. One of the primary means through which it achieved this goal was by creating reserved federal contracting opportunities for its participants, like the real property maintenance and construction contracts for which GOVERNMENT OFFICIAL 1 had management responsibility. These were known as "small business set-aside" contracts.

12. An 8(a) Program participant was eligible to participate in the Program for a period of nine years from the date of SBA's approval letter certifying its admission to the program. The participant had to maintain its eligibility during its tenure in the Program and had to inform the SBA of any changes that would adversely affect its Program eligibility. A firm that completed its nine-year term of participation in the 8(a) Program was deemed to have graduated from the program.

13. 8(A) COMPANY 1 was certified as a participant in the 8(a) Program, with a nine-year program term that began on or about October 12, 2001.

14. Under 8(a) Program rules, in order to be awarded a small business set-aside contract or an 8(a) contract for general construction

work, an 8(a) Program participant had to agree to perform at least 15% of the cost of the contract with its own employees. Relatedly, to assist the business development of 8(a) Program participants, an 8(a) Program participant actually had to perform certain percentages of work with its own employees, including at least 15% of the work on general construction contracts.

15. In order to enter and remain in the 8(a) Program, a company had to be a small business that was unconditionally owned and controlled by one or more socially and economically disadvantaged individuals who were of good character and citizens of and residing in the United States.

16. 8(A) COMPANY 1, through 8(A) PROGRAM PARTICIPANT 1, submitted annual updates to the SBA. These updates included a certification that the company met certain requirements of the 8(a) Program, including the requirements for unconditional control, good character, and eligibility.

17. Many of the construction contracts awarded by Letterkenny from the late 1990s until the time of GOVERNMENT OFFICIAL 1's

retirement in 2018 were through the 8(a) Program. As a result, the only companies eligible to bid on and win these construction contracts were those that had qualified for entry into the 8(a) Program and continued to meet the eligibility requirements.

18. SCOTT E. BOONE, DANIEL E. MCGUIRE, and THOMAS E. LAUER were not eligible for entry into the 8(a) Program and, consequently, could not bid on and enter 8(a) Program set-aside contracts on their own.

19. Letterkenny's contracting office generally issued construction contracts through a vehicle known as a job order contract ("JOC"). Sometimes these contracts were also referred to, alternatively, as indefinite delivery, indefinite quantity ("IDIQ") contracts or task order contracts.

20. With a JOC, a contract for a specified dollar amount was awarded to a prime contractor, and individual jobs or tasks could then be performed until the entire contract value was used up. A JOC could be either for one year with the possibility of renewal or for a period of several years.

21. GOVERNMENT OFFICIAL 1's office, the Directorate of Public Works ("DPW"), asked the Letterkenny contracting office to authorize JOCs for construction work. Hence, DPW was the "requiring activity" for the contract. These requests were generally made when GOVERNMENT OFFICIAL 1 indicated that another JOC was needed. GOVERNMENT OFFICIAL 1 also developed the scope of work for these JOCs. When DPW, through GOVERNMENT OFFICIAL 1, requested that another JOC be issued, the contracting office generally followed these recommendations.

22. GOVERNMENT OFFICIAL 1 also provided the contracting office names of 8(a) Program participants that he believed the contracting office should consider for these contracts. After being recommended to the contracting office, these companies were then generally invited to submit technical proposals, which included a description of the company, its abilities, its past work experience, and key personnel summaries, which were like résumés.

23. A company interested in a contract also submitted a cost proposal in the form of a coefficient. With a JOC, a coefficient was

generally supposed to account for a contractor's overhead and profits. It represented the markup or multiplier over specified direct cost items that a company proposed to charge for its services. The lower a company's coefficient, the cheaper the company's services were to the entity issuing the contract, in this case Letterkenny Army Depot.

24. Companies placing bids provided their coefficients directly to the contracting office, and these coefficients were generally not included in the information given to GOVERNMENT OFFICIAL 1.

25. GOVERNMENT OFFICIAL 1 was also the assigned contracting officer's representative or "COR" on the construction contracts that were initiated by DPW and issued to 8(a) Program participants. GOVERNMENT OFFICIAL 1's training as a COR instructed him to be "the eyes and ears" of the contracting officers at Letterkenny Army Depot.

26. Until in or around 2008, the construction contracts managed by GOVERNMENT OFFICIAL 1 were non-competitive, direct-award contracts. In other words, Letterkenny Army Depot could select prime contractors for these contracts without a competitive bidding process.

27. When making direct, non-competitive awards for construction contracts, the Letterkenny contracting office relied on GOVERNMENT OFFICIAL 1's recommendations. GOVERNMENT OFFICIAL 1, therefore, had significant input into when the Letterkenny contracting office issued new construction contracts and the parties to whom those contracts were awarded.

28. GOVERNMENT OFFICIAL 1 also had significant input into the dollar amounts associated with the contracts that he managed. Until in or around 2008, the dollar limit on construction JOCs issued by Letterkenny was about $3.5 million. On several occasions between 2007 and 2009, the dollar limit on these contracts was increased following GOVERNMENT OFFICIAL 1's recommendations to the Letterkenny contracting office.

29. SCOTT E. BOONE, DANIEL E. MCGUIRE, and THOMAS E. LAUER became affiliated with several 8(a) Program participants that received 8(a) Program set-aside contracts at Letterkenny with the recommendation of GOVERNMENT OFFICIAL 1, prior to when they formed a relationship with 8(A) PROGRAM PARTICIPANT 1. From

about 2003 until about 2009, the cumulative value of the contracts awarded to these companies was over $40 million. Through these contracts, SCOTT E. BOONE, DANIEL E. MCGUIRE, and THOMAS E. LAUER developed a close working relationship with GOVERNMENT OFFICIAL 1.

30. From about 2007 until about 2014, 8(A) PROGRAM PARTICIPANT 1 was affiliated with SCOTT E. BOONE, DANIEL E. MCGUIRE, and THOMAS E. LAUER. 8(A) COMPANY 1 was awarded construction contracts at Letterkenny Army Depot in 2007, 2008, and 2009. The collective value of its construction contracts was over $70 million, including several non-competitive, direct award JOCs and also a competitive JOC awarded in 2009 that was worth about $60 million. In addition, 8(A) COMPANY 1 received a Letterkenny contract for painting and associated services worth approximately $15 million, also in 2009.

31. In or around 2006, SCOTT E. BOONE founded a company known as Bon Secour Management, LLC. Boone was president of Bon

Secour Management, and the company was headquartered at his home in the Middle District of Pennsylvania.

32. SCOTT E. BOONE, DANIEL E. MCGUIRE, and THOMAS E. LAUER certified Bon Secour Management as a Service-Disabled Veteran Owned Small Business ("SDVOSB") on or about October 2011. This certification was made based on the representation that SCOTT E. BOONE, president of Bon Secour Management, was a service-disabled veteran. As the president of Bon Secour Management, SCOTT E. BOONE had to exercise ownership and control over his company.

33. SDVOSBs were eligible to participate in the SBA's SDVOSB Program. The SDVOSB Program was similar to the 8(a) Program in that qualified entrants were eligible for certain reserved contracting opportunities, such as set-aside contracts. Its purpose was to help veteran-owned businesses in various ways.

34. Like the requirement for 8(a) Program participants, when awarded a prime contract or subcontract through the SDVOSB program, at least 15% of the labor costs associated with that contract had to be spent on the SDVOSB's own employees.

35. DANIEL E. MCGUIRE sought out SDVOSB contracting opportunities for Bon Secour Management and handled paperwork for Bon Secour Management, such as proposals and invoices. When promoting Bon Secour Management, DANIEL E. MCGUIRE encouraged others to contact GOVERNMENT OFFICIAL 1 for a review of the company's past performance.

36. THOMAS E. LAUER was the point of contact for Bon Secour Management in the U.S. Government's System for Award Management, a registry for companies doing business with the federal government, for several years following Bon Secour Management's certification as an SDVOSB. THOMAS E. LAUER also sought out and secured SDVOSB contracting opportunities for Bon Secour Management.

37. Bon Secour Management received several small-business set-aside contracts starting on or about November 2011, including a contract for work on the Letterkenny railroad system, which was signed on or about January 2013 and continued until on or about mid-2018. GOVERNMENT OFFICIAL 1 was the COR for this contract as well.

THE 8(A) PROGRAM CONSPIRACY AND ITS OBJECTS

38. Paragraphs 1 through 37 are incorporated here.

39. From on or about 2003 until on or about 2014, in Franklin County, within the Middle District of Pennsylvania, and elsewhere, the defendants,

**SCOTT E. BOONE,**
**DANIEL E. MCGUIRE**, and
**THOMAS E. LAUER**

did knowingly conspire, confederate, and agree, together and with other persons both known and unknown to the Grand Jury, to commit offenses against the United States and to defraud the United States, that is:

To knowingly and willfully execute a scheme and artifice with the intent to defraud the United States and to obtain money and property by means of false and fraudulent pretenses, representations, promises, and omissions, and by concealment of material facts, in any procurement of property and services as a prime contractor with the United States and as a subcontractor and supplier on a contract in which there was a prime contract with the United States, and the value

of such contract and subcontract, and any constituent part thereof, was $1,000,000 or more, in violation of Title 18, United States Code, Section 1031.

MANNER AND MEANS OF THE CONSPIRACY

40. SCOTT E. BOONE, DANIEL E. MCGUIRE, and THOMAS E. LAUER formed relationships with 8(a) Program participants, including 8(A) PROGRAM PARTICIPANT 1 and her company, 8(A) COMPANY 1.

41. GOVERNMENT OFFICIAL 1 was introduced to 8(A) PROGRAM PARTICIPANT 1 at a meeting that took place at Letterkenny in or around 2007. Around the time of this meeting, 8(A) PROGRAM PARTICIPANT 1 became aware of SCOTT E. BOONE, DANIEL E. MCGUIRE, and THOMAS E. LAUER's longstanding relationship with GOVERNMENT OFFICIAL 1 and their history of relationships with other 8(a) Program participants. Around the time of this meeting, 8(A) COMPANY 1 began receiving 8(a) Program set-aside contracts at Letterkenny.

42. From about 2007 until about 2009, SCOTT E. BOONE, DANIEL E. MCGUIRE, and THOMAS E. LAUER prepared and

submitted proposals for 8(a) Program set-aside construction contracts at Letterkenny under the name of 8(A) COMPANY 1.

43. GOVERNMENT OFFICIAL 1 was responsible for evaluating the technical components of the offers for construction contracts submitted under 8(A) COMPANY 1's name. GOVERNMENT OFFICIAL 1 knew that 8(A) COMPANY 1 was affiliated with SCOTT E. BOONE, DANIEL E. MCGUIRE, and THOMAS E. LAUER. GOVERNMENT OFFICIAL 1 also became familiar with the style of proposal written by DANIEL E. MCGUIRE, which he recognized and knew to be associated with SCOTT E. BOONE, DANIEL E. MCGUIRE, and THOMAS E. LAUER based on the other 8(a) Program participants they were affiliated with.

44. GOVERNMENT OFFICIAL 1 recommended 8(A) COMPANY 1 for selection by the Letterkenny contracting office on the basis of the company's affiliation with SCOTT E. BOONE, DANIEL E. MCGUIRE, and THOMAS E. LAUER.

45. Following GOVERNMENT OFFICIAL 1's recommendations, 8(A) COMPANY 1 was selected for a series of construction contracts

managed by GOVERNMENT OFFICIAL 1, including three non-competitive, direct award contracts—each of which was worth approximately $3 million to $3.5 million—in 2007, 2008, and 2009.

46. Following their initial meeting in or around 2007, neither 8(A) PROGRAM PARTICIPANT 1 nor her company, 8(A) COMPANY 1, had any meaningful presence at Letterkenny. 8(A) PROGRAM PARTICIPANT 1 and her existing employees played no meaningful role in the execution or oversight of contracts that 8(A) COMPANY 1was awarded at Letterkenny. Furthermore, no construction equipment bearing the name of 8(A) COMPANY 1 was present at Letterkenny.

47. SCOTT E. BOONE, DANIEL E. MCGUIRE, and THOMAS E. LAUER ran all of 8(A) COMPANY 1's contracts on a day-to-day basis, including preparing individual job proposals for 8(A) COMPANY 1, supervising subcontractors, and handling paperwork.

48. 8(A) PROGRAM PARTICIPANT 1 had no meaningful input in the amounts paid to vendors, suppliers, and subcontractors. Instead, a bookkeeper working for SCOTT E. BOONE and DANIEL E. MCGUIRE wrote out 8(A) COMPANY 1 checks to these companies when directed to

do so by SCOTT E. BOONE and DANIEL E. MCGUIRE. The bookkeeper then sent these already filled-out checks to 8(A) PROGRAM PARTICIPANT 1, along with invoice copies and prefilled envelopes, so that 8(A) PROGRAM PARTICIPANT 1 could sign and mail payments to these companies.

49. GOVERNMENT OFFICIAL 1 held several hundred site visits on jobs associated with contracts awarded to 8(A) COMPANY 1. SCOTT E. BOONE was a regular attendee at these meetings, as were a couple of his site superintendents. SCOTT E. BOONE and his employees regularly signed into these meetings as employees of 8(A) COMPANY 1. 8(A) PROGRAM PARTICIPANT 1 did not attend these site visits. GOVERNMENT OFFICIAL 1 then prepared a memorandum of the site visit, adopting the representations made by SCOTT E. BOONE and his employees. This memorandum became part of the relevant contract file.

50. SCOTT E. BOONE falsely and fraudulently identified himself as personnel of 8(A) COMPANY 1 on numerous occasions, including on or about December 10, 2007, January 22, 2008, January 20, 2010, January 22, 2010, March 29, 2010, May 27, 2010, and May 2, 2012.

51. For several years starting around 2007, SCOTT E. BOONE, DANIEL E. MCGUIRE, and THOMAS E. LAUER were simultaneously affiliated with both 8(A) COMPANY 1 and another 8(a) Program participant that received contracts managed by GOVERNMENT OFFICIAL 1. The representations made by SCOTT E. BOONE, DANIEL E. MCGUIRE, and THOMAS E. LAUER about which company they were affiliated with depended on which contract a job fell under, but the performance of the work itself was otherwise unaffected by whether it was a job done, on paper, by 8(A) COMPANY 1 or the other 8(a) Program participant.

52. As stated above, on several occasions between 2007 and 2009, the dollar limit on construction contracts managed by GOVERNMENT OFFICIAL 1 was increased. Each time an increase occurred, GOVERNMENT OFFICIAL 1 made a recommendation to the Letterkenny contracting office to increase the dollar limit to a specific amount—first, from $3.5 million to $15 million in or around 2008, then from $15 million to $60 million in or around 2009. The contracting office accepted each of GOVERNMENT OFFICIAL 1's recommendations.

OVERT ACTS IN FURTHERANCE OF THE CONSPIRACY

53. At the meeting in or around 2007 attended by GOVERNMENT OFFICIAL 1, SCOTT E. BOONE, DANIEL E. MCGUIRE, THOMAS E. LAUER, and 8(A) PROGRAM PARTICIPANT 1, it was discussed that 8(A) PROGRAM PARTICIPANT 1 would, if selected for 8(a) Program set-aside construction contracts, also utilize favored subcontractors previously utilized by SCOTT E. BOONE, DANIEL E. MCGUIRE, and THOMAS E. LAUER to perform work on the contracts awarded to her company, 8(A) COMPANY 1.

54. On or about November 15, 2007, 8(A) PROGRAM PARTICIPANT 1 and THOMAS E. LAUER created a business account with account number ending in 2180 at a branch of Dollar Bank located in or around Pittsburgh, PA. On a business account signature card, they listed 8(A) PROGRAM PARTICIPANT 1 as the president of 8(A) COMPANY 1 and THOMAS E. LAUER, falsely, as 8(A) COMPANY 1's "bookkeeper." This account was set up so that both of their signatures were required for each and every check, withdrawal, or transfer. In other words, 8(A) PROGRAM PARTICIPANT 1 was unable to use funds

in this account without the express written approval of THOMAS E. LAUER.

55. On or about November 30, 2007, in Letterkenny Army Depot contract number W911N2-08-D-0013, it was falsely and fraudulently represented and promised that 8(A) COMPANY 1 would "provide all management, supervision, quality control and safety," "provide the proper planning, scheduling, material procurement, and simultaneous management of multiple work crews at various locations," "execute a flow of independent job orders and adjust his craft mix without impacting other contractors or tenant operations, "effectively manage his subcontractors to insure that the government is provided a 'seamless' level of effort on each job order," and "provide the means, manpower and equipment to accept and unload all materials delivered to the sites for work under this contract."

56. In contract number W911N2-08-D-0013, it was also falsely and fraudulently represented and promised that 8(A) COMPANY 1 would "not subcontract the performance of any of the requirements of this subcontract to any lower tier subcontractor without the prior written

approval of the SBA and the designated Contracting Officer of the Government under the terms and conditions of this subcontract."

57. In contract number W911N2-08-D-0013, it was also falsely and fraudulently represented and promised that 8(A) COMPANY 1 would "perform on the site, and with its own organization, work equivalent to at least 50 percent of the total amount of work to be performed under the contract."

58. On or about December 2007, 8(A) PROGRAM PARTICIPANT 1 assigned authority over Contract No. W911N2-08-D-0013, a $3.5 million Letterkenny JOC awarded to her company and signed on or about November 30, 2007, to SCOTT E. BOONE, DANIEL E. MCGUIRE, and THOMAS E. LAUER. 8(A) PROGRAM PARTICIPANT 1 specifically assigned authority to SCOTT E. BOONE, DANIEL E. MCGUIRE, and THOMAS E. LAUER to prepare proposals and negotiate contracts, issue and manage subcontracts, supervise construction, negotiate change orders, control and track project costs, prepare invoices, prepare and issue payments, and execute all documents. 8(A) PROGRAM PARTICIPANT 1 also assigned to them

any other authority required to manage projects. This assignment of authority was memorialized in a letter dated December 6, 2007.

59. Around the same time, 8(A) PROGRAM PARTICIPANT 1 represented that she had established a separate checking account for all projects managed by SCOTT E. BOONE, DANIEL E. MCGUIRE, and THOMAS E. LAUER, with a requirement for dual signatures by her and one of them. 8(A) PROGRAM PARTICIPANT 1 also agreed to transfer any funds for projects managed by SCOTT E. BOONE, DANIEL E. MCGUIRE, and THOMAS E. LAUER into the dual signature checking account and to send all checks to vendors, suppliers, and subcontractors within two days of receipt, after these checks were already written out and signed by either SCOTT E. BOONE, DANIEL E. MCGUIRE, or THOMAS E. LAUER.

60. When assigning authority to SCOTT E. BOONE, DANIEL E. MCGUIRE, and THOMAS E. LAUER on or about December 2007, 8(A) PROGRAM PARTICIPANT 1 also pledged that she would "not interfere with the day-to-day operations" of her own contracts.

61. SCOTT E. BOONE, DANIEL E. MCGUIRE, and THOMAS E. LAUER, and 8(A) PROGRAM PARTICIPANT 1 moved laborers, on paper, onto the payroll of 8(A) COMPANY 1 to make it appear, falsely, as if 8(A) COMPANY 1 was complying with the 8(a) Program requirement that it perform 15% of the cost of a contract with its own employees.

62. SCOTT E. BOONE described this practice of moving employees from one payroll to another to GOVERNMENT OFFICIAL 1. GOVERNMENT OFFICIAL 1 understood this was a violation of the rules and purpose of the 8(a) Program, and yet GOVERNMENT OFFICIAL 1 continued to assist SCOTT E. BOONE, DANIEL E. MCGUIRE, THOMAS E. LAUER, and 8(A) PROGRAM PARTICIPANT 1 in securing construction contracts that he managed.

63. A number of the employees that were moved onto 8(A) COMPANY 1's payroll came from the favored subcontractors long utilized by SCOTT E. BOONE, DANIEL E. MCGUIRE, and THOMAS E. LAUER to perform work at Letterkenny. Despite the movement of these employees to 8(A) COMPANY 1's payroll, the employees' roles

remained unchanged. They had no interaction with 8(A) PROGRAM PARTICIPANT 1 or her existing employees, and instead they continued to report to the subcontracting companies from which they came.

64. On or about May 22, 2008, in Letterkenny Army Depot contract number W911N2-09-D-0019, it was falsely and fraudulently represented and promised that 8(A) COMPANY 1 would "provide all management, supervision, quality control and safety," "provide the proper planning, scheduling, material procurement, and simultaneous management of multiple work crews at various locations," "execute a flow of independent job orders and adjust his craft mix without impacting other contractors or tenant operations, "effectively manage his subcontractors to insure that the government is provided a 'seamless' level of effort on each job order," and "provide the means, manpower and equipment to accept and unload all materials delivered to the sites for work under this contract."

65. In contract number W911N2-09-D-0019, it was also falsely and fraudulently represented and promised that 8(A) COMPANY 1 would "not subcontract the performance of any of the requirements of this

subcontract to any lower tier subcontractor without the prior written approval of the SBA and the designated Contracting Officer of the Government under the terms and conditions of this subcontract."

66. In contract number W911N2-09-D-0019, it was also falsely and fraudulently represented and promised that 8(A) COMPANY 1 would "perform on the site, and with its own organization, work equivalent to at least 20 percent of the total amount of work to be performed under the contract."

67. On or about March 14, 2009, in Letterkenny Army Depot contract number W911N2-08-D-0052, it was falsely and fraudulently represented and promised that 8(A) COMPANY 1 would "provide all management, supervision, quality control and safety," "provide the proper planning, scheduling, material procurement, and simultaneous management of multiple work crews at various locations," "execute a flow of independent job orders and adjust his craft mix without impacting other contractors or tenant operations, "effectively manage his subcontractors to insure that the government is provided a 'seamless' level of effort on each job order," and "provide the means,

manpower and equipment to accept and unload all materials delivered to the sites for work under this contract."

68. In contract number W911N2-08-D-0052, it was also falsely and fraudulently represented and promised that 8(A) COMPANY 1 would "not subcontract the performance of any of the requirements of this subcontract to any lower tier subcontractor without the prior written approval of the SBA and the designated Contracting Officer of the Government under the terms and conditions of this subcontract."

69. In contract number W911N2-08-D-0052, it was also falsely and fraudulently represented and promised that 8(A) COMPANY 1 would "perform on the site, and with its own organization, work equivalent to at least 50 percent of the total amount of work to be performed under the contract."

70. GOVERNMENT OFFICIAL 1 also recommended 8(A) COMPANY 1 for contracts outside of his area of management on the basis of the company's affiliation with SCOTT E. BOONE, DANIEL E. MCGUIRE, and THOMAS E. LAUER. For instance, in or around 2009, 8(A) COMPANY 1 was awarded Letterkenny Army Depot contract

number W911N2-09-D-0023 for painting and associated services worth approximately $15 million. This contract was managed by a division other than the engineering and planning division, but GOVERNMENT OFFICIAL 1 was asked to evaluate 8(A) COMPANY 1's past performance. GOVERNMENT OFFICIAL 1 described 8(A) COMPANY 1's performance to Letterkenny's contracting office as "excellent," but did not disclose 8(A) PROGRAM PARTICIPANT 1 or 8(A) COMPANY 1's lack of meaningful involvement in contract execution.

71. On or about April 30, 2009, in Letterkenny Army Depot contract number W911N2-09-D-0023, it was falsely and fraudulently represented and promised that 8(A) COMPANY 1 would "perform on the site, and with its own organization, work equivalent to at least 20 percent of the total amount of work to be performed under the contract" and "not subcontract the performance of any of the requirements of this subcontract to any lower tier subcontractor without the prior written approval of the SBA and the cognizant Contracting Officer of the Letterkenny Army Depot." Relatedly, it was falsely and fraudulently represented and promised that 8(A) COMPANY 1 would comply with

"limitations on subcontracting" in a U.S. Government contracting rule that mirrored the requirement specific to small business programs.

72. Several contracts awarded to 8(A) COMPANY 1 required technical proposals to be submitted in order to demonstrate 8(A) COMPANY 1's ability to perform on its contracts. Contract number W911N2-09-D-0023, for instance, required 8(A) COMPANY 1 to "submit, along with their proposals, technical information as follows: a. Narrative description of the contractor's history, including estimated annual value of completed contract work. Plan for maintaining in-house capabilities to complete the work, including description of trade skills and associated numbers of personnel and a general listing of types of contractor owned equipment or leasing agreements for service contract work to be used in this contract" and "e. Listing of subcontractors proposed for use on this contract, to include their area of specialization, skills, and experience. This item shall be accompanied by a narrative outlining the expected extent of subcontracting to be employed throughout the contract and the subcontractors anticipated response time to prime contractor's requirements."

73. On or about March 23, 2009, THOMAS E. LAUER submitted a proposal to Letterkenny Army Depot in response to solicitation W911N2-09-R-0043, which became contract number W911N2-09-D-0023. The technical proposal falsely and fraudulently stated that 8(A) COMPANY 1 "has already established a field office and staff (Superintendents, Quality Assurance/Quality Control Managers, inspectors, etc.) at LEAD."

74. The technical proposal also falsely and fraudulently stated that 8(A) COMPANY 1 "intends to function as a general contractor and subcontract as necessary to complete tasks. Accordingly, 8(A) COMPANY 1's staff is comprised of the managers required to complete and direct subcontractors and subcontracts." Similarly, the technical proposal falsely and fraudulently stated, "8(A) COMPANY 1 will function as a general contractor" and "intends to subcontract the majority of work awarded." When listing the "proven subcontractors" 8(A) COMPANY 1 intended to utilize, the proposal fraudulently omitted and concealed Bon Secour Management, which was, in fact, a separate company responsible for all project management, superintendence, and

QA/QC services. The proposal also fraudulently omitted and concealed that 8(A) COMPANY 1 would subcontract all of the work awarded because a separate company was going to perform all project management, superintendence, and QA/QC services and the only "labor" performed would be from workers being moved onto the 8(A) COMPANY 1 payroll but whose roles would otherwise remain unchanged.

75. The technical proposal also fraudulently omitted and concealed that 8(A) COMPANY 1 was required to use SCOTT E. BOONE, DANIEL E. MCGUIRE, and THOMAS E. LAUER to manage projects for the company at Letterkenny Army Depot.

76. The technical proposal also falsely and fraudulently represented that 8(A) COMPANY 1 had the "experience and capabilities" that it was required to have in order to be a successful offeror due to the knowledge and experience of its "staff," "team," and "personnel." Experience summaries that were submitted in support of this technical proposal falsely and fraudulently represented multiple

people, including SCOTT E. BOONE and DANIEL E. MCGUIRE, as 8(A) COMPANY 1 personnel dating back to 2007.

77. This technical proposal was further supported by additional submissions, including a "TECHNICAL PROPOSAL Addendum" dated March 31, 2009, which THOMAS E. LAUER likewise submitted. This Addendum was submitted in response to the Letterkenny Army Depot Contracting Office's finding that 8(A) COMPANY 1 had not sufficiently provided a "[p]lan for maintaining In-House capabilities to complete the work, including description of trade skills and associated numbers of personnel." Specifically, the finding that was that 8(A) COMPANY 1 "[n]eed[ed] a Plan/Statement addressing use of Prime Contractor employees for 20% of work." 8(A) COMPANY 1 had also not provided a "trade skills description" or "# of personnel."

78. On or about March 31, 2009, THOMAS E. LAUER, when describing 8(A) COMPANY 1's "In House Plan," wrote that the company would employ a list of personnel for this contract, while fraudulently omitting and concealing that these "employees" would be moved from the payroll of favored subcontractors to 8(A) COMPANY 1's payroll.

THOMAS E. LAUER also falsely and fraudulently stated that 8(A) COMPANY 1 "will employ at least 20% of all labor needed for each task. 8(A) COMPANY 1 has the capability to draw from 30 additional employees from our Pittsburgh Office." THOMAS E. LAUER fraudulently omitted and concealed that 8(A) COMPANY 1 did not and could not utilize any employees from its "Pittsburgh Office" for contracts at Letterkenny Army Depot. Finally, regarding "Number of personnel," THOMAS E. LAUER falsely and fraudulently misrepresented 8(A) COMPANY 1's in-house capabilities when he wrote, "8(A) COMPANY 1 has had over 50 personnel employed at various times depending on current tasks and workloads."

79. The 2009 construction JOC that ended up being worth around $60 million, with Letterkenny Army Depot contract number W911N2-09-D-0027, was awarded to 8(A) COMPANY 1 through a competitive bidding process. Prior to the interested parties' submission of best-and-final offers, GOVERNMENT OFFICIAL 1 evaluated the proposals submitted by each of the two offerors, including 8(A) COMPANY 1.

GOVERNMENT OFFICIAL 1 found both proposals to be capable of being made technically acceptable.

80. GOVERNMENT OFFICIAL 1 was aware that the primary determinant of which party got the contract would be the cost coefficient. With this contract, the offerors' coefficient information was included in the package GOVERNMENT OFFICIAL 1 received, but the information was redacted. GOVERNMENT OFFICIAL 1 was, nevertheless, able to see these figures by turning the pages over and looking at them through the back of the sheets on which they were written. GOVERNMENT OFFICIAL 1 therefore gained access to bidding information that he was not supposed to have.

81. Around this same time, SCOTT E. BOONE stopped by GOVERNMENT OFFICIAL 1's office. SCOTT E. BOONE asked GOVERNMENT OFFICIAL 1 whether 8(A) COMPANY 1's bid would be successful. GOVERNMENT OFFICIAL 1 told SCOTT E. BOONE that their coefficient would be fine, signaling that no further revision of that figure would be necessary to win the contract.

82. SCOTT E. BOONE thus solicited confidential information from GOVERNMENT OFFICIAL 1 that GOVERNMENT OFFICIAL 1 was not supposed to have and which SCOTT E. BOONE was not supposed to receive. GOVERNMENT OFFICIAL 1 shared this confidential information.

83. On or about July 27, 2009, in Letterkenny Army Depot contract number W911N2-09-D-0027, it was falsely and fraudulently represented and promised that 8(A) COMPANY 1 would "provide all management, supervision, quality control and safety," "provide the proper planning, scheduling, material procurement, and simultaneous management of multiple work crews at various locations," "execute a flow of independent job orders and adjust his craft mix without impacting other contractors or tenant operations, "effectively manage his subcontractors to insure that the government is provided a 'seamless' level of effort on each job order," and "provide the means, manpower and equipment to accept and unload all materials delivered to the sites for work under this contract."

84. In contract number W911N2-09-D-0027, it was also falsely and fraudulently represented and promised that 8(A) COMPANY 1 would "not subcontract the performance of any of the requirements of this subcontract to any lower tier subcontractor without the prior written approval of the SBA and the designated Contracting Officer of the Government under the terms and conditions of this subcontract."

85. In contract number W911N2-09-D-0027, it was also falsely and fraudulently represented and promised that 8(A) COMPANY 1 would "perform on the site, and with its own organization, work equivalent to at least 10 percent of the total amount of work to be performed under the contract." Relatedly, it was falsely and fraudulently represented and promised that 8(A) COMPANY 1 would comply with "limitations on subcontracting" in a U.S. Government contracting rule that mirrored the requirement specific to small business programs.

86. GOVERNMENT OFFICIAL 1 and SCOTT E. BOONE had a discussion that 8(A) COMPANY 1 would make it appear, falsely, that the company was satisfying this requirement by moving onsite laborers onto 8(A) COMPANY 1's payroll, consistent with prior practice.

87. From on or about July 2009 until on or about May 2013, 8(A) PROGRAM PARTICIPANT 1 received in a Dollar Bank checking account over $70 million in payments from the federal government. 8(A) PROGRAM PARTICIPANT 1 then transferred a similar amount to the Dollar Bank checking account ending in 2180 over which she and THOMAS E. LAUER had dual signature authority. From the account ending in 2180, nearly $9 million was paid to Bon Secour Management, and around $6 million was paid back into the 8(A) COMPANY 1 account from which the funds originally came. Tens of millions of dollars were also paid to subcontractors that had long been performing work for SCOTT E. BOONE, DANIEL E. MCGUIRE, and THOMAS E. LAUER at Letterkenny.

88. On numerous occasions, including on or about June 4, 2010, the bookkeeper working for SCOTT E. BOONE and DANIEL E. MCGUIRE sent by FedEx Express to 8(A) PROGRAM PARTICIPANT 1 a Priority Overnight envelope containing checks that were already made out to various parties, such as vendors, suppliers, and

subcontractors, requiring only the signature of 8(A) PROGRAM PARTICIPANT 1.

89. On or about August 2008, 8(A) COMPANY 1, through 8(A) PROGRAM PARTICIPANT 1, submitted a false and fraudulent certification to the SBA that all information submitted in the company's 8(a) annual update, attachment, and the personal financial statements was true, correct, and accurate. In making this certification, 8(A) PROGRAM PARTICIPANT 1 falsely and fraudulently certified compliance with various 8(a) Program requirements, including the Program's control, good character, and eligibility requirements.

90. 8(A) PROGRAM PARTICIPANT 1 fraudulently omitted and concealed from this annual update either a copy of the December 2007 "assignment of authority" letter in which 8(A) PROGRAM PARTICIPANT 1 gave SCOTT E. BOONE, DANIEL E. MCGUIRE, and THOMAS E. LAUER authority over a contract awarded to her at Letterkenny Army Depot, or any description of the substance of the agreement described in that letter, despite the requirement to inform the SBA of any changes that could adversely affect its Program

eligibility or, if unable to provide such a certification, inform SBA of any changes and provide relevant supporting documentation.

91. On or about January 2009, 8(A) COMPANY 1, through 8(A) PROGRAM PARTICIPANT 1, submitted a false and fraudulent certification to the SBA that all information submitted in the company's 8(a) annual update, attachment, and the personal financial statements was true, correct, and accurate. In making this certification, 8(A) PROGRAM PARTICIPANT 1 again falsely and fraudulently certified compliance with various 8(a) Program requirements, including the Program's control, good character, and eligibility requirements.

92. 8(A) PROGRAM PARTICIPANT 1 again fraudulently omitted and concealed from this annual update either a copy of the December 2007 "assignment of authority" letter in which 8(A) PROGRAM PARTICIPANT 1 gave SCOTT E. BOONE, DANIEL E. MCGUIRE, and THOMAS E. LAUER authority over a contract awarded to her at Letterkenny Army Depot, or any description of the substance of the agreement described in that letter, despite the requirement to inform the SBA of any changes that could adversely affect its Program

eligibility or, if unable to provide such a certification, inform SBA of any changes and provide relevant supporting documentation.

All in violation of Title 18, United States Code, Section 371.

**THE GRAND JURY FURTHER CHARGES:**

**COUNTS 2 THROUGH 6**
18 U.S.C. § 1031
(Major Fraud Against the United States)

93. Paragraphs 1 through 37 and 40 through 92 are incorporated here.

94. From on or about 2007 until on or about 2014, in Franklin County, within the Middle District of Pennsylvania, and elsewhere, the defendants,

**SCOTT E. BOONE,**
**DANIEL E. MCGUIRE**, and
**THOMAS E. LAUER,**

aiding and abetting each other and other persons both known and unknown to the Grand Jury, knowingly and willfully executed and attempted to execute, and willfully participated in, a scheme and artifice with the intent to defraud the United States and to obtain

money and property by means of false and fraudulent pretenses, representations, promises, and omissions, and by concealment of material facts, in any procurement of property and services as a prime contractor with the United States and as a subcontractor and supplier on a contract in which there was a prime contract with the United States, and the value of such contract and subcontract, and any constituent part thereof, was $1,000,000 or more, as described below:

| Count | Contract Signed On or About | Location and Contract Number | Approximate Total Contract Value |
|---|---|---|---|
| 2 | 11/30/2007 | Letterkenny, W911N2-08-D-0013 | $3.5 million |
| 3 | 5/22/2008 | Letterkenny, W911N2-08-D-0052 | $3.5 million |
| 4 | 3/14/2009 | Letterkenny, W911N2-09-D-0019 | $3.5 million |
| 5 | 4/30/2009 | Letterkenny, W911N2-09-D-0023 | $15 million |
| 6 | 7/27/2009 | Letterkenny, W911N2-09-D-0027 | $60 million |

All in violation of Title 18, United States Code, Sections 1031 and 2.

**THE GRAND JURY FURTHER CHARGES:**

**COUNT 7**
18 U.S.C. § 371
(Conspiracy to Commit Major Fraud Against the United States)

BACKGROUND

95. Paragraphs 1 through 37 and 40 through 92 are incorporated here.

96. VA Medical Centers were facilities that provided healthcare services to U.S. military veterans, including many of the services typically associated with hospitals such as surgery, critical care, physical therapy, oncology, and prosthetic care.

97. On or about March 26, 2013, Bon Secour Management, as an SDVOSB, was awarded contract VA246-13-C-0018 to replace the high voltage distribution system at the Salem Veterans Affairs Medical Center in Salem, Virginia.

98. The value of this contract was approximately $5.3 million. Bon Secour Management received its final payment for this contract on or about March 2019.

99. The work for this contract required laborers to be in or around Salem, Virginia, at the site of the VA Medical Center. In addition, the contract required specialized skill in performing electrical work.

100. ELECTRICAL SUBCONTRACTOR 1 was a company focusing on specialized electrical contracting. SCOTT E. BOONE knew the owner of the company.

THE SDVOSB PROGRAM CONSPIRACY AND ITS OBJECTS

101. Paragraphs 1 through 37, 40 through 92, and 96 through 100 are incorporated here.

102. From on or about 2013 until on or about 2019, in Cumberland County, within the Middle District of Pennsylvania, and elsewhere, the defendants,

**SCOTT E. BOONE,**
**DANIEL E. MCGUIRE,** and
**THOMAS E. LAUER,**

did knowingly conspire, confederate, and agree, together and with other persons both known and unknown to the Grand Jury, to commit offenses against the United States and to defraud the United States, that is:

To knowingly and willfully execute a scheme and artifice with the intent to defraud the United States and to obtain money and property by means of false and fraudulent pretenses, representations, promises, and omissions, and by concealment of material facts, in any procurement of property and services as a prime contractor with the United States and as a subcontractor and supplier on a contract in which there was a prime contract with the United States, and the value of such contract and subcontract, and any constituent part thereof, was $1,000,000 or more, in violation of Title 18, United States Code, Section 1031.

MANNER AND MEANS OF THE CONSPIRACY

103. On or about April 2013, Bon Secour Management, through SCOTT E. BOONE as managing member, hired ELECTRICAL SUBCONTRACTOR 1 to perform high voltage electrical work and supporting trade work on contract VA246-13-C-0018 at the Salem VA Medical Center.

104. Bon Secour Management moved individuals who worked for ELECTRICAL SUBCONTRACTOR 1 onto its payroll to make it appear,

falsely, that Bon Secour Management was meeting the requirement for SDVOSBs to perform at least 15% of the labor on its contracts.

OVERT ACTS IN FURTHERANCE OF THE CONSPIRACY

105. On or about March 12, 2013, Bon Secour Management, through SCOTT E. BOONE and one of SCOTT E. BOONE's employees, told the owner of ELECTRICAL SUBCONTRACTOR 1 that Bon Secour Management would receive 4% of the contract value as its "profit," plus an additional $150,000 in "profit from product and material," irrespective of the winning contract bid amount.

106. On or about March 26, 2013, in Salem VA Medical Center contract number VA246-13-C-0018, Bon Secour Management, through SCOTT E. BOONE, falsely and fraudulently represented and promised that "at least 15 percent of the cost of the contract performance incurred for personnel [would] be spent on [Bon Secour Management's] employees."

107. On or about April 2013, Bon Secour Management, through SCOTT E. BOONE, placed a longtime superintendent of ELECTRICAL SUBCONTRACTOR 1 on the Bon Secour Management payroll, knowing

that the superintendent would already be supervising the work performed by ELECTRICAL SUBCONTRACTOR 1. The superintendent continued to report to the owner of ELECTRICAL SUBCONTRACTOR 1.

108. In addition, Bon Secour Management placed on its payroll one or more additional laborers, including a backhoe operator, who had been working for ELECTRICAL SUBCONTRACTOR 1. These laborers likewise continued to report to the same superintendent moved onto the Bon Secour Management payroll and, ultimately, to the owner of ELECTRICAL SUBCONTRACTOR 1

109. ELECTRICAL SUBCONTRACTOR 1's owner told SCOTT E. BOONE how much these employees of ELECTRICAL SUBCONTRACTOR 1 were paid.

110. On or about April 24, 2013, Bon Secour Management submitted a Form 1413 to the Department of Veterans Affairs, which included a "STATEMENT AND ACKNOWLEDGEMENT" signed by both SCOTT E. BOONE and the owner of ELECTRICAL

SUBCONTRACTOR 1 acknowledging the prime contractor/subcontractor relationship between the two companies.

111. On or about April 25, 2013, Bon Secour Management submitted to the Department of Veterans Affairs' acquisition office in Salem, Virginia a "Letter of Superintendent Designation," signed by both SCOTT E. BOONE and the superintendent he had just hired. SCOTT E. BOONE gave the superintendent "authority and responsibility to act on behalf of Bon Secour Management, LLC on all matters regarding VA246-13-C-0018, Replace High Voltage Distribution System." SCOTT E. BOONE wrote, "As the Project Superintendent, you will be responsible for all personnel on site and will be present at all times when work is being completed on the above referenced contract." The letter was provided to the Department of Veterans Affairs.

112. SCOTT E. BOONE also submitted to the Department of Veterans Affairs a list of personnel that Bon Secour Management intended to have work on the site. This list included the personnel moved onto the Bon Secour Management payroll from the payroll of

ELECTRICAL SUBCONTRACTOR 1. It did not include individuals who had previously worked for Bon Secour Management.

113. Bon Secour Management, through SCOTT E. BOONE, fraudulently omitted and concealed that the superintendent and other laborers were moved onto the payroll of Bon Secour Management for the purpose of satisfying the company's self-performance requirement under the SDVOSB Program, as reflected in the contract terms.

All in violation of Title 18, United States Code, Section 371.

**THE GRAND JURY FURTHER CHARGES:**

**COUNT 8**
18 U.S.C. § 1031
(Major Fraud Against the United States)

114. Paragraphs 1 through 37, 40 through 92, 96 through 100, and 103 through 113 are incorporated here.

115. From on or about 2013 until on or about 2019, in Cumberland County, within the Middle District of Pennsylvania, and elsewhere, the defendants,

**SCOTT E. BOONE,**
**DANIEL E. MCGUIRE,** and
**THOMAS E. LAUER,**

aiding and abetting each other and other persons both known and unknown to the Grand Jury, knowingly and willfully executed and attempted to execute, and willfully participated in, a scheme and artifice with the intent to defraud the United States and to obtain money and property by means of false and fraudulent pretenses, representations, promises, and omissions, and by concealment of material facts, in any procurement of property and services as a prime contractor with the United States and as a subcontractor and supplier on a contract in which there was a prime contract with the United States, and the value of such contract and subcontract, and any constituent part thereof, was $1,000,000 or more, as described below:

| Count | Contract Signed On or About | Location and Contract Number | Approximate Total Contract Value |
|---|---|---|---|
| 8 | 3/26/2013 | Salem VA Medical Center, VA246-13-C-0018 | $5.3 million |

All in violation of Title 18, United States Code, Sections 1031 and 2.

**THE GRAND JURY FINDS PROBABLE CAUSE:**

FORFEITURE ALLEGATIONS

116. The allegations contained in Counts 1 through 8 of this Superseding Indictment are hereby re-alleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 981(a)(1), Title 28, United States Code, Section 2461(c), and Title 18, United States Code, Section 982.

117. Upon conviction of an offense set forth in Counts 1 through 6 of this Superseding Indictment, the defendants,

**SCOTT E. BOONE,**
**DANIEL E. MCGUIRE,** and
**THOMAS E. LAUER,**

shall forfeit to the United States pursuant to Title 18, United States Code, Section 982(a), any property real or personal that constitutes, is derived from, or is traceable to the proceeds obtained directly or indirectly from the commission of the offense of which the person is convicted; or that is used to commit, facilitate, or promote, or is intended to be used to commit, facilitate, or promote, the commission of the offense of which the

person is convicted. The property to be forfeited includes, but is not limited to, the following:

a. Approximately $85,000,000;

118. Furthermore, upon conviction of an offense set forth in Counts 7 through 8 of this Superseding Indictment, the defendants,

**SCOTT E. BOONE,**
**DANIEL E. MCGUIRE,** and
**THOMAS E. LAUER,**

shall forfeit to the United States pursuant to Title 18, United States Code, Section 982(a), any property real or personal that constitutes, is derived from, or is traceable to the proceeds obtained directly or indirectly from the commission of the offense of which the person is convicted; or that is used to commit, facilitate, or promote, or is intended to be used to commit, facilitate, or promote, the commission of the offense of which the person is convicted. The property to be forfeited includes, but is not limited to, the following:

b. Approximately $5,300,000;

119. If any of the property described above, as a result of any act or omission of the Defendant:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

All pursuant to 18 U.S.C. § 982(a)(1) and 982(b); Title 21, United

States Code, Section 853(p); and Title 28, United States Code, Section 2461(c).

A TRUE BILL

BRIAN D. MILLER
United States Attorney

[redacted]
FOREPERSON

RAVI ROMEL SHARMA
Assistant United States Attorney

8/12/26
Date