**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Crim. No. 1:22-CV-00426 |
| | : | |
| v. | : | |
| | : | |
| SCOTT E. BOONE, *et al.* | : | Judge Jennifer P. Wilson |

**MEMORANDUM**

Defendants Scott Boone ("Boone"), Daniel McGuire ("McGuire"), and Thomas Lauer ("Lauer") (collectively, "Defendants") stand accused of major fraud against the United States and conspiracy to commit the same. They have moved to dismiss the indictment under the Fifth Amendment's Due Process Clause.[1] They claim that the Government violated their due process rights by prejudicially delaying the initiation of this prosecution. Defendants' motion, however, applies

[1] The Government filed a superseding indictment on August 12, 2026. (Doc. 340.) The superseding indictment adds no new charges and instead, as the Government explains, includes additional factual details that are consistent with those explicated in the Government's previously filed amended bill of particulars. (Doc. 343, p. 2.) In general, "a superseding indictment does not have an effect on the pretrial motions filed on the original indictment 'unless the district court has ruled that the superseding indictment moots the pending motions.'" *United States v. Jason*, No. 24-cr-358, 2026 WL 1230211, at *1 n.1 (E.D. Pa. May 4, 2026) (quoting *United States v. Bazuaye*, No. 03-cr-12, 2004 WL 784835, *5 (S.D.N.Y. Apr. 12, 2004)). A pretrial motion may become moot when a superseding indictment "'change[s] the circumstances surrounding' such motions." *Id.* (quoting *United States v. Zuniga*, No. 2:18-cr-00224, 2020 WL 1516970, at *3 (D.N.J. Mar. 30, 2020)). Here, the court finds no changed circumstances that would moot the pending motion to dismiss, so it is appropriate to resolve the motion notwithstanding the filing of the superseding indictment. *See id.*; *United States v. Harvey*, No. 2:12-cr-113, 2014 WL 657595, at *1 (W.D. Pa. Feb. 20, 2014) ("[B]ecause the Superseding Indictment re-asserts many of the charges in the original Indictment, the Court will resolve all pending motions."). On a telephone status conference convened this day, the Government concurred with this assessment. Defendants took no position.

an erroneous legal standard to a set of facts that is not borne out by evidence. Under the correct legal standard, the evidence shows that Defendants suffered no due process violation. Therefore, the court will deny Defendants' motion to dismiss.

## FINDINGS OF FACT

Defendants' motion to dismiss is predicated on the notion that five government agencies investigated them for the instantly charged crimes for eleven years before the indictment issued. (*See* Doc. 120, pp. 6–9; Doc. 321, pp. 11–12.)[2] This notion is mistaken. In reality, the Government executed three independent investigations that each focused on separate conduct.

The first investigation was conducted by the Small Business Administration Office of Inspector General ("SBA-OIG") and the Federal Bureau of Investigation ("FBI") in conjunction with the United States Attorney's Office for the Western District of Pennsylvania ("SBA-OIG Investigation"). The SBA-OIG Investigation explored whether Defendant Rebecca Davis ("Elstner")[3] fraudulently attempted to

[2] For ease of reference, the court uses the page numbers from the CM/ECF header.

[3] Rebecca Davis changed her last name twice during the period relevant to this case. At separate times, she was Rebecca Numer and Rebecca Elstner. The court refers to her in this opinion using her former married name of Elstner, because that is the name she used most frequently during the relevant time and so as not to cause confusion with Special Agent Sophia Davis.

reenter the SBA's 8(a) Business Development Program ("8(a) Program") after already having graduated from the program. (Hr'g Tr. 345:1–5.)[4]

The second investigation was conducted by the Defense Criminal Investigative Service ("DCIS") and the Naval Criminal Investigative Service ("NCIS") in conjunction with the United States Attorney's Office for the Western District of Pennsylvania ("Smallwood Investigation"). The Smallwood Investigation examined potential contracting improprieties and "defective pricing" with respect to contracts that Alan Smallwood Excavating, LLC ("ASE") was awarded from Naval Support Activity in Mechanicsburg, Pennsylvania. (Hr'g Tr. 726:21–23, 727:12–13.)

Finally, the third investigation was conducted by the United States Army Criminal Investigation Division ("Army CID") with assistance from SBA-OIG and DCIS, and in conjunction with the United States Attorney's Office for the Middle District of Pennsylvania ("Middle District Investigation"). The Middle District Investigation initially set out to determine whether James Coccagna ("Coccagna"), a contracting officer at Letterkenny Army Depot in Chambersburg, Pennsylvania ("Letterkenny"), and Boone's company, Bon Secour Management ("BSM"), were engaging in contracting improprieties. (*See* Hr'g Tr. 626:11–15, 639:11–15.)

---

[4] Citations to "Hr'g Tr." refer to the transcript of the evidentiary hearing convened on May 26, 27, and 28, 2026. (Docs. 318, 319, 320.)

Eventually, the investigation broadened to examine whether Elstner's organization, Elstner Construction Company ("Elstner Construction"), was being used as a front company by Boone, McGuire, and Lauer to obtain 8(a) Program set-aside contracts. (*See* Hr'g Tr. 248:16–249:3.) This investigation is what ultimately led to the indictment in this case. (*See* Hr'g Tr. 717:2–3, 720:12–22.) Delineating these three investigations is crucial to resolving the instant motion.

**A. SBA-OIG Investigation**

The SBA-OIG Investigation began around 2011 following receipt of an anonymous complaint. (Hr'g Tr. 311:18–22, 333:12.) The investigation was initiated with the approval of Assistant United States Attorney Robert Cessar, a prosecutor in the United States Attorney's Office for the Western District of Pennsylvania. (Def. Ex. 2, p. 1.) The case was then reassigned to two other Assistant United States Attorneys in that office, Paul Skirtich of the civil division and Lee Karl of the criminal division. (Hr'g Tr. 347:19–24.) No other Assistant United States Attorneys were assigned to the case. (*See id.*) The only other governmental agency involved in the SBA-OIG Investigation was the FBI. (*See* Hr'g Tr. 300:14–24.) Neither DCIS nor NCIS was ever involved. (Hr'g Tr. 348:17–22.)

The SBA-OIG Investigation's purpose, for its duration, was "narrowly focused" on determining whether Elstner fraudulently gained admittance to the

8(a) Program for a second time using a second business entity. (Def. Ex. 2, p. 1; *accord* Hr'g Tr. 345:1–5.) That is because, in 1983, Elstner allegedly applied and was admitted to participate in the 8(a) Program with her company Yeso Construction Company. (Def. Ex. 2, p. 2.) Elstner allegedly continued participating in the 8(a) Program until 1988, at which point she "exhausted her eligibility" for the program. (*Id.*) In 2001, Elstner allegedly applied to participate in the 8(a) Program again, this time with Elstner Construction. (*Id.*) In doing so, Elstner allegedly misrepresented that she had never previously participated in the 8(a) Program, *id.*, thus violating the 8(a) Program's one-time eligibility rule. *See generally* 13 C.F.R. § 124.108(b) (detailing the one-time eligibility rule). Elstner allegedly misrepresented that she had never previously participated in the 8(a) Program in a 2009 recertification statement. (Def. Ex. 2, p. 2.)

SBA-OIG Special Agent Sophia Davis ("Special Agent Davis") testified about some of the actions she took to investigate the above allegations. She collected Elstner's 8(a) file from Marisa Fentzel ("Fentzel"), a business development specialist in the SBA Pittsburg District Office. (Def. Ex. 37, p. 1; Hr'g Tr. 306:13–20.) She also conducted several interviews of Fentzel and the deputy district director, Barabara Fisher, in the first few months of 2011. (Def. Exs. 112, 113, 115, 116, 117.) Special Agent Davis also interviewed Elstner.

(Hr'g Tr. 301:6–9.) These investigative actions probed only those topics that concerned Elstner's eligibility for the 8(a) Program. (*See* Hr'g Tr. 320:6–7.)

There is no evidence that SBA-OIG or the FBI investigated any other allegations of criminal conduct involving Defendants, Elstner, or their respective entities during the SBA-OIG Investigation. All evidence, in fact, points to the contrary. The SBA-OIG Investigation did not consider any contracts that Elstner received through the 8(a) Program. (Hr'g Tr. 320:1–7.) So, unsurprisingly, Special Agent Davis never investigated allegations that Elstner Construction was a pass-through entity wrongly obtaining 8(a) Program contracts from Letterkenny. (Hr'g Tr. 345:6–12.) She did not even know that Elstner was performing 8(a) contracts at Letterkenny during the SBA-OIG Investigation. (Hr'g Tr. 319:13–16.) So, too, the SBA-OIG Investigation did not investigate BSM or ASE; these entities, in fact, never even came up during the investigation. (Hr'g Tr. 369:22–370:6.)

As a result, the SBA-OIG Investigation clearly did not investigate the alleged criminal conduct that forms the basis for the instant case. (Hr'g Tr. 345:16–19.) In fact, the SBA-OIG Investigation gave rise to no criminal charges. In 2013, The United States Attorney's Office for the Western District of Pennsylvania declined to prosecute Elstner. (Def. Ex. 2, p. 3.) Two reasons for this decision have been proffered to the court. First, it was determined that the

case could not proceed criminally because "all attempts to recover original and/or critical SBA documents, deemed necessary for criminal prosecution, failed, due to SBA document destruction practices and inconsistent record keeping practices." (*Id.*) Second, Elstner had used her correct name and social security number on her second 8(a) Program application, which made prosecutors think that the likelihood of conviction could be diminished by jurors questioning why the Government did not deny an application with accurate information. (*See* Hr'g Tr. 312:7–21, 388:18–25.) Rather than prosecute Elstner, the government entered into a settlement agreement with her whereby she would pay the United States about $300,212. (Def. Ex. 2, p. 4.) At this point, the SBA-OIG Investigation closed. (*See* Hr'g Tr. 333:12.)

**B. Smallwood Investigation**

Around March 2012, Special Agent David Snyder ("Special Agent Snyder") of NCIS brought an investigation referral involving ASE's contracting activities to Special Agent Jennifer Jezewski ("Special Agent Jezewski") of DCIS. (Hr'g Tr. 726:8–13, 740:9–13.) What ensued was the Smallwood Investigation, which was entirely separate from the SBA-OIG Investigation.

First, the Smallwood Investigation involved different investigating agencies. NCIS and DCIS were the only investigative agencies that worked on the Smallwood Investigation. (Hr'g Tr. 736:16–18.) SBA-OIG was never involved,

Hr'g Tr. 728:11–14, and Special Agent Jezewski never became aware the SBA-OIG and the FBI were conducting the SBA-OIG Investigation, Hr'g Tr. 730:8–15.

Second, the Smallwood Investigation was conducted by different Assistant United States Attorneys in the Western District of Pennsylvania. Investigators presented the Smallwood Investigation to prosecutors in September 2013. (*See* Hr'g Tr. 728:25–729:2.) The case was then initially assigned to Assistant United States Attorney Tonya Goodman. (Hr'g Tr. 729:9–10.) The case was then reassigned to Assistant United States Attorney Leo Dillion ("AUSA Dillion") around March 2014 due to "realignment" in the United States Attorney's Office. (Hr'g Tr. 729:12–15, 730:1–4.) AUSA Dillion retired around September 2016, at which point the investigation was reassigned to Assistant United States Attorney James Wilson. (Hr'g Tr. 732:8–16.) Paul Skirtich, Lee Karl, and Robert Cessar never had any involvement with the Smallwood Investigation. (Hr'g Tr. 730:23–731:15.)

Finally, the Smallwood Investigation inquired into different allegations than the SBA-OIG Investigation. Whereas the latter focused on Elstner's eligibility for the 8(a) Program, the former solely focused on allegations involving ASE's contracts at the Naval Activity Support. (Hr'g Tr. 726:18–23, 727:9–13, 732:17–22.) No evidence suggests that the Smallwood Investigation and the SBA-OIG Investigation ever looked into the same criminal allegations.

Despite its narrow scope, the Smallwood Investigation team learned of information about other alleged criminal conduct during an interview of Alan Smallwood ("Smallwood"), the proprietor of ASE, in early 2015. (Hr'g Tr. 732:23–733:2, 739:4–8.) During that interview, Smallwood told Special Agent Jezewski that BSM managed other 8(a) Program companies, one of which was Elstner Construction. (Hr'g Tr. 733:8–10.) Special Agent Jezewski had never heard of BSM, Elstner, or Elstner Construction prior to that interview. (Hr'g Tr. 742:23–743:12.) She also first learned during this interview the names of BSM's principal, Boone, and his business partners, McGuire and Lauer. (Hr'g Tr. 743:13–20.) Smallwood also shared during his interview that Elstner told him that she felt like BSM was ripping her off. (Hr'g Tr. 733:10–12.)

Following Smallwood's interview, investigators decided to interview Elstner, Hr'g Tr. 733:13–18, in order to learn about her "business relationship" with BSM and "any of its employees," Def. Ex. 46, p. 1. This interview took place in September 2016, Hr'g Tr. 733:18–20, and was memorialized in a contemporaneous memorandum, Def. Ex. 46.

During the interview, Elstner described her relationship with BSM. Around 2006, she got in contact with Lauer, who told her that "we"—individuals unknown to Elstner at the time—were looking for "an 8(a) contractor that does good work, has required bonding, and would be willing to work with them or for them." (*Id.* at

1.) Elstner told Lauer that she was interested in this work. (*Id.* at 2.) So, Lauer set up a meeting between Elstner and himself, Boone, and McGuire. (*Id.*) During that meeting, Elstner reiterated her interest in working with them and expressed a willingness to enter into a business agreement. (*Id.*)

Boone, McGuire, and Lauer reciprocated this interest several weeks later and set up a meeting between themselves, Elstner, and Coccagna in, as Elstner recalled, either 2008 or 2009. (*Id.*) Elstner described Coccagna at that meeting as "extremely direct" and explained to investigators that Coccagna "told [Elstner] exactly how the contracting would work and more so that she would receive the contracts and she would have to use specific sub-contractors" that Coccagna chose. (*Id.*) If she did not follow his terms, Coccagna allegedly said, "he would find another 8(a) contractor to do the work." (*Id.*) Elstner went along with this scheme despite her alleged discomfort with it, and she reported to investigators that she received an Indefinite Delivery Indefinite Quantity ("IDIQ") contract. (*Id.* at 3.) During the interview, Elstner also detailed how BSM and Defendants were allegedly involved in her business operations, including work on her contracts. (*Id.*) In total, Elstner reported receiving approximately $80 million worth of contracts while working with BSM. (*Id.*)

DCIS and NCIS investigators determined that the information Elstner proffered should be shared with Army CID, since it concerned Letterkenny, an

Army installation. (Hr'g Tr. 734:12–19.) Investigators thought it was particularly important to share the fact that a contracting official there might be engaging in contracting improprieties involving high-value contracts. (*See* Hr'g Tr. 734:23–735:3.) Upon receiving this referral, Army CID opened its own investigation—the Middle District Investigation—which was separate and apart from the Smallwood Investigation. (*See* Hr'g Tr. 735:7–12.) Indeed, Army CID never worked on the Smallwood Investigation. (Hr'g Tr. 740:19–641:7.)

The Smallwood Investigation ultimately ended as a result of deconfliction discussions with the Middle District Investigation. (*See* Hr'g Tr. 735:13–16.) Deconfliction is a common law-enforcement practice whereby one investigation closes so as not to impede another. (Hr'g Tr. 736:1–7.) It is essentially a process by which law enforcement agencies ensure they don't "step on each other's toes." (Hr'g Tr. 736:5–7.) Here, the Smallwood Investigation team "was asked to stand down" by the Middle District Investigation team, because the latter had "more promising leads" and was investigating contacts of a "much larger dollar value." (Hr'g Tr. 735:13–16.) Following this deconfliction request, the Smallwood Investigation formally closed. (Hr'g Tr. 735:17–20.)

**C. Middle District Investigation**

As noted above, the Middle District Investigation began once NCIS and DCIS referred information from Elstner's September 2016 interview to Army CID.

That referral was made by Special Agent Snyder to Special Agent Kevin Nolan of Army CID ("Special Agent Nolan") in November 2016. (Hr'g Tr. 623:25–624:2.) During their conversation, Special Agent Snyder informed Special Agent Nolan that a contracting official at Letterkenny might be doing "illegal activities" with BSM. (Hr'g Tr. 623:14–20.) Special Agent Snyder identified the official as Coccagna, but only could give Special Agent Nolan a phonetic spelling of the name. (Hr'g Tr. 626:21–24.) Special Agent Snyder also provided a copy of the Elstner interview memorandum, Hr'g Tr. 624:3–10, which additionally identified Boone, McGuire, and Lauer as individuals potentially involved in illegal conduct, *see* Hr'g Tr. 685:1–12; *accord* Def. Ex. 46. The Elstner interview memorandum was the "universe of information" that Special Agent Nolan and Army CID received from this referral. (Hr'g Tr. 663:8–12.) Special Agent Nolan did not ask for any other investigative materials or files from NCIS or DCIS, because he thought his investigation dealt with separate issues from their investigation. (Hr'g Tr. 665:8–23, 692:12–21.)

**1. November 2016 to January 2017**

Special Agent Nolan then began a new investigation. He opened a "raw data file," *i.e.*, a sort of preliminary informal case file, and began attempting to corroborate the allegations. (Hr'g Tr. 623:21–23, 627:7–11.) As Special Agent Nolan saw it, the "investigative focus" of the Middle District Investigation at this

time was "the dirty contracting officer at Letterkenny" and his relationship with BSM. (Hr'g Tr. 626:11–15, 639:11–15.) Accordingly, Special Agent Nolan spent the first couple months of the Middle District Investigation learning more about Coccagna and the contracts for which he was responsible. He deduced that Coccagna was the person that Elstner told NCIS and DCIS about by searching the Army's email address book for individuals with names that matched the phonetic spelling he had. (Hr'g Tr. 627:1–15.)

Once he identified Coccagna, Special Agent Nolan asked an Army CID analyst to discern the contracts for which Coccagna was the assigned contract officer representative. (Hr'g Tr. 627:25–628:5.) The list the analyst compiled for Special Agent Nolan contained one contract awarded to Elstner, a 2009 job-order contract bearing contract number W911N2-09-D-0027 ("27 Contract").[5] (Hr'g Tr. 628:6–13; *see* Hr'g Tr. 476:16–17.) Special Agent Nolan determined that the 27 Contract was the IDIQ contract that Elstner mentioned in her September 2016 interview. (Hr'g Tr. 630:3–10.) He came to this conclusion because of (1) the timing of the 27 Contract—Elstner recalled meeting with Coccagna at Letterkenny in 2008 or 2009, and the 27 Contract was issued in 2009—and (2) the nature of the 27 Contract—Elstner said she received an IDIQ contract, and the 27 Contract was

[5] A job order contract is a contract to perform certain tasks or projects as needed until the value of the contract has been depleted. (*See* Hr'g Tr. 403:4–22.)

a job-order contact, which is the same as an IDIQ contract. (Hr'g Tr. 629:22–6:30:10.)

With this information in hand, Special Agent Nolan went about obtaining two more categories of preliminary information. First, he and his supervisor met with Letterkenny's contracting office on December 22, 2016, in the hope of obtaining the 27 Contract's file, Hr'g Tr. 631:11–15, which they obtained about a week later after Letterkenny personnel told them it would take some time to box it up, Hr'g Tr. 631:16–20, 632:9–10. Second, in January 2017, Special Agent Nolan requested a comprehensive set of Coccagna's emails from the Defense Information System Agency, which managed the Army's email network at the time. (Hr'g Tr. 632:17–633:9.) He did this in case Coccagna got word of the investigation and started deleting emails. (Hr'g Tr. 632:16–19.) It was also in January 2017 when Special Agent Nolan officially opened this matter in Army CID systems. (Hr'g Tr. 630:23–25.)

**2. February 2017 to October 2017**

In February 2017, Special Agent Nolan deployed with Army CID to Kuwait. (Hr'g Tr. 624:24–625:4.) His responsibilities abroad were the same as his domestic ones, investigating contracting crimes and procurement fraud involving local contractors. (Hr'g Tr. 621:9–12, 625:9–13.) While in Kuwait, Special Agent Nolan was expected to work only on cases there. (Hr'g Tr. 625:23–626:1.)

As a result, the Middle District Investigation was temporarily reassigned to Special Agent William Schelpf of Army CID ("Special Agent Schelpf"). (Hr'g Tr. 634:9–14.) Special Agent Schelpf advanced the Middle District Investigation in Special Agent Nolan's absence. For one, investigators presented the case to the United States Attorney's Office for the Middle District of Pennsylvania, which accepted it in April 2017. (Hr'g Tr. 635:5–10.) No evidence suggests that office's Western District counterpart was ever involved in the Middle District Investigation. Moreover, Special Agent Schelpf collected or attempted to collect additional evidence, including but not necessarily limited to labor records and an image of Coccagna's work computer. (Hr'g Tr. 635:1–5.) He also attempted to interview Elstner, but that interview was repeatedly pushed back at the request of her counsel. (Hr'g Tr. 635:11–23.)

**3. October 2017 to January 2019**

Special Agent Nolan returned from Kuwait in October 2017 and straightaway resumed working on the Middle District Investigation. (Hr'g Tr. 635:24–636:6.) For instance, he interviewed Elstner in November 2017. (Hr'g Tr. 636:3–4.) More investigative actions followed promptly, but now with the assistance of subject matter experts.

Up until this point, Army CID was the only investigative agency running the Middle District Investigation. (*See* Hr'g Tr. 659:3–7.) In January 2018, the

investigation team, recognizing their lack of specialized knowledge in SBA contracting rules and processes, figured that they "needed an expert in the room if [they] were going to pursue this [case]." (Hr'g Tr. 638:18–639:1, 639:21–640:4.) Consequently, Army CID reached out to SBA-OIG, and SBA Special Agent Michael Moffa ("Special Agent Moffa") was assigned to the investigation. (Hr'g Tr. 638:18–20.) Special Agent Moffa subsequently opened the investigation in the SBA-OIG system in 2018. (Hr'g Tr. 250:12–18.) In preparing to join the Middle District Investigation, Special Agent Moffa reviewed Special Agent Davis's investigative file from the SBA-OIG Investigation.[6] (Hr'g Tr. 278:14–20.) He recognized, however, in reviewing these files that the SBA-OIG Investigation dealt with an entirely different subject matter than the Middle District Investigation. (Hr'g Tr. 278:12–279:10.)

With SBA-OIG onboard, the Middle District Investigation team continued moving the investigation forward in 2018. For example, investigators interviewed Elstner for a second time. (Hr'g Tr. 637:23–638:2.) They also interviewed Coccagna; Coccagna's supervisor, Bill Tarman; and the individual in charge of the

[6] At this time, Special Agent Davis—who had become an assistant special agent in charge, overseeing agents in New York and Philadelphia, Hr'g Tr.320:18–23—was Special Agent Moffa's "first-line supervisor," Hr'g Tr. 320:13–15. The two special agents had regular quarterly meetings while the Middle District Investigation was ongoing. (Hr'g Tr. 320:24–321:6.) These meetings may very well have discussed the status of the Middle District Investigation. (*See* Hr'g Tr. 276:17–277:1.) Yet, nothing regarding this working relationship suggests that the SBA-OIG Investigation and the Middle District Investigation were overlapping or related.

job-order contract that succeed Elstner's job-order contract. (Hr'g Tr. 637:19–22, 638:6–12, 719:2–5.) About one month after the Coccagna interview, which occurred in April 2018, investigators attempted to subpoena Coccagna's and Boone's respective personal emails. (Hr'g Tr. 645:13–17, 677:21–25.) Investigators also attempted to obtain the emails of Michelle Fike, Hr'g Tr. 651:16–23, a then-contract specialist at Letterkenny who prepared various documents related to contract solicitations and procurement, Hr'g Tr. 521:15–522:13, 651:6–9.

This investigative progress lost some momentum starting around June 2018, when staffing turnover occurred at Special Agent Nolan's Army CID office. (Hr'g Tr. 646:22–647:8.) That office previously had six agents and territorial responsibilities for all of Pennsylvania, New Jersey, and Delaware. (Hr'g Tr. 634:15–20.) The personnel shakeup in summer 2018 saw Special Agent Nolan's supervisor and three others depart, leaving in the office only Special Agents Nolan and Schelpf. (Hr'g Tr. 647:1–6.) As a result, Special Agent Nolan took over supervisory duties in the office and Special Agent Schelpf "floated 40 cases on his own until" more agents were hired. (Hr'g Tr. 647:1–8.)

### 4. January 2019 to December 2022

Additional hiring occurred in January 2019.[7] (Hr'g Tr. 647:9–11.) At that time, the Middle District Investigation was reassigned to Special Agent Zachary Jackson, and Special Agent Nolan became his supervisor. (Hr'g Tr. 653:15–22.) Several other Army CID special agents were assigned to the Middle District Investigation over time, including Special Agent Schelpf, Special Agent Rob Orsimarsi, and Special Agent Ryan Conner. (Hr'g Tr. 654:3–9.) This turnover can be ascribed to the case agents completing mandatory deployments overseas or mobilizations to other stateside assignments. (Hr'g Tr. 654:13–656:11.)

Despite this moderate discontinuity, there was never a time when the Middle District Investigation was unstaffed by a case agent from Army CID. (Hr'g Tr. 655:23–25.) So, too, there was never a point when an assigned case agent stopped working the Middle District Investigation, Hr'g Tr. 656:12–14, or was told to "stand down" on the investigation, Hr'g Tr. 656:15–17. Special Agent Moffa testified similarly that no such stand-down order was given to him. (Hr'g Tr. 284:21–285:1.) In sum, there is no evidence that the Middle District Investigation ever ceased.

[7] DCIS also joined the Middle District Investigation sometime after January 2019. (See Hr'g Tr. 659:15–22.) The DCIS agent assigned to the investigation was Special Agent T.J. McKenna ("Special Agent McKenna"). No evidence suggests Special Agent Jezewski was ever involved in the Middle District Investigation or that Special Agent McKenna was ever involved in the Smallwood Investigation.

To the contrary, the Middle District Investigation was "a continuous, active investigation," Hr'g Tr. 284:25, between 2019 and its conclusion in 2022. In 2019, investigators obtained five subpoenas for records and completed four investigative interviews. (Doc. 312, p. 2.) In 2020, investigators obtained six subpoenas for records and conducted ten investigative interviews. (*Id.*) In 2021, investigators obtained two subpoenas for records, conducted 19 investigative interviews, and attempted four additional interviews. (*Id.*) In 2022, investigators obtained five subpoenas for records, conducted 12 investigative interviews, and attempted two additional interviews. (*Id.* at 3.) In sum, between 2019 and 2022, investigators obtained 18 subpoenas for records, conducted 45 investigative interviews, and attempted 6 additional interviews. (*Id.* at 2–3.) The result of the Middle District Investigation was the indictment against Defendants in this case. (Hr'g Tr. 717:2–3, 720:12–22.)

## PROCEDURAL HISTORY

On December 14, 2022, a federal grand jury returned an eight-count indictment against Defendants and Elstner, charging six counts of major fraud against the United States, 18 U.S.C. § 1031, and two counts of conspiracy to commit the same, *id.* § 371. (Doc. 1.) A superseding indictment, which alleges the same charges, was returned on August 12, 2026. (Doc. 340). The charges involve two schemes. Counts one through six allege a scheme by which Defendants and

Elstner fraudulently obtained five Letterkenny contracts.[8] (*Id.* ¶¶ 1–94.) Counts seven and eight allege a scheme by which Boone, McGuire, and Lauer fraudulently obtained one contract from the Salem Veterans Affairs Medical Center in Salem, Virginia. (*Id.* ¶¶ 95–115.)

On May 14, 2025, Defendants and Elstner moved to dismiss the indictment on the grounds that the Government prejudicially delayed the initiation of this case in violation of the Due Process Clause.[9] (Doc. 119.) They contemporaneously filed a brief in support of their motion. (Doc. 120.) After the filing of their motion, Elstner pleaded guilty to the charges against her and, thus, withdrew from the motion to dismiss.[10] (Doc. 316.)

---

[8] In the superseding indictment, Elstner is referred to as "8(A) Program Participant 1."

[9] Defendants filed several motions to dismiss. (Docs. 116, 121, 124.) The court resolved those motions separately. (Docs. 173, 174, 192, 193.)

[10] Elstner's plea agreement with the Government contains the following relevant proviso:

> The defendant agrees, at the time of her guilty plea, to withdraw from any motions that she has filed up to and including the date of her guilty plea. . . . The Government agrees that if the remaining defendants' pending motion to dismiss due to alleged preindictment delay, *see* Doc. 119, is granted as to Counts 1 through 6 against every remaining defendant in the [i]ndictment, and, if the Government appeals this ruling and the dismissal of Counts 1 through 6 against every remaining defendant is affirmed on appeal, the Government shall concur in the defendant's motion to withdraw her guilty plea and, if such a motion is granted, move to dismiss the charges against the defendant with prejudice, or, if the defendant has been sentenced or completed any sentence resulting from this conviction, concur in a motion to vacate the defendant's conviction and sentence. If the motion is denied, the remaining defendants appeal, and, on appeal, Counts 1 through 6 against every remaining defendant are dismissed due to preindictment delay, the Government shall concur if the defendant then moves to vacate the conviction and sentence.

(Doc. 303, ¶ 35.)

The court initially scheduled an evidentiary hearing on the motion for September 30, 2025. (Doc. 129, ¶ 2.) The court continued the hearing several times as a result of ongoing document productions from the Government that were necessary to present evidence at the hearing. (Docs. 167 & 186.) The court ultimately convened the evidentiary hearing on May 26, 27, and 28, 2026. Thereafter, the parties had the opportunity to file post-hearing briefing. Defendants filed a supplemental brief in support on June 29, 2026. (Doc. 324.) The Government filed a brief in opposition on July 21, 2026. (Doc. 334.) And, Defendants responded with a reply brief on August 5, 2026. (Doc. 339.) The motion is now ripe for resolution.

## LEGAL STANDARD

The United States Constitution provides protections against impermissible delays in the initiation and prosecution of criminal proceedings. The Sixth Amendment's Speedy Trial Clause is the primary protection for those formally charged or actually restrained. *United States v. Marion*, 404 U.S. 307, 320 (1971). For those not yet charged, statues of limitations are the "primary guarantee" against "prosecutorial delay" and the initiation of "overly stale criminal charges." *United States v. Lovasco*, 431 U.S. 783, 789 (1977) (quoting *Marion*, 404 U.S. at 322). Nevertheless, "the Due Process Clause has a limited role to play in protecting against oppressive [pre-indictment] delay." *Id.*

*Marion* and *Lovasco* are the two seminal Supreme Court cases discussing this due process protection. While both cases stand for the same general proposition—oppressive pre-indictment delay can violate due process—each case offered a slightly different articulation of when such a delay rises to the level of a due process violation.

In *Marion*, the Court explicitly adopted a Government concession that "the Due Process Clause of the Fifth Amendment would require dismissal of the indictment if it were shown at trial that the pre-indictment delay in this case caused substantial prejudice to [defendants'] rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused." 404 U.S. at 324. Ultimately, the Court found no due process violation in that case since the defendants failed to make those necessary showings. *Id.* at 325–26.

*Lovasco* rearticulated *Marion's* fundamental holding. It explained that "proof of prejudice is generally a necessary but not sufficient element of a due process claim." *Lovasco*, 431 U.S. at 790. Thus, according to *Lovasco*, "the due process inquiry must consider the reasons for the delay as well as the prejudice to the accused." *Id.* The thrust of the analysis, the Court elaborated, is to determine whether forcing the defendant to stand trial after the complained-of delay "violates those 'fundamental conceptions of justice which lie at the base of our civil and political institutions' . . . and which define 'the community's sense of fair play and

decency.'" *Id.* (quoting first *Mooney v. Holohan*, 294 U.S. 103, 112 (1935), then *Rochin v. California*, 342 U.S. 165, 173 (1952)). In a footnote, the Court also noted that the Government expanded the concession it made in *Marion* to include additional conduct. *Id.* at 795 n.17. That expanded concession read, "[a] due process violation might also be made out upon a showing of prosecutorial delay incurred in reckless disregard of circumstances, known to the prosecution, suggesting that there existed an appreciable risk that delay would impair the ability to mount an effective defense." *Id.*

Perhaps unsurprisingly, the circuits are split on how to apply *Marion* and *Lovasco* when analyzing the Government's role in pre-indictment delays. Some circuits, seizing on *Lovasco's* articulation of the standard, require defendants simply to show the Government's delay is the result of negligent or reckless disregard of "an appreciable risk that the delay would impair the ability to mount an effective defense," *United States v. Minkkinen*, 168 F.4th 174, 185 (4th Cir. 2026) (quoting *Howell v. Barker*, 904 F.2d 889, 895 n.9 (4th Cir. 1990)), or require the Government, upon a showing of prejudice, to explain why the reasons for its delay do not offend fundamental conceptions of justice, *Tucker v. City of Chicago*, 907 F.3d 487, 493 (7th Cir. 2018), or still yet, require district courts to balance the reasons for the delay against the length of the delay to determine if fundamental

conceptions of justice have been offended, *United States v. Corona-Verbera*, 509 F.3d 1105, 1112 (9th Cir. 2007).

On the other hand, most circuits, tracking *Marion's* articulation of the standard, require defendants to show that the Government intentionally delayed bringing charges in order to gain a tactical advantage. *United States v. Garcia*, 74 F.4th 1073, 1096 (10th Cir. 2023); *United States v. Barragan*, 752 F. App'x 799, 800–01 (11th Cir. 2018); *United States v. Melendez-Gonzalez*, 892 F.3d 9, 15 (1st Cir. 2018); *United States v. Schaffer*, 586 F.3d 414, 424 (6th Cir. 2009); *United States v. Cornielle*, 171 F.3d 748, 752 (2d Cir. 1999); *United States v. Crouch*, 84 F.3d 1497, 1514 (5th Cir. 1996) (en banc); *United States v. Stierwalt*, 16 F.3d 282, 285 (8th Cir. 1994). This approach aligns with the Supreme Court's post-*Lovasco* articulation of the standard. *See United States v. Gouveia*, 467 U.S. 180, 192 (1984) ("[T]he Fifth Amendment requires the dismissal of an indictment, even if it is brought within the statute of limitations, if the defendant can prove that the Government's delay in bringing the indictment was a deliberate device to gain an advantage over him and that it caused him actual prejudice in presenting his defense.").

The parties dispute which test applies here. The Government contends that Defendants must show that it intentionally delayed bringing the instant charges in order to gain a tactical advantage. (Doc. 334, p. 7.) Defendants disagree, arguing

that the court must apply a balancing test similar to those the minority of circuits have adopted. (Doc. 120, pp. 24–28; Doc. 339, pp. 10–11.) Defendants are wrong.

The Third Circuit has been clear for a long time: "To successfully invoke the due process clause, a defendant must prove actual prejudice and intentional delay by the government to gain a tactical advantage." *United States v. Otto*, 742 F.2d 104, 107 (3d Cir. 1984); *accord United States v. Staton*, 605 F. App'x 110, 113 (3d Cir. 2015); *United States v. Roland*, 545 F. App'x 108, 115 (3d Cir. 2013); *Snyder v. Klem*, 438 F. App'x 139, 141 (3d Cir. 2011); *Strohl v. Grace*, 354 F. App'x 650, 654–55 (3d Cir. 2009); *Gov't of V.I. v. Pereira*, 302 F. App'x 72, 77 (3d Cir. 2008); *United States v. Stewart*, 179 F. App'x 814, 816 (3d Cir. 2006); *United States v. Robles*, 129 F. App'x 736, 738 (3d Cir. 2005); *United States v. Beckett*, 208 F.3d 140, 150–51 (3d Cir. 2000); *United States v. Ismaili*, 828 F.2d 153, 168 (3d Cir. 1987); *United States v. Sebetich*, 776 F.2d 412, 430 (3d Cir. 1985). Despite nearly a dozen Third Circuit pronouncements to the contrary, Defendants present several arguments why they need not prove intentional delay. None of them are availing.

First, Defendants contend that the Third Circuit opinion in *Otto* supports their position. (Doc. 339, p. 10.) They read *Otto* to require district courts to balance the reasons for delay against the prejudice the delay caused. (*See id.*; Doc. 120, p. 26.) Defendants rely on two purportedly supportive excerpts in particular.

(Doc. 339, p. 10.) The first is the *Otto* court's statement that proof of prejudice makes a due process claim "ripe for adjudication," at which point the court "must consider the reasons for the delay as well as the prejudice to the accused." 742 F.2d at 107–08 (quoting *Lovasco*, 431 U.S. at 789, 790.) The second is its statement that "no unfairness or procedural inadequacy results by requiring the accused to produce evidence establishing either prejudice or intentional delay before the government must account for the delay." *Id.* at 108. One must consider, though, the context in which these statements appear—*i.e.*, directly after the court concluded both (1) the Government need not "explain its inaction whenever a defendant asserts prejudice stemming from a delayed indictment" and (2) a defendant must prove "actual prejudice *and* intentional delay . . . to gain a tactical advantage." *Id.* at 107 (emphasis added). Considering these conclusions—which Defendants ignore—reveals that Defendants' reading of *Otto* is erroneous and unpersuasive.

Second, Defendants contend that the Supreme Court's decision in *United States v. Doggett*, 505 U.S. 647 (1992), supports their position. (Doc. 339, pp. 14–15; *see* Doc. 120, p. 27.) *Doggett* held that Government negligence leading to an eight-year delay between the defendant's indictment and arrest violated the Speedy Trial Clause. 505 U.S. at 657–58. Defendants fixate on the following passage from *Doggett*: "When the Government's negligence thus causes delay . . . generally

sufficient to trigger judicial review . . . and when the presumption of prejudice, albeit unspecified, is neither extenuated . . . nor persuasively rebutted, the defendant is entitled to relief." *Id.* at 658 (citations and footnotes omitted). They argue that this principle applies with equal force in this case.

Again, context matters. *Doggett* deals with a post-indictment invocation of the Speedy Trial Clause, *id.* at 648, not a pre-indictment invocation of the Due Process Clause. Defendants see no meaningful distinction between these two postures, Doc. 339, p. 15, but they are mistaken. The Supreme Court has recognized "[t]he right to a speedy trial is generically different from any other rights enshrined in the Constitution for the protection of the accused." *Barker v. Wingo*, 407 U.S. 514, 519 (1972). The most important difference is that "the right to [a] speedy trial is a more vague concept than other procedural rights." *Id.* at 521. Because the right is "so slippery," *id.* at 522, the Supreme Court has adopted a four-part balancing test whereby courts must consider the "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Id.* at 530. The *Doggett* Court's ruling came specifically in the context of this balancing test. Nothing in that opinion suggests—contrary to Defendants' position—that its holding applies outside that context. Likewise, Defendants identify no controlling precedent that altered this circuit's due process test in the wake of *Doggett*.

The best Defendants can point to is *United States v. Benjamin*, 816 F. Supp. 373 (D.V.I. 1993). (Doc. 120, pp. 26–27; Doc. 339, pp. 13–14). That court determined that *Doggett* required courts to provide defendants relief under the Due Process Clause when negligent, unreasonable delay caused actual prejudice. *Benajmin*, 816 F. Supp. at 381. Benjamin is unpersuasive for two reasons. To start, at least eight post-*Benjamin* Third Circuit cases have stated only intentional, tactical delay can violate a defendant's due process rights. *Staton*, 605 F. App'x at 113; *Roland*, 545 F. App'x at 115; *Snyder*, 438 F. App'x at 141; *Strohl*, 354 F. App'x at 654–55; *Pereira*, 302 F. App'x at 77; *Stewart*, 179 F. App'x at 816; *Robles*, 129 F. App'x at 738; *Beckett*, 208 F.3d at 150–51. Even putting this insurmountable hurdle aside, this court does not agree with the *Benjamin* court that *Doggett* controls in the due process context of pre-indictment delays.

Finally, Defendants place significant weight on the fact that the Government has conceded in other litigation that delay caused by recklessness is sufficient to violate due process. (Doc. 120, p. 28; Doc. 339, pp. 12–13.) It is true, as Defendants point out, that the Government did make such concessions in *Lovasco*, 431 U.S. at 795 n.17, and *United States v. Newmark*, No. 06-cr-447, 2007 WL 839077, at *6 (E.D. Pa. Mar. 14, 2007). These concessions, however, do not carry the significance that Defendants ascribe to them. Whatever effect a concession of

law has in any particular case[11], "it does not necessarily establish a legal precedent, which, under the rule of *stare decisis*, will control the decision of other unrelated cases." *Art & Antique Dealers League of Am., Inc. v. Seggos*, 121 F.4th 423, 437 (2d Cir. 2024), *cert. denied sub nom. Art & Antique Dealers League of Am., Inc. v. Lefton*, 145 S. Ct. 2732 (2025). The significance of the Government's previous concessions are particularly minimal here where abundant controlling precedent contradicts them.

In sum, this court is bound to apply Third Circuit precedent. That precedent is unambiguous: Defendants' motion will succeed only if they prove (1) "actual prejudice" and (2) "intentional delay by the government to gain a tactical advantage." *Otto*, 742 F.2d at 107. The court next applies this standard to the facts at hand.

## DISCUSSION

The court begins and ends its analysis with considering whether the Government intentionally delayed bringing the indictment to gain a tactical advantage. It did not.

Defendants presented no evidence that suggests any investigator, prosecutor, or agency exhibited such bad faith. They did not even present evidence that the

[11] Generally, "a concession of law is not binding on [a] court." *United States v. Santiago*, 387 F. App'x 223, 226 n.2 (3d Cir. 2010) (quoting *United States v. Marino*, 682 F.2d 449, 455 (3d Cir. 1982)).

investigation leading to this indictment—the Middle District Investigation—took longer than it should have. Instead, Defendants' due process theory is essentially that the Government's investigation took a long time, and during that period, it inadvertently failed to preserve evidence useful to Defendants. (Doc. 324, pp. 45–47.) This plainly is insufficient to warrant dismissal under *Marion*, *Lovasco*, and their Third Circuit progeny. Nevertheless, the court is compelled to set the record straight on both of these points.

As detailed above, the investigation of the alleged crimes at issue in this case did not, as Defendants say, begin in "March 2015," *id.* at 45, or last "over more than a decade," Doc. 339, p. 16. Defendants' position conflates the Middle District Investigation with those that preceded it. Those earlier investigations dealt with entirely separate conduct than the Middle District Investigation, among other differences. The SBA-OIG Investigation's sole focus was whether Elstner wrongly and fraudulently reentered the 8(a) Program. The Smallwood Investigation looked only at alleged contacting improprieties involving ASE and the Naval Support Activity.

The Middle District Investigation began around November 2016. It then operated, as Defendants concede, "without interruption." (Doc. 324, p. 45.) Indeed, the factual recitation above details the continuous investigative steps taken between November 2016 and the December 2022 indictment. Defendants take no

umbrage with this six-year interval and offer no evidence to suggest that it was the result of anything other than a thorough investigation. If the Middle District Investigation was at all less than optimally efficient—which the court does not adopt as a finding—it can be easily attributed to benign circumstances such as Army CID staff turnover.

Defendants' briefing reveals that their complaint is not so much the length of time it took before the Government sought an indictment, but rather the Government's purported failure to preserve evidence helpful to them in the interim. (*See, e.g.*, Doc. 339, p. 16 (complaining that the Government failed to secure evidence).) Again, however, a showing of prejudice alone does not offend due process; prejudice is "a necessary but not sufficient element of a due process claim." *Lovasco*, 431 U.S. at 790. Therefore, Defendants' arguments about prejudice cannot overcome their failure to prove intentional delay.

To be clear, the court takes no position on whether the Government caused Defendants any prejudice. But the court does conclude that if Defendants were prejudiced, there is no evidence that such prejudice was the result of intentional delay, *see Marion*, 404 U.S. at 324, or any other bad faith, *cf. Arizona v. Youngblood*, 488 U.S. 51, 58 (1988) ("[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does

not constitute a denial of due process of law.”). This finding dooms Defendants’ motion.

## CONCLUSION

For the reasons set forth herein, Defendants’ motion to dismiss for prejudicial delay, Doc. 119, will be denied. An appropriate order will issue accordingly.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Court Judge
Middle District of Pennsylvania

Dated: August 17, 2026